Christopher Mixson (NV Bar#10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
c.mixson@kempjones.com

Attorney for Plaintiffs

Roger Flynn, (CO Bar#21078) Pro Hac Vice
Jeffrey C. Parsons (CO Bar#30210), Pro Hac Vice
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Attorneys for Great Basin Resource Watch, Basin and Range Watch, and Wildlands Defense

Talasi B. Brooks (ISB#9712), Pro Hac Vice
Western Watersheds Project
P.O. Box 2863
Boise ID 83714
(208) 336-9077
tbrooks@westernwatersheds.org

Attorney for Western Watersheds Project

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT; et al. | ) | Case No.: 3:21-cv-0103-MMD-CLB |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | PLAINTIFFS' |
| UNITED STATES DEPARTMENT OF THE | ) | MOTION FOR PRELIMINARY |
| INTERIOR; et al. | ) | INJUNCTION and |
| | ) | MEMORANDUM IN |
| | ) | SUPPORT |
| Defendants, | ) | |
| | ) | **ORAL ARGUMENT** |
| LITHIUM NEVADA CORP. | ) | **REQUESTED** |
| | ) | |
| Defendant-Intervenor-Applicant. | ) | |

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

LIST OF EXHIBITS .......................................................................................... viii

INTRODUCTION ................................................................................................ 1

PLAINTIFFS' EFFORTS TO AVOID THE NEED FOR PRELIMINARY RELIEF ................. 4

STANDARDS FOR PRELIMINARY RELIEF ............................................................ 6

ARGUMENT ..................................................................................................... 7

I.      Plaintiffs Are Likely to Succeed on the Merits ........................................ 7

A.      Failure to Comply with the Binding Resource Management Plans
        Under FLPMA .................................................................................... 8

        1.      Violation of RMP and FLPMA Requirements to Protect the
                Greater Sage-Grouse ............................................................... 10

        a.      The RMP established binding standards to protect sage grouse ....... 10

        b.      BLM failed to apply the RMP habitat protection and design standards ..... 12

        c.      BLM failed to ensure mitigation that provides a "net conservation gain"
                to sage grouse .......................................................................... 15

        2.      Violation of RMP Visual Resource Protection Requirements .......... 16

        3.      BLM Cannot Violate the RMPs Based on an Unsupported Belief that
                LNC Has "Valid Existing Rights" under Federal Mining Laws to
                Permanently Occupy Public Lands ............................................. 18

B.      Failure to Prevent "Unnecessary or Undue Degradation" to Protected Wildlife .... 19

C.      Additional Violations of FLPMA and NEPA ............................................. 21

        1.      Failure to Analyze and Ensure Compliance with Water Quality Standards ....... 22

        2.      Failure to Analyze and Ensure Compliance with Air Quality Standards ............ 25

        3.      Failure to Take a Hard Look at Baseline Conditions and Impacts to Wildlife .... 26

        a.      Greater Sage-Grouse .................................................................. 27

        b.      Pronghorn ................................................................................ 27

     c.    *Amphibians* .................................................................................28

     d.    *Springsnails*................................................................................29

     4.    Failure to Adequately Analyze Cumulative Impacts ...........................30

     5.    Failure to Adequately Analyze Mitigation Measures and Their Effectiveness ...33

**II.**   **The Project Will Result in Immediate Irreparable Harm to Wildlife Habitat and Plaintiffs' Interests and Uses** ............................................................35

**III.**  **The Balance of Hardships and Public Interest Tip Sharply in Favor of Plaintiffs**………………………………………………………….........38

**IV.**  **No More Than a Nominal Bond is Appropriate in this Case** ....................................39

## TABLE OF AUTHORITIES

*Federal Caselaw*

Alliance for the Wild Rockies v. Cottrell,
632 F.3d 1127 (9th Cir. 2011) ........................................................................6, 7

Amoco Prod. Co. v. Vill. of Gambell, Alaska,
480 U.S. 531 (1987) ...........................................................................................35

Cal. Ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency,
766 F.2d 1319 (9th Cir. 1985) ...........................................................................39

Center for Biological Diversity v. U.S. Dept. of the Interior,
623 F.3d 633 (9th Cir. 2010) .............................................................................19

Center for Biological Diversity v. U.S. Fish and Wildlife Service,
409 F.Supp.3d 738 (D. Ariz. 2019) ..............................................................18, 19

City of Davis v. Coleman,
521 F.2d 661 (9th Cir. 1975) .............................................................................17

Davis v. Nelson,
329 F.2d 840 (9th Cir. 1964) .............................................................................18

Friends of the Earth v. Brinegar,
518 F.2d 322 (9th Cir. 1975) .............................................................................39

Great Basin Mine Watch v. Hankins,
456 F.3d 955 (9th Cir. 2006) ........................................................................31, 32

Great Basin Resource Watch v. BLM,
844 F.3d 1095 (9th Cir. 2016) ..........................................................24, 30, 31, 32

Idaho Sporting Congress v. Thomas,
137 F.3d 1146 (9th Cir. 1998) ...........................................................................26

L.A. Mem'l Coliseum Comm. v. NFL,
634 F.2d 1197 (9th Cir. 1980) ...........................................................................39

Lara v. Secretary of the Interior,
820 F.2d 1525 (9th Cir. 1987) ...........................................................................18

League of Wilderness Defenders v. Connaughton,
752 F.3d 755 (9th Cir. 2014) .........................................................................6, 39

Mineral Policy Center v. Norton,
292 F.Supp.2d 30 (D.D.C. 2003) ....................................................................9, 19

Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.,
463 U.S. 29 (1983) .......................................................................................19

NRDC v. EPA,
859 F.2d 156 (D.C. Cir. 1988) ......................................................................17

N. Plains v. Surface Transp. Bd.,
668 F.3d 1067 (9th Cir. 2011) ................................................................22, 26

Ocean Advocates v. U.S. Army Corps of Engineers,
402 F.3d 846 (9th Cir. 2005) ..........................................................................7

Or. Nat. Desert Ass'n v. Rose,
921 F.3d 1185 (9th Cir. 2019) ......................................................................25

Or. Nat. Res. Council Fund v. Brong,
492 F.3d 1120 (9th Cir. 2007) ........................................................................8

Republic of the Phil. v. Marcos,
862 F.3d 1355 (9th Cir. 1988) ........................................................................6

Save Our Sonoran v. Flowers,
408 F.3d 1113 (9th Cir. 2005) ......................................................................35

Se. Alaska Conservation Council v. U.S. Army Corps of Engineers,
472 F.3d 1097 (9th Cir. 2006) ......................................................................38

Sierra Club v. Bosworth,
510 F.3d 1016 (9th Cir. 2007) ......................................................................38

South Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior,
588 F.3d 718 (9th Cir. 2009 ...........................................................35, 37, 39

Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,
608 F.3d 592 (9th Cir. 2010) ..................................................................30, 32

U.S. v. Coleman,
390 U.S. 599 (1968) .....................................................................................18

Western Exploration v. U.S. Dept. of the Interior,
250 F.Supp.3d 718 (D. Nev. 2017) .........................9, 10, 11, 12, 15, 16, 20, 21, 25

Western Watersheds Project v. Kraayenbrink,
632 F.3d 472 (9th Cir. 2011) .......................................................................33

<u>Western Watersheds Project v. Schneider</u>,
417 F.Supp.3d 1319 (D. Idaho 2019) ......................................................10

<u>Winter v. Natural Resources Defense Council</u>,
555 U.S. 7 (2008) ....................................................................................6

***Federal Statutes***

Administrative Procedure Act,
5 U.S.C. §§ 704, 706(2) .............................................................................7

Federal Clean Air Act,
42 U.S.C. § 1857 *et seq.* ...........................................................................25

Federal Clean Water Act,
30 U.S.C. § 1151 *et seq.* ...........................................................................22

Fed. Rule. Civ. Pro. 65(c) ..........................................................................39

Federal Land Policy and Management Act ("FLPMA"),
43 U.S.C. §§ 1701 *et seq.* .............................................................*passim*

Mining Law of 1872
30 U.S.C. §22 ....................................................................18, 20, 33

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ............................................................*passim*

Surface Resources and Multiple Use Act of 1955,
30 U.S.C. §611 ......................................................................................19

***Federal Regulations***

40 C.F.R. Part 1500........................................................................21

40 C.F.R. § 1500.1....................................................................21, 22

40 C.F.R. § 1501.2............................................................................21

40 C.F.R. § 1502.2............................................................................22

40 C.F.R. § 1502.5............................................................................21

40 C.F.R. § 1502.9............................................................................33

40 C.F.R. § 1502.14..........................................................................33

40 C.F.R. § 1502.16 ..................................................................................................33

40 C.F.R. § 1503.4(a) ...............................................................................................17

40 C.F.R. § 1508.7 ..............................................................................................22, 30

40 C.F.R. § 1508.8 ....................................................................................................22

40 C.F.R. § 1508.9 ....................................................................................................22

40 C.F.R. § 1508.25 ..................................................................................................22

43 C.F.R. § 1601.0-5(b) ..............................................................................................8

43 C.F.R. § 1601.0-5(c) ..............................................................................................8

43 C.F.R. § 1610.5-3(a) ..............................................................................................8

43 C.F.R. § 3809.5 ................................................................................................8, 20

43 C.F.R. § 3809.411(d)(3)(iii) .................................................................................19

43 C.F.R. § 3809.420 ..............................................................................9, 19, 22, 25

### *Other Authority*

65 Fed. Reg. 69998, 70053 (Nov. 21, 2000) .....................................................20, 33

80 Fed. Reg. 59857-59942 (Oct. 2, 2015) ................................................................11

85 Fed. Reg. 3413-14 (Jan. 21, 2020) .......................................................................17

85 Fed. Reg. 43304-43376 (July 16, 2020) ..............................................................21

BLM, Special Status Species Management Manual, 6840 .........................................21

U.S. Dept. of Justice/BLM Brief in Western Exploration v. U.S. Dept. of the Interior,
250 F. Supp. 3d 718, 747 (D. Nev. 2017),
2016 WL 3413490 ……………………………..……………………………………… 21

**<u>Exhibit List for Plaintiffs' Motion for Preliminary Injunction</u>**

1. BLM Record of Decision (ROD) for Thacker Pass Project.

2. BLM Final Environmental Impact Statement for Thacker Pass Project, Main Body, Chapters 1-6 (FEIS).

3. FEIS Appendix B (LNC Mining Plan of Operations).

4. Nevada Department of Wildlife (NDOW), Letter to BLM on FEIS, Jan. 4, 2021.

5. FEIS Appendix R (Response to Comments).

6. U.S. Interior Dept., Letter to Director, National Economic Council, July 15, 2020.

7. BLM Winnemucca Resource Management Plan (Winnemucca RMP).

8. Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region, 2015 (Great Basin ROD).

9. Nevada and Northeastern California Greater Sage-Grouse Approved RMP Amendment, Attachment 2 to Great Basin ROD, 2015 (ARMPA).

10. U.S. Fish and Wildlife Service, Conservation Objectives Team Report, 2013 (COT Report).

11. FEIS Figures (excerpted from FEIS Appendix A).

12. FEIS Appendix N (discussing Sage Grouse ARMPA).

13. ARMPA Appendix C (Required Design Features).

14. ARMPA Appendix E (Sage Grouse Disturbance Caps).

15. BLM <u>Special Status Species Mgmt. Manual 6840.</u>

16. U.S. Dept. of Justice/BLM Brief in <u>Western Exploration v. U.S. Dept. of the Interior,</u> 250 F. Supp. 3d 718, 747 (D. Nev. 2017).

17. U.S. Environmental Protection Agency (EPA), Letter to BLM on FEIS, Jan. 4, 2021.

18. FEIS Appendix K (air quality).

19. FEIS Appendix H (wildlife).

20. FEIS Appendix G (resource summaries).

21.     BLM Nevada Special Status/Sensitive Species List.

22.     Kings River Pryg Summary Report (excerpt from
        http://docs.springstewardship.org/Springsnails/Springsnail_Summary_Reports_Aug_19_2020
        .pdf (last viewed May 22, 2021).

23.     Conservation Strategy for Springsnails, Prepared for: The Nevada-Utah Springsnail
        Conservation Team, Nevada Department of Wildlife and Utah Division of Wildlife (in
        cooperation with BLM)
        http://docs.springstewardship.org/Springsnails/SpringsnailFinal_26_Aug_2020_Final.pdf
        (last viewed May 22, 2021).

24.     Jindalee Resources, "Drilling Commences at McDermitt Lithium Project," Nov. 16, 2020.

25.     Declaration of Talasi B. Brooks (WWP counsel).

26.     Declaration of John Hadder (GBRW).

27.     Declaration of Kelly Fuller (WWP).

28.     Declaration of Kevin Emmerich (BRW).

29.     Declaration of Katie Fite (WD).

30.     Declaration of Dr. Clait E. Braun.

31.     Declaration of Eric Molvar (WWP).

**INTRODUCTION**

Plaintiffs Western Watersheds Project (WWP), Great Basin Resource Watch (GBRW), Basin and Range Watch (BRW), and Wildlands Defense (WD), submit this Motion for Preliminary Injunction, and Memorandum in support, to enjoin the Thacker Pass Lithium Mine Project (Project/project or Mine/mine), proposed by Lithium Nevada Corporation (LNC) that would be the largest lithium mine in the United States. The Project was fast-tracked for approval by the Defendants Department of the Interior (DOI) and Bureau of Land Management (BLM) just before the end of the previous Administration, and Plaintiffs recently learned that LNC and/or BLM plan to begin ground-disturbing activities as soon as June 23, 2021. Plaintiffs challenge BLM's January 15, 2021 Record of Decision, (ROD)(Exh. 1), approving LNC's two Plans of Operations (PoOs): (1) for the open pit mine, waste dumps, and related operations; and (2) for the "North/South Exploration Project," adjacent to the mine, as well as the Final Environmental Impact Statement (FEIS)(Exh. 2) BLM prepared for the mine and exploration operations, for violations of the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA). *See* FEIS Figure 2-2 (map of Projects)(Exh. 11).

The mine Project alone will be one of the largest open pit mines in the region. It includes an open pit, waste rock storage facilities, a coarse gangue (valueless mineral) stockpile, a large processed tailings waste dump facility, groundwater pumping/dewatering, haul and secondary roads, electrical transmission lines, and additional mine facilities to support mining and lithium processing operations. The mine pit would be roughly 400 feet deep. Approximately 230 million cubic yards (CY) of ore would be mined, and over 190 million CY of waste rock material would be generated during the 41-year mine life. FEIS at 2-4. The height of the West waste rock storage facility (WRSF) would be 482 feet. The total height of the East WRSF would be 208 feet. FEIS at 2-5. The coarse gangue material stockpile (CGS) would be 200 feet tall. FEIS at 2-7. The permanent clay tailings filter stack (CTFS) dump would hold 353.6 million CY of processed waste and be 350 feet high. FEIS at 2-9 to 2-10. Altogether, the Project area covers 17,933 acres of land: 10,468 acres associated with the mine itself and 7,465 acres associated with

the exploration project. The Project would directly disturb 5,695 acres. ROD at 3.

According to LNC, as soon as June 23, 2021, LNC intends to begin "mechanical trenching" operations at seven undisclosed sites with the Project area, each up to "40 meters" long and "a few meters deep." LNC also plans to dig up to 5 feet deep at 20 other undisclosed sites, all pursuant to a new historical/cultural resources plan that has never been subject to NEPA analysis or disclosed to the public. LNC and BLM have been collaborating on this plan for months but have refused to provide a copy to Plaintiffs and BLM has refused to state plainly whether it plans to undertake other surface disturbing activities associated with the Project. *See* Decl. of Talasi B. Brooks ¶ 7 (Exh. 25). Extensive surface disturbance of this nature will immediately disturb or destroy important sagebrush habitats. *See* Decl. of Dr. Clait E. Braun ¶ 30 (Exh. 30).

The ROD also authorizes LNC to commence "waste rock removal and stripping concurrent with process facility construction" (FEIS Appx. B, Mining Plan, at 25)(Exh. 3), "scheduled to begin in 2021" (Id. at 27). The "waste rock removal" involves blasting/excavation of the mine pit and dumping of the millions of tons of rock adjacent to the pit; "stripping" of the ground removes the vegetation. This will eliminate Plaintiffs' recreational uses of these lands and result in immediate, severe, and unmitigated impacts to environmental and cultural resources and protected and special status birds, wildlife, and plants in the Project area, including federally protected species and State of Nevada Species of Conservation Concern and At-Risk species, by permanently destroying irreplaceable habitats and cutting off connectivity between habitats to the north and south.

In its comments to BLM on the FEIS, the Nevada Department of Wildlife (NDOW) was very critical of the Project's impacts to wildlife:

> We continue to find that the Preferred Alternative will likely result in adverse impacts to wildlife, ground and surface waters, and riparian vegetation within and outside the project area. These impacts include effects to an array of species and will likely have permanent ramifications on the area's wildlife and habitat resources.

NDOW January 4, 2021 letter to BLM, at 1 (Exh, 4). NDOW continued:

> Groundwater dependent habitats in the Montana Mountains north of the Project area

2

boundary are critical to greater sage-grouse, Lahontan cutthroat trout, mule deer, pronghorn, and many other wildlife species. Given the arid nature of this region, water sources, riparian vegetation, and wet-meadow habitats are essential to wildlife and the loss or degradation of these areas will have significant negative impacts on wildlife populations. Id.

One directly affected species is the greater sage-grouse, a ground-nesting bird famous for its mating dance performed on breeding grounds called leks. The sage-grouse depends upon sagebrush for all parts of its lifecycle and birds return to the same leks to breed year after year. To stave off the need to list this bird under the federal Endangered Species Act, BLM in 2015 amended land use plans across 67 million acres of sage-grouse habitat to adopt conservation measures for the species and its habitat—including the Winnemucca Resource Management Plan (RMP) that governs the lands here.

Sage-grouse use the Project area, which is adjacent to four leks and contains over 5,000 acres of high-value sage-grouse habitats. But BLM refused to require LNC to adhere to any of these vital protections, based upon the unsupported assumption that the mining company holds "valid existing rights" entitling it to use the entire Project area. And, while the RMP requires an operator to offset any unavoidable impacts through compensatory mitigation that achieves a "net conservation gain" for sage-grouse, BLM approved the Project without *any* such mitigation plan in place. According to NDOW, impacts from Project-related noise alone may cause population-level impacts to sage-grouse by causing them to abandon a critical lek located less than a mile from the Project area.

The Project will also destroy habitats for pronghorn, golden eagles, various amphibians, and springsnails—including the endemic Kings River pyrg—dependent on the riparian areas and springs that will be dewatered or destroyed by the Project, as well as several sensitive plant species. While the FEIS broadly acknowledges impacts to these species, it does not provide adequate information to evaluate their extent and magnitude. For instance, it does not disclose that most of the entire known population of Kings River pyrg may be impacted by the Project's groundwater depletion. Nor does it consider the effects of severing two pronghorn movement corridors in the Project area.

Due to the Project's massive scale and impacts, BLM admitted that the Project will

violate the Winnemucca RMP's Visual Resource Management (VRM) protection standards:

> Overall, **the construction and operation of the Proposed Alternative would not meet the current VRM Class II objectives,** *and would not conform with the existing ROD/RMP* (see Section 1.5.3). The existing character of the landscape would not be retained, and the level of change to the characteristic landscape would be noticeable and likely attract the attention of the casual observer. Overall, the **construction and operation of Alternative A would not meet the current VRM Class II objectives,** *and would not conform with the existing ROD/RMP* (see Section 1.5.3).

FEIS at 4-101 (emphasis added).

The Project will also cause serious groundwater pollution. The FEIS predicts that the

mine pit backfill would cause antimony in the groundwater to exceed the applicable Nevada

water quality standard: "Geochemical modeling results indicate that pore water in backfill will

exceed MCLs [Maximum Contaminant Levels] for longer than 20 pore volumes." FEIS at R-121

(Exh. 5). Because of this predicted groundwater contamination, the BLM should have, but did

not, analyze or require mitigation to prevent the Mine from exceeding the Nevada water quality

standard. This was severely criticized by the U.S. EPA (as detailed below).

Despite the destruction of these irreplaceable public values, DOI/BLM put the Project on

an "expedited" track to "streamline environmental review" and provide for quick approval by the

Trump Administration. *See* July 15, 2020 letter from Katharine Sinclair Macgregor, Interior

Department to Larry Kudlow, Director of the National Economic Council. (Exh. 6). In the rush

to implement the Project, BLM downplayed or ignored the mine's serious environmental impacts

and violated federal environmental statutes including the Federal Land Policy Management Act

(FLPMA), 43 U.S.C. §§1701 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C.

§§4321 *et. seq.*, and their implementing regulations and policies.

### PLAINTIFFS' EFFORTS TO AVOID THE NEED FOR PRELIMINARY RELIEF

Shortly after the filing the Complaint in this matter, Plaintiffs informed counsel for BLM

and LNC that Plaintiffs intended on filing a Motion for Temporary Restraining Order (TRO) or

Preliminary Injunction to enjoin any ground disturbance and operations at the site. The parties

participated in discussions including a video conference call on March 25, 2021 and numerous

email communications up to the last week discussing ways to avoid the need for such a motion. Brooks Decl. ¶¶ 3-4 (Exh. 25). During the March 25, 2021 call, LNC informed Plaintiffs and Federal Defendants that LNC did not anticipate conducting operations associated with the Thacker Pass Project for six to seven months. Id. ¶ 5. The parties discussed a stipulation where BLM and LNC would commit to no surface-disturbing activities at the Project site until Plaintiffs' case could be heard on the merits. Id. ¶¶ 3-4. To date, ground disturbance has not commenced at the Project site. However, on April 28, 2021, LNC CEO Alexei Zawadzki published an opinion piece in the Sierra Nevada Ally stating that LNC is on "the cusp of construction." See Decl. of John Hadder ¶ 18 (Exh. 26).

During these negotiations, Plaintiffs repeatedly stated they would object to any ground disturbance, but offered a compromise in the proposed stipulation where LNC could undertake wildlife surveys and other project-related activities that did not involve any ground disturbance. Brooks Decl. ¶¶ 4-5. Nevertheless, LNC informed Plaintiffs on May 13, 2021 and again on May 26, 2021, that LNC intends to begin mechanized ground excavations as soon as June 23, 2021, consisting of extensive "mechanical trenching" and digging associated with a newly approved "Historic Properties Treatment Plan" (HPTP) which has never been submitted for public review. Brooks Decl. ¶ 7; see also FEIS at 4-85 (admitting that the HPTP was "currently in development" when the FEIS was issued in January 2021). Under the HPTP, LNC would disturb important cultural/historical resources, as well as wildlife habitat, without any public review or analysis. FEIS at 4-85 (such work would include "excavations and artifact collection."). Plaintiffs requested a copy of the HPTP, but LNC and BLM have refused to provide one to date. Brooks Decl. ¶ 7. LNC did not change its position that additional operations would start within 6-7 months from March 2021. BLM also informed Plaintiffs that it would not agree to refrain from conducting ground disturbance at the site, despite Plaintiffs' request that BLM provide the authorizing decision for such activities and describe any potential activities. Brooks Decl. ¶ 6.

Thus, in order to protect public lands and resources, and Plaintiffs' uses and interests at the site, Plaintiffs have no choice but to seek relief enjoining ground disturbance at the site – for

both LNC's and/or BLM's initial activities, as well as those operations that would soon occur during the pendency of this case.

## STANDARDS FOR PRELIMINARY RELIEF

To obtain preliminary relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, 555 U.S. 7, 20 (2008). In considering a preliminary injunction motion, the Court's focus is on the harms that will result during the full pendency of the case while the injunction is in place. *See* League of Wilderness Defs. v. Connaughton, 752 F.3d 755, 765-66 (9th Cir. 2014). Assuming that irreparable harm is sufficiently likely and the public interest favors a stay, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." Id. at 1131. "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" Republic of the Phil. v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988)(citations omitted).

Plaintiffs satisfy all four parts of this test because (1) the ground clearing, blasting, road construction, drilling and other initial operations will result in immediate and irreparable harm to wildlife and Plaintiffs, and their members' use of these public lands; (2) the multiple legal failures of the FEIS and ROD evidence a strong likelihood of success on the merits; (3) the balance of hardships tips overwhelmingly towards Plaintiffs; and (4) the public interest will be well served if the Project is enjoined while this Court considers the merits of this important case.

## ARGUMENT

**I.     Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs' claims for relief allege violations of FLPMA and NEPA that are reviewed under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06. Pursuant to the APA, a federal court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] . . . (D) without observance of procedures required by law." 5 U.S.C. §§ 704, 706(2). In determining whether the Agency's actions violated federal law, "[courts] 'must not 'rubber-stamp' . . . administrative decisions [they] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 859 (9th Cir. 2005).

BLM's Decision here is arbitrary and capricious and violates FLPMA and NEPA because the agency refused to apply binding requirements of the Winnemucca RMP, adopted to protect sage-grouse, visual resources, water and air quality, and other environmental values, and erroneously presumed that LNC holds valid existing rights entitling it to use of the entire Project area. But BLM never substantiated this assumption, particularly as it pertains to areas to be used as tailings heaps and waste rock dumps. By authorizing actions that violate the RMP, and refusing to require necessary mitigation for adverse environmental effects, BLM is allowing "unnecessary and undue degradation," which it must prevent under FLPMA. Nevertheless, throughout the FEIS, BLM assumes that adverse effects to the environment will be mitigated or avoided, based upon voluntary commitments by LNC to be adopted in vague, future, plans that have never been reviewed by the public, and through use of undisclosed, undetermined technology. In its rush to approve the Project, the FEIS glosses over likely effects to the environment based upon minimal analysis that falls far short of NEPA's required "hard look."

Plaintiffs are likely to succeed on their claims, although a likelihood of success on any claim warrants relief. At a minimum, an injunction should issue because Plaintiffs have shown

"that serious questions going to the merits were raised." <u>Alliance for the Wild Rockies</u>, 632 F.3d at 1134-35.

**A.      Failure to Comply with the Binding Resource Management Plans Under FLPMA**

The Project will not comply with the Winnemucca RMP and related Sage Grouse Approved RMP Amendment (ARMPA) requirements and thus violates FLPMA and its implementing regulations. FLPMA requires that all activities approved by BLM comply with the requirements of binding RMPs, also known as "land use plans." "The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available." 43 U.S.C. §1732(a). FLPMA requires that: "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. §1701(a)(8).

Complying with the RMP is required by both the general land use conformity requirement of FLPMA and BLM's duty under FLPMA to "prevent unnecessary or undue degradation" ("UUD") of the public lands. 43 U.S.C. §1732(b). BLM's FLPMA regulations require that all resource management decisions "shall conform to the approved [land use] plan." 43 C.F.R. §1610.5-3(a). BLM defines "conformity" as requiring that "a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment." <u>Id.</u> §1601.0-5(b). "Consistent" is defined as requiring that decisions "will adhere to the terms, conditions, and decisions of officially approved and adopted resource related plans . . . ." <u>Id.</u> §1601.0-5(c). *See* <u>Or. Natural Res. Council Fund v. Brong</u>, 492 F.3d 1120, 1128 (9th Cir. 2007)(BLM-approved project components "are inconsistent with the Plan and, consequently, violate FLPMA.").

Complying with the RMP is also required to meet BLM's duty to prevent UUD, which requires BLM to ensure that all environmental protection standards will be met at all times. *See* 43 C.F.R. §3809.5 (definition of UUD prohibited by FLPMA includes "fail[ure] to comply with

one or more of the following: … Federal and state laws related to environmental protection.").

Mining operations are not exempted from FLPMA's requirement to comply with the environmental protection provisions in the RMP. In <u>Western Exploration v. U.S. Dept. of the Interior</u>, 250 F. Supp. 3d 718, 747 (D. Nev. 2017), this Court held that in the mining context, as well as for other potential uses of public land, RMP standards to protect the greater sage-grouse must be met to comply with BLM's duty to "prevent unnecessary or undue degradation" under FLPMA. This Court rejected a challenge from the mining industry and others and upheld the Interior Department's RMP requirements for sage grouse as part of the UUD mandate:

> Defendants [Interior Department et al.] contend that the ''unnecessary or undue degradation'' standard in the statute does not preclude the agency from establishing a more protective standard that seeks improvements in land conditions that ''go beyond the status quo.'' The FEIS states that if actions by third parties result in habitat loss and degradation, even after applying avoidance and minimization measures, then compensatory mitigation projects will be used to provide a net conservation gain to the sage-grouse.'' The Agencies' goals to enhance, conserve, and restore sage-grouse habitat and to increase the abundance and distribution of the species, they argue, is best met by the net conservation gain strategy because it permits disturbances so long as habitat loss is both mitigated and counteracted through restorative projects. If anything, this strategy demonstrates that the Agencies allow some degradation to public land to occur for multiple use purposes, but that degradation caused to sage-grouse habitat on that land be counteracted. The Court fails to see how BLM's decision to implement this standard is arbitrary and capricious.
>
> In sum, Plaintiffs fail to establish that BLM's challenged decisions under FLPMA are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

<u>Western Exploration</u>, 250 F. Supp. 3d at 747 (internal citations omitted). *See also* <u>Mineral Policy Center v. Norton</u>, 292 F. Supp. 2d 30, 49 (D.D.C. 2003)("when BLM receives a proposed plan of operations under the 2001 [and still current] rules, pursuant to Section 3809.420(a)(3), it assures that the proposed mining use conforms to the terms, conditions, and decisions of the applicable land use plan, in full compliance with FLPMA's land use planning and multiple use policies.").

Despite this, BLM based the ROD and FEIS on its erroneous legal position that because LNC has filed mining claims across the site and plans to conduct mining-related operations, BLM (and LNC) are exempt from complying with the applicable RMP requirements—including requirements to ensure LNC mitigates for unavoidable adverse impacts to sage-grouse. BLM's failure to comply with the RMPs thus violates FLPMA and the APA.

1. <u>Violation of RMP and FLPMA Requirements to Protect the Greater Sage-Grouse</u>

    *a.    The RMP established binding standards to protect sage grouse*

BLM has adopted binding protective standards for sage-grouse in its RMP for the Winnemucca District (Exh. 7) which was amended by the "Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region" (Great Basin ROD) (Exh. 8). The Great Basin ROD adopted the Nevada and Northeastern California Greater Sage-Grouse Approved 2015 RMP Amendment (ARMPA) (Exh. 9).

Yet because BLM assumed that LNC had "valid existing rights" entitling it to use of the entire area, it did not apply these sage-grouse standards in authorizing the Project. *See* FEIS Appx. N (Exh. 12)(discussed below). By failing to require LNC to comply with the RMP/ARMPA conservation measures, or impose *any* meaningful measures to mitigate the Project's impacts on imperiled wildlife and natural resources, BLM violated FLMPA's mandates that it comply with its own RMP and prevent UUD of the public lands.

After the U.S. Fish and Wildlife Service (FWS), in 2010, found the sage-grouse was warranted for listing under the Endangered Species Act (ESA) due to inadequate existing regulatory mechanisms in federal land-use plans and its imperiled status across the intermountain West, BLM and the U.S. Forest Service began an inter-agency process to revise land-use plans in sage-grouse range to adopt sage-grouse protection measures. *See* <u>Western Exploration</u>, 250 F. Supp. 3d at 727 (summarizing history); *see also* <u>W. Watersheds Project v. Schneider</u>, 417 F. Supp. 3d 1319, 1325-28 (D. Idaho 2019)(summarizing history through 2019). "Ultimately, on September 16 and 21, 2015, the Agencies issued Records of Decision approving their respective management plan amendments, which govern 67 million acres of federal lands across ten western states." <u>Western Exploration</u>, 250 F. Supp. 3d at 727. The Plan Amendments "guide future land and resource management decisions on lands administered by BLM and the Forest Service." <u>Id.</u>[1] Relying on the strict protection requirements in the RMPs, the FWS found in 2015

---

[1] Although the Trump Administration in 2019 promulgated changes to the 2015 ARMPAs, those changes remain enjoined by the District of Idaho in <u>Western Watersheds Project v. Schneider</u>, 417 F. Supp. 3d 1319 (D. Idaho 2019). Thus, the 2015 ARMPAs are presently in effect. *See also*

that the sage-grouse was not warranted for listing under the ESA. 80 Fed. Reg. 59857-59942 (Oct. 2, 2015).

Because sage-grouse are a landscape species that rely on intact expanses of sagebrush habitat to support their lifecycle, the sage-grouse ARMPAs focused on identifying and protecting key sage-grouse habitats. To this end, the FWS convened a "conservation objectives team," (COT) which, in March 2013, issued a report that identified and mapped sage-grouse "priority areas for conservation" (PACs), maintaining the integrity of which is "the essential foundation for sage-grouse conservation." COT Report at 36 (Exh. 10). In the 2015 ARMPA, BLM identified "Priority Habitat Management Areas" (PHMAs), "General Habitat Management Areas" (GHMAs) and, applicable in Nevada and California, "Other Habitat Management Areas" (OHMAs). PHMAs are "BLM-administered lands identified as having the highest habitat value for maintaining sustainable GRSG populations" which are a subset of the FWS PACs. Great Basin ROD at 1-15 (Exh. 8). The ARMPA established specific management direction and sage-grouse protections in PHMAs, GHMAs, and OHMAs. The Project area lies within the Lone Willow Population Management Unit (PMU). FEIS at 4-43 (Exh. 2). Virtually the entire Lone Willow PMU, including all or nearly all of the Project area, is within the Western Great Basin PAC. Most or all of the Project area is PHMA.[2] FEIS Figures 4.5-11 and -12 (Exh. 10).

Recognizing the importance of preserving expanses of interconnected sagebrush habitats to sage-grouse conservation, the ARMPA seeks to "avoid, minimize, and mitigate" any effects to sage-grouse by avoiding new disturbance or else minimizing or mitigating any disturbance. Objective SSS 4, ARMPA at 2-6 (Exh. 9). To carry out this objective, the ARMPA requires BLM to first, avoid impacts by working with LNC to locate Project facilities outside of PHMA and GHMA, place surface-disturbing activities in non-habitat or in the lowest quality habitat, or locate Project facilities within or adjacent to existing infrastructure. *See* MD SSS-1 (ARMPA at

---

Western Exploration, 250 F. Supp. 3d at 750-51 (denying vacatur and injunctive relief).

[2]The 2015 ARMPA designated most of the Project area as PHMA, while the 2019 ARMPA designated all of the Project area and habitat south of it as PHMA. FEIS Figures 4.5-11 and -12 (Exh. 10).

2-6) (requiring BLM to do these things "whether in accordance with a valid existing right or not"). Then, to minimize impacts, the ARMPA caps disturbance in PHMA at 3 percent at both the PMU scale and the project scale. *See* FEIS Appx. N at N-5 (discussing MD SSS 2A)(Exh. 12). As this Court noted: "Under the BLM Plan, a 3 percent human disturbance cap immediately applies to lands classified as PHMA." <u>Western Exploration</u>, 250 F. Supp. 3d at 737. The ARMPA includes "Required Design Features" (RDFs) and other conservation measures to minimize impacts to sage-grouse from developments. ARMPA Appendix C (Exh. 13).

        *b.*      *BLM failed to apply the RMP habitat protection and design standards*

In approving the Project, BLM has not demonstrated that it avoided or minimized impacts to sage-grouse. Indeed, it jettisoned the disturbance cap requirement, even though BLM admits that disturbance in the Project area **already** surpasses the 3 percent threshold beyond which no further disturbance may be authorized. The Project will disturb 1.12 percent of PHMAs within the PMU and will raise disturbance in the Project area from 4.4 percent to 12 percent. FEIS at N-5, N-17 (Exh. 13). In fact, the Project would completely span the southeastern portion of the PMU, severing the southernmost portion of the PMU from the rest of the PMU. *See* FEIS Figure 4.5-1 (Exh. 10). BLM never convened a technical team to determine whether the Project can be modified to a "net conservation gain" to the species, as is required to meet the criteria for an exception to the three percent disturbance cap. Fed. Defs.' Ans. ¶ 79, ECF No. 17.

BLM also did not apply the ARMPA's RDFs (Exh. 13) or other requirements to minimize disturbance to sage grouse. MD SSS 2B (ARMPA at 2-8, Exh. 9). The RDFs include lek buffer distances, MD SSS 2D (<u>Id.</u>) and seasonal restrictions to manage surface-disturbing activities and uses to prevent disturbances to sage-grouse during seasonal life-cycle periods. MD SSS 2E (<u>Id.</u> at 2-8 to 2-9).  The ARMPA also includes strict noise limits and requires that BLM authorizations limit noise from activities to a maximum of 10 decibels above ambient sound levels at least 0.25 miles from active and pending leks, from 2 hours before to 2 hours after sunrise and sunset during the breeding season. MD SSS 2F (<u>Id.</u> at 2-9). Where habitat or populations "triggers" are reached, as is the case in the Lone Willow PMU where the Project lies,

BLM must take additional management or mitigation actions set forth in MD SSS 17 through 24.

Instead of requiring these measures to minimize impacts, BLM simply claimed:

The proponent has proposed a suite of applicant-committed environmental protection measures into their Proposed Action, which incorporate Design Features and Management Decisions from the 2015 [ARMPA]. Proposed locatable minerals resource projects are not subject to the application of seasonal restrictions identified in the [ARMPA].

Appx. N at N-9 (Exh. 12). But a closer look at these "design features" reveals that LNC refused to apply, and BLM did not require, *any* of the RDFs for locatable minerals projects. *See* Appx. N, Tables N.3, N.4 (N-11- N-15). Those RDFs include measures that would have helped offset noise impacts, loss of connectivity, and impacts to sage-grouse seasonal habitats from long-term groundwater drawdown from the mine, for instance:

Install noise shields to comply with noise restrictions (see Action SSS 7) when drilling during the breeding, nesting, brood-rearing, and/or wintering season. Apply GRSG seasonal timing restrictions when noise restrictions cannot be met. (LOC 1).

Cluster disturbances associated with operations and facilities as close as possible, unless site-specific conditions indicate that disturbances to GRSG habitat would be reduced if operations and facilities locations would best fit a unique special arrangement. (LOC 2).

Address post reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs. (LOC 5).

FEIS, Appx. N, Table N.4, N-15. BLM dismissed all these measures as "not applicable," without explanation. *See* id.

BLM's failure to apply conservation measures to minimize impacts to sage-grouse will have significant impacts to sage-grouse. For instance, NDOW, in comments to BLM, stated that the Project would violate the noise limits in the ARMPA and could have significant negative effects on the Montana-10 and Pole Creek 01 leks, which would harm sage-grouse at the population level:

The calculations predict that **project related noise at these leks will exceed BLM ARMPA standards** and result in potential impacts. Increased noise at sage-grouse leks has been shown to have negative effects on lek attendance, with likely implications to sage-grouse populations. Current research indicates that as noise levels reach 10 dBA L50 above natural background levels (Pre-Project L90), sage-grouse lek attendance declines and lek abandonment can occur. Thus, **the anticipated project related noise increases at Montana-10 and Pole Creek 01 could have significant negative effects on these leks and the Lone Willow PMU.** Based on average lek attendance, the Montana-10 lek is one

of the three largest leks in the Lone Willow PMU and **the loss of this lek would likely be of high consequence to greater sage-grouse populations.**

FEIS at R-184 (comment #P830)(emphasis added)(Exh. 5). In response, BLM relied on a potential future "noise monitoring plan" to purportedly reduce these impacts. Id. But, as NDOW noted, such future potential plans would not ensure that the ARMPA noise standards would be met: "While we appreciate DEIS's inclusion of noise reduction measures and restricting high noise activities to times less critical to wildlife, **this does not change the model's predictions that important thresholds will be exceeded**." Id. (emphasis added). In light of these exceedances, NDOW recommended that additional details for monitoring, mitigation, and adaptive management be determined in advance of the Final EIS to address the noise impacts on these leks.

Instead of complying with NDOW's request, BLM claimed that any monitoring plan or mitigation was purely voluntary and that it did not have to apply the ARMPA standards:

> Development of a noise monitoring plan may help in identifying activities that produce high noise levels and recommend timing restrictions during critical breeding periods (March-May); however, **these measures would be *voluntary* actions. The proposed project is a non-discretionary 43 CFR 3809 action and BLM's discretion is limited to preventing unnecessary and undue degradation, and *may not impose timing or operational restrictions directed under the 2015 GRSG ARMPA*.**

FEIS at R-184 to 185 (Response to NDOW comment #P831)(emphasis added).

Thus, BLM dismissed its obligation to comply with the sage-grouse ARMPA requirements, based on the unsubstantiated assertion that they are "not applicable" because LNC's mining claims at the site confer "valid existing rights." *See, e.g.,* FEIS at 4-45 (Ex. 2), N-25, N-6, N-9, N-18, Table N.4 (Exh. 12). Yet, outside of the fact that LNC has staked mining claims across the Project site, BLM has offered no evidence that those claims are "valid" or that BLM has determined whether the lands underlying these claims, especially the thousands of acres to be buried by the waste/tailings dumps, satisfy the Mining Law's strict test for "valid existing rights." *See* discussion below.

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      *c.*     *BLM failed to ensure mitigation that provides a "net conservation gain" to sage grouse.*

Even if BLM could show that LNC has "valid existing rights" on all the Project lands, and impacts cannot be avoided, the ARMPA nevertheless requires that BLM "ensure mitigation that provides a net conservation gain to the species," such as the use of the State of Nevada Conservation Credit system. MD SSS 2B (PHMA) (ARMPA at 2-7, 2-8). In <u>Western Exploration</u>, this Court highlighted "that **if actions by third parties result in habitat loss and degradation, even after applying avoidance and minimization measures, then compensatory mitigation projects will be used to provide a net conservation gain to the sage-grouse**." 250 F. Supp. 3d at 747 (emphasis added). As this Court stated, the RMP's "goals to enhance, conserve, and restore sage-grouse habitat and to increase the abundance and distribution of the species, … is best met by the net conservation gain strategy because it permits disturbances so long as habitat loss is both mitigated and counteracted through restorative projects." <u>Id.</u>

But here, BLM approved the Project without *any* mitigation plan in place at all, let alone a plan to mitigate to a net conservation gain standard. While the FEIS generally outlines two mitigation plan options in Appendix N, the ROD commits LNC to only consider mitigation measures sometime in the future, long after the public NEPA review process ended in 2020:

> LNC will continue to consult with the BLM and the Nevada Department of Conservation and Natural Resources (DCNR) Sagebrush Ecosystem Technical Team (SETT) on a mitigation plan based on the Habitat Quantification Tool analysis. The mitigation plan will be developed by the SETT consistent with the Nevada Conservation Credit System or other applicable state requirements.

ROD at 11 (Exh. 1). There is no mitigation plan actually in place.

Further, both of the mitigation plan options mentioned in the FEIS are wholly inadequate. For example, the first option mentioned involves the purchase of temporary conservation credits. FEIS at N-25 (Exh. 12). But that plan involves no permanent conservation credits to offset the effects of permanent groundwater drawdown from the mine that will affect surface water used by sage-grouse in the Project area for the foreseeable future. FEIS at 4-54 (Exh. 2). And, the conservation credits are "not intended to offset effects to other resources, such as impacts to

riparian and water resources, or impacts from noise." FEIS, N-25. BLM declined to require the noise mitigation and monitoring recommended by NDOW, so those impacts would go entirely unaddressed under the first option.

Meanwhile, the second option, described in three sentences in the FEIS Appendix N, relies on to-be-determined "habitat enhancement" projects, including, potentially, "noxious weed treatments, pinon-juniper removal, water developments, sagebrush and forb seeding, and wildfire prevention fuel breaks." FEIS at N-25. Some of these types of projects may be harmful to sage-grouse and neither option describes how a net conservation gain would be achieved – because there is no specific plan in place. Thus, BLM did not require the mandated "compensatory mitigation projects [that] will be used to provide a net conservation gain to the species." Western Exploration, 250 F.Supp.3d at 747.

BLM is not free to disregard FLPMA's requirements, including the requirement to comply with its own RMP, by relying on vague, unverified "valid existing rights" in this way. Nor may it approve the Project with no mitigation plan in place. BLM's failure to avoid, minimize, and mitigate impacts to sage-grouse, in violation of the RMP, thus violates FLPMA.

2.   Violation of RMP Visual Resource Protection Requirements

BLM also exempted the Project from the Winnemucca RMP's Visual Resource protection standards. FLPMA mandates the protection of scenic values, requiring that "the public lands be managed in a manner that will protect the quality of the ... scenic ... values...." 43 U.S.C. §1701(a)(8). "[N]atural scenic … values" are one of the resources for which public land should be managed. 43 U.S.C. §1702(c). The RMP implements these mandates by requiring that projects authorized by BLM must comply with the following: for "Visual Resources (VRM) Goal: Manage public land actions and activities to provide protection of the visual values and scenic quality of existing landscapes consistent with the Visual Resource Management (VRM) class objectives." Winnemucca RMP at 2-44 (Exh. 7). "The objective of Visual Resource Management (VRM) is to manage public lands in a manner which would protect the quality of the scenic (visual) values of these lands." FEIS at 4-98 (Exh. 2). Most of the project site is

protected under VRM Class II. "The objective of VRM Class II is to retain the existing character of the landscape, while keeping the level of change to the characteristic landscape low." FEIS at 4-99. BLM admits that the Project will violate these VRM requirements in the RMP:

> **Overall, the construction and operation of the Proposed Alternative would not meet the current VRM Class II objectives, and would not conform with the existing ROD/RMP** (see Section 1.5.3). The existing character of the landscape would not be retained, and the level of change to the characteristic landscape would be noticeable and likely attract the attention of the casual observer.

FEIS at 4-101 (emphasis added). As detailed above, under FLPMA, BLM cannot approve actions that will violate its RMP. In response to Plaintiffs' extensive comments highlighting how the Project would violate the VRM requirements of the RMP, BLM simply stated: "Thank you for your comment," with no analysis or response. *See* Comments P645-656, FEIS at Appx. R at 143-146 (Exh. 5). This is a bald dismissal, not a response.[3]

BLM had previously understood that, because the Project would violate the RMP's VRM standards, in order to legally approve the Project, it would have to amend the RMP to remove these requirements:

> A Land Use Plan Amendment addressing visual resources would be included with the Project and analyzed in the EIS if visual resource issues cannot be mitigated during the exploration, construction, and operation of the Project to conform with the visual resource management class-2 designation in the current RMP, approved in 2015.

BLM's Notice of Intent to prepare the EIS. 85 Fed. Reg. 3413, 3414 (Jan. 21, 2020).

Yet BLM never amended the RMP, despite admitting that the Project would violate the RMP standards. Neither the ROD nor the FEIS explain why the RMP was never amended, as BLM stated it was required to do in its Federal Register Notice, or how BLM can approve a Project that violates the Visual Protection Standards in the RMP.

---

[3] This also violates the agency's duties under NEPA to fully respond to all substantive comments. BLM "shall assess and consider" and "shall respond" to comments. 40 C.F.R. §1503.4(a). "Consider" means "to investigate and analyze; 'consideration' encompasses an affirmative duty to investigate and compile data, and a further duty to incorporate that data into a detailed reasoned analysis." City of Davis v. Coleman, 521 F.2d 661, 679 (9th Cir. 1975). Responding to significant public comments is a "fundamental tenet of administrative law." NRDC v. EPA, 859 F.2d 156, 188 (D.C. Cir. 1988).

3.   BLM Cannot Violate the RMPs Based on an Unsupported Belief that LNC Has "Valid Existing Rights" under Federal Mining Laws to Permanently Occupy Public Lands

BLM based the FEIS and ROD on the mistaken view that LNC's filing of mining claims at the site exempts BLM from complying with the RMPs because LNC has "valid existing rights" to permanently occupy much of the Project site under the 1872 Mining Law. *See, e.g.,* FEIS at 4-45 (Exh. 2); N-25, N-6, N-9, N-18, Table N.4 (Exh. 12). Yet "valid existing rights" can only accrue to the company if it satisfies the requirements of the Mining Law for occupancy and possession rights. "A mining claimant has the right to possession of a claim only if he has made a mineral discovery on the claim." Lara v. Secretary of the Interior, 820 F.2d 1535, 1537 (9th Cir. 1987). *See also* Davis v. Nelson, 329 F.2d 840, 845 (9th Cir. 1964)("right to occupation and purchase of the lands" is limited to only those lands "in which valuable mineral deposits are found.")

The ROD authorizes LNC to permanently occupy the public lands with the placement of the waste rock, stockpiles, and tailings waste on the company's mining claims. Yet the Mining Law limits the permanent use and development of mining claims on public lands to only those lands that contain a "valuable mineral deposit": "All **valuable mineral deposits** in lands belonging to the United States … shall be free and open to exploration and purchase, **and the lands in which they are found** to occupation and purchase." 30 U.S.C. §22 (emphasis added).

"If there is no valuable mineral deposit beneath the purported unpatented mining claims, the unpatented mining claims are completely *invalid* under the 1872 Mining Law, and no property rights attach to those invalid unpatented mining claims." Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv., 409 F. Supp. 3d 738, 748 (D. Ariz. 2019)(emphasis in original)(vacating federal approval of mining project). This economic test for claim validity necessarily includes the consideration of all costs necessary to develop, process, transport, and market the mineral, including costs to protect public land and the environment. "[I]t must be shown that the mineral can be extracted, removed and marketed at a profit." U.S. v. Coleman, 390 U.S. 599, 602 (1968).

Under the APA, BLM must support its assumption that LNC has "valid existing rights" on its mining claims based on evidence in the record:

18

Any decision made without first establishing a factual basis upon which the [agency] could form an opinion on surface rights would entirely ignore an important aspect of this problem. *See State Farm*, 463 U.S. at 43 [Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29 (1983)]. Likewise, **a grant to use the surface when the administrative record shows such a right does not exist would contravene the [agency's] duty to protect the [public lands] from depredations and offer an opinion that runs contrary to the evidence.**

Center for Biological Diversity, 409 F. Supp. 3d at 758 (emphasis added).

Yet BLM has not inquired into whether the claimed lands to be used for the waste and tailings dumps and other non-extractive operations contain valuable mineral deposits under the Mining Law – the statutory prerequisite for "valid existing rights" to permanently occupy public lands. Indeed, the evidence in the FEIS shows that the lands covered by these claims do not contain the requisite valuable deposit of a locatable mineral (i.e., those minerals subject to claiming under the 1872 Mining Law), but rather mere "common varieties" of rock and stone which are not locatable (i.e., cannot be legitimately claimed) under the Mining Law. *See* Surface Resources and Multiple Use Act of 1955, 30 U.S.C. § 611. There is no support in the FEIS and ROD for BLM's position that LNC has satisfied the Mining Law's requirements for "valid existing rights" to use and possess public lands for permanent disposal of mine waste, stockpiles, and tailings, and BLM may not evade complying with its own RMP by broadly claiming LNC possesses "valid existing rights" entitling it to use the entire Project area.

**B.** **Failure to Prevent "Unnecessary or Undue Degradation" to Protected Wildlife**

FLPMA mandates that BLM "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §1732(b)(the "UUD standard"). This duty is "the heart of FLPMA [that] amends and supercedes the Mining Law." Mineral Policy Center, 292 F. Supp. 2d at 42. BLM cannot approve a mining project that would cause UUD. 43 C.F.R. §3809.411(d)(3)(iii). "FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and by state law." Ctr. for Biological Diversity v. Dept. of Interior, 623 F.3d 633, 644 (9th Cir. 2010).

As part of preventing UUD, BLM must ensure that all operations comply with the Performance Standards found at §3809.420. *See* 43 C.F.R. §3809.5 (definition of UUD,

specifying that failing to comply with the Performance Standards constitutes UUD). One of the most important Performance Standards requires BLM to ensure that all operations comply with all environmental protection standards.  *See* 43 C.F.R. §3809.5 (definition of UUD includes "fail[ure] to comply with one or more of the following: … Federal and state laws related to environmental protection.").

Even if BLM's unsupported assumption that LNC holds "valid existing rights" were correct, BLM's duty to prevent UUD would still require the agency to impose mitigation measures to protect imperiled wildlife, including the ARMPA mandate to "avoid, minimize, mitigate" impacts to sage-grouse. *See* Western Exploration, 250 F. Supp. 3d at 747 (RMP sage-grouse standards must be met to comply with BLM's duty to "prevent unnecessary or undue degradation" under FLPMA). As the Interior Department has stated:

> Although other Federal and State agencies regulate various aspects of mining under other statutes, BLM has its own responsibilities under FLPMA and the mining laws to protect the resources and values of the public lands from unnecessary or undue degradation.
> …
> [S]ections 302(b) and 303(a) of FLPMA, 43 U.S.C. 1732(b) and 1733(a), and the mining laws, 30 U.S.C. 22, provide the BLM with the authority to require mitigation. **Mitigation measures fall squarely within the actions the Secretary can direct to prevent unnecessary or undue degradation of the public lands. An impact that can be mitigated, but is not, is clearly unnecessary.**

65 Fed. Reg. 69998, 70053 (November 21, 2000)(Preamble to BLM's 43 C.F.R. Part 3809 mining regulations)(emphasis added).

In addition to the ARMPA requirements, as part of its duties to prevent UUD to public land resources under FLPMA, BLM has established a national policy to protect designated Special Status Species (also known as Sensitive Species) such as the sage-grouse.[4]

> The objectives of the BLM special status species policy are:
> A. To conserve and/or recover ESA-listed species and the ecosystems on which they depend so that ESA protections are no longer needed for these species.
> B. **To initiate proactive conservation measures that reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of**

---

[4] The Greater Sage-Grouse is included on BLM' Nevada Sensitive and Status Species List occurring in the Winnemucca District (Exh. 21).

20

**these species under the ESA.**

Special Status Species Mgmt. Manual 6840 at 3 (emphasis added)(Exh. 15). As DOI/BLM stated

to this Court, the "net conservation gain" standard, and the Special Status Species requirements,

are implemented to comply with BLM's FLPMA duty to protect sage-grouse:

> This standard complies with BLM's policy for special status species, which calls for "special management consideration to promote . . . conservation and reduce the likelihood and need for future listing under the ESA" and for practices that "*improve* the condition of the species' habitat on BLM-administered lands." BLM Manual 6840 - Special Status Species Management) (emphasis added); *accord* 43 U.S.C. §1701(a)(8). Seeking a net gain to Sage-Grouse habitat is fully consistent with FLPMA's guiding principles.

Federal Brief in Western Exploration, at 26 (Exh. 16).

As detailed above, BLM never analyzed or required mitigation to achieve this "net

conservation gain," never instituted "practices that 'improve the conditions of the species

habitat,'" and never "call[ed] for 'special management consideration to promote conservation'"

for sage-grouse or otherwise complied with the agency's Sensitive Species requirements in BLM

Manual 6840 (Exh. 15). Nor did BLM meet these requirements for other designated Sensitive

Species, as discussed in more detail below. By failing to mitigate for impacts to imperiled

species, BLM is illegally authorizing UUD.

**C.    Additional Violations of FLPMA and NEPA.**

In reviewing and approving the Project, BLM also violated other requirements of

FLPMA, as well as NEPA. NEPA is our "basic national charter for protection of the

environment." 40 C.F.R. §1500.1(a).[5] Congress enacted NEPA to ensure that federal agencies

(1) consider and evaluate all environmental impacts of their decisions and (2) disclose and

provide an opportunity for the public to comment on such environmental impacts. 40 C.F.R.

§§1501.2, 1502.5. "NEPA procedures must ensure that environmental information is available to

---

[5] The national NEPA regulations were recently revised. *See* 85 Fed. Reg. 43304-43376 (July 16, 2020).  However, because BLM conducted its NEPA review for this Project before the new regulations became effective, the NEPA regulations existing prior to September 14, 2020, at 40 C.F.R. Part 1500, apply here. *See, e.g.,* FEIS at 5-1, *quoting* 40 C.F.R. §1508.7 for the requirement to analyze, and definition of, "cumulative effects," from the previous NEPA regulations.

public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §1500.1(b). This review must be supported by detailed data and analysis – unsupported conclusions violate NEPA. *See* N. Plains v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011)(conclusions must be supported by reliable studies and analysis). An EIS must include a full and adequate analysis of environmental impacts of a project and alternatives and take a "hard look" at the direct, indirect, and cumulative impacts of the project and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. 40 C.F.R. §§1508.7, 1508.8, 1508.9, 1508.25(c). NEPA requires that the FEIS fully review and determine how the Project will comply with all relevant federal and state environmental and public land laws. *See* 40 C.F.R. §1502.2(d) (requiring an EIS to state how alternatives and decisions "will or will not achieve the requirements of . . . other environmental laws and policies.")

1.   Failure to Analyze and Ensure Compliance with Water Quality Standards

To comply with FLPMA's mandate to prevent UUD, approved projects must comply with all environmental protection policies and requirements—including Federal and state water quality standards. *See* 43 C.F.R. §3809.420(b)(4)("All operators shall comply with applicable Federal and state water quality standards, including the Federal Water Pollution Control Act [Clean Water Act], as amended (30 U.S.C. 1151 *et seq.*)." The Winnemucca RMP also requires compliance with all water quality standards: BLM must "Protect and maintain watersheds so they appropriately capture, retain, and release water of quality that meets State and national standards." RMP at 2-7 (Exh. 7).

BLM failed to meet these requirements because antimony, a harmful pollutant, will be released into the groundwater in violation of water quality standards. "Geochemical modeling results indicate that pore water in [the mine pit] backfill will exceed MCLs [Maximum Contaminant Levels] for longer than 20 pore volumes." FEIS at R-121 (Exh. 5). Because groundwater flowing from the pit would exceed standards, this violates FLPMA and BLM's mining regulations at 43 C.F.R. Part 3809.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

To purportedly prevent these violations, the FEIS relies on undefined future plans not subject to public NEPA and FLPMA review. For instance, BLM claims that "[p]otential impacts to groundwater water quality downgradient from the backfilled pit would be addressed as outlined in Mitigation WR-3 provided in Section 4.3.2 of EIS." FEIS at R-122. "Mitigation WR-3" is LNC's "Groundwater Quality Monitoring and Groundwater Quality Management Plans," which states that "in the event that constituent concentrations exceed established regulatory thresholds at one or more established compliance monitoring points, and the exceedance is attributable to contamination originating from mine facilities or operations, LNC would provide the BLM and NDEP with a groundwater quality management plan for review and approval." FEIS at 4-26, Section 4.3.2 "Recommended Mitigation and Monitoring" (Exh. 2). But just as is the case with the sage-grouse mitigation plan, this plan does not exist.

Plaintiffs specifically requested BLM to provide these plans during the NEPA process for public review, but BLM refused. *See* GBRW Comment P572: "Present a model for an alternative closure option for the backfilled pits that prevents the release of pollutants in a groundwater plume, such as a period of active pumping and treating of pore water until the discharge from the waste-rock backfill is below the groundwater MCLs." FEIS at R-122 (Exh. 5). Since the FEIS predicts the violation of water quality standards, BLM should have provided the public with the agency's plans. BLM's reliance on future plans unreviewed by the public, or BLM, violates NEPA and FLPMA.

The U.S. Environmental Protection Agency (EPA) also strongly criticized BLM's failure to analyze impacts to water quality, and ensure against any exceedance of water quality standards:

Unmanaged Groundwater Quality Degradation
As explained in the Final EIS, **adverse effects to groundwater quality are expected from all action alternatives. Without mitigation, a plume of groundwater exceeding the Nevada Division of Environmental Protection Profile I Reference Values for antimony is expected to flow uncontrolled from the backfilled pit.** According to fate and transport modeling included in the EIS (Appendix P Part 1 p. 125-133), the preferred alternative (Alternative A) would result in a plume extending approximately one-mile (p. 4-26) downgradient of the pit 300-years post-closure at levels still above Profile I (Appendix P Part 1 p. 132-133).

EPA'S DETAILED COMMENTS ON THE FEIS, at 1, contained in EPA's January 4, 2021

letter to BLM (emphasis added)(Exh.17). EPA further noted that the FEIS failed to adequately

review mitigation required to prevent this contamination:

> While the Final EIS includes three conceptual options that have the potential to mitigate antimony groundwater contamination (Appendix P Part 1 p. 154-159), **the plans are not developed with an adequate level of detail to assess whether or how groundwater quality downgradient from the pit would be effectively mitigated.** In our comments on the Draft EIS, the EPA recommended more detailed information about how effective these potential mitigation options could be, and an evaluation of additional disturbance and impacts from implementing the proposed mitigation options (40 CFR 1508.25(a)(1)(iii)).

Id. (emphasis added). EPA also highlighted how BLM failed to respond to these serious

concerns:

> In response, the BLM stated that options for blending/discharge and active treatment "have not been evaluated, and therefore may not be feasible for consideration as mitigation for the Final EIS" (Appendix R p. R-180). **Therefore, conclusions in the Final EIS that groundwater quality management plans would "effectively mitigate impacts to groundwater quality downgradient from the pit" (p. 4-25) are not adequately supported**.

Id. (emphasis added). EPA criticized BLM for failing to meet its environmental protection

responsibilities at the Mine: "Without detailed information about mitigation and its efficacy, it is

unclear how a Record of Decision could state that all practicable means to avoid or minimize

environmental harm from the alternative selected have been adopted." Id. EPA also noted that

LNC recently submitted a new mitigation plan that purportedly reduces the ground water

pollution – but that this plan was submitted long after the NEPA public review process ended:

> On December 16, 2020, the EPA received a revised version of the Plan of Operation's Appendix H, "Thacker Pass Project Monitoring Plan," during the first Water Resources Technical Advisory Group meeting. **This revised monitoring plan includes a new potential future mitigation option for groundwater quality impacts that was not discussed in the Draft or Final EIS.**

Id. (emphasis added).

Under NEPA, BLM cannot attempt to fill holes in its analysis with critical reports and

mitigation measures that were never subject to public review. Great Basin Resource Watch v.

BLM, 844 F.3d 1095, 1104 (9th Cir. 2016). "Such late analysis, 'conducted without any input

from the public,' impedes NEPA's goal of giving the public a role to play in the decisionmaking

24

process and so 'cannot cure deficiencies' in a [NEPA document]." <u>Or. Natural Desert Ass'n v. Rose</u>, 921 F.3d 1185, 1192 (9th Cir. 2019)(*quoting* <u>Great Basin</u>). *See also* <u>Western Exploration</u>, 250 F. Supp. 3d at 748.

2.  <u>Failure to Analyze and Ensure Compliance with Air Quality Standards</u>

The FEIS and ROD do not ensure compliance with all applicable air quality standards, as required by FLPMA. Nor did BLM fully review all air quality issues as required by NEPA. Failure to comply with air quality standards violates FLPMA because it constitutes UUD. *See* 43 C.F.R. § 3809.420(b)(4)("All operators shall comply with applicable Federal and state air quality standards, including the Clean Air Act (42 U.S.C. 1857 *et seq*.)." It also violates the Winnemucca RMP, which requires that projects "[m]eet all applicable local, state, tribal and national ambient air quality standards and regulations under the Clean Air Act (as amended)." RMP at 2-6 (Exh. 7).

In their comments on the DEIS, Plaintiffs specifically raised the serious air quality concerns to BLM, describing how the sulfur dioxide emissions analysis is inadequate. For example, in Table 4.10 (FEIS at 4-78, Exh. 2), BLM claims that in Phase I the facility would emit only 75.8 tons per year (TPY) of sulfur dioxide ($SO_2$) for the 337,895 tons of sulfur anticipated to be burned to produce the sulfuric acid. But as Plaintiffs pointed out, no currently-existing technology is capable of achieving these emissions reductions as claimed by BLM/LNC.

Nevertheless, the FEIS assumes these massive emissions reductions will be achieved based upon "state-of-the-art" technology—without identifying what that technology is:

> In order to minimize the emissions from the sulfuric acid plant, **LNC has committed to installing a state-of-the-art scrubbing control**, which is above customary industry standard. As a result, the sulfur dioxide and acid mist emissions from the sulfuric acid plant will be well below the emission standards. … **While the exact scrubbing system has not yet been determined**, LNC has committed to installing a control that, at the minimum, meets the emission levels used in this analysis.

FEIS Appx. K, (PDF pp. 18-19)(emphasis added)(Exh. 18). Since the FEIS does not disclose what this technology will be, because it "has not yet been determined," neither the public nor BLM can fairly assess the likely effectiveness on this unknown technology as mitigation for

25

sulfur dioxide emissions, in violation of NEPA and FLPMA. Relying on this unsupported assumption is arbitrary and capricious. *See* Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1150 (9th Cir. 1998).

BLM failed to explain how the effectiveness of these measures can be determined from so little information. Further, even if the purported "state-of-the-art technology" were capable of achieving the emissions reductions projections in Phase 1, BLM nevertheless assumes that $SO_2$ emissions will essentially remain the same in Phase 2, despite the fact that production would be **doubled**. LNC claims, and BLM assumes, that the projected process emissions from the acid plant for critical air pollutants are largely identical for both Phase 1 and Phase 2. "[T]he total process emissions show only a small increase between Phases 1 and 2." FEIS Appx. K, (PDF at p. 20); *See* Tables 3 and 4 in Appx. K (PDF at p. 19)(showing that the $SO_2$ emissions for Phase 1 at 76.2 tons/year vs. 76.8 tons/year for Phase 2)(Exh. 18).

There is no evidence to support these bold assumptions, particularly since the "state-of-the-art" technology is still "undetermined." BLM's assumption that emissions will stay the same at doubled production, without the required evidentiary support, is arbitrary and capricious. Thus, the FEIS failed to establish that all air quality standards can be met with clear data and analysis – in violation of NEPA and FLPMA.

3.    Failure to Take a Hard Look at Baseline Conditions and Impacts to Wildlife

The FEIS failed to take a hard look at impacts from the Project to special status birds, wildlife, and plants in the Project area. BLM does not have adequate baseline information to understand these imperiled species' presence in, and use of, the Project area and thus, to analyze how they will be affected. The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process, because an inadequate environmental baseline precludes an accurate assessment of Project impacts. "[W]ithout [baseline] data, an agency cannot carefully consider information about significant environment impacts. Thus, the agency fails to consider an important aspect of the problem, resulting in an arbitrary and capricious decision." N. Plains Resource Council, 668 F.3d at 1085.

### a.      *Greater Sage-Grouse*

As noted above, the Project will have serious impacts to greater sage-grouse that BLM failed to consider or address. The Project will completely sever the southern half of the eastern portion of the Lone Willow PMU from the northern portion—an effect BLM overlooked in its sage-grouse analysis. And, according to NDOW, noise from the Project may also have significant effects to the Montana-10 and Pole Creek 01 leks, which in turn would have what NDOW characterized as population-level effects that the FEIS does not consider.

While the FEIS admits that significant effects to sage-grouse are anticipated from the Project, it fails to provide basic information necessary to determine what those effects will be. Although the FEIS admits that the "Potential for Occurrence" for sage-grouse is "High/confirmed-observed in surveys," FEIS at H-9 (Exh. 19), no details are provided. BLM does not disclose baseline sage-grouse populations in the Project area and in the PMU or describe how they use seasonal habitats in the area. The FEIS does not even disclose which Priority Area for Conservation (PAC) the PMU is in, although it is within the Western Great Basin PAC, which extends into Oregon and California. Without this baseline information, the FEIS fails to provide sufficient information to assess impacts to the bird from likely destruction of the populations at Thacker Pass and the southeastern portion of the Lone Willow PMU. And, because there is no adequate baseline, future monitoring to discern changes to sage-grouse populations in the Project area would be meaningless.

### b.      *Pronghorn*

Nearly the entire Project area is within pronghorn winter range. FEIS Figure 4.5-7 (Exh. 11). Two pronghorn movement corridors lie within the Project area. FEIS at 4-38 (Exh. 2). These corridors facilitate access between limited use and winter range habitat to the south of the Project area and winter range, summer range, and year-round habitat to the north of the Project area, and daily movement between the Quinn River Valley and the Montana Mountains. Id. The Project's destruction of habitat is likely to prohibit or impede pronghorn movement between seasonal habitats and during daily movement.

Yet the FEIS does not consider or disclose how severing these pronghorn movement corridors, or destroying nearly 5,000 acres of pronghorn winter range, will impact pronghorn populations. The FEIS has little pronghorn information, stating simply that: "limited use, winter, and summer pronghorn antelope distributions, and a pronghorn movement corridor, occur through portions of the study area and buffer." FEIS Appx. G unnumbered page 129 of 134 (Exh. 20). No details are provided.

BLM's consideration of impacts to pronghorn is limited to vague generalizations such as: "Surface disturbance associated with mining activities and development of mine facilities…would directly affect wildlife through the loss of potentially suitable habitat by vegetation removal, and removal of seeps and springs and seasonal water sources for wildlife." FEIS at 4-34 (Exh. 2). Similarly, it provides that "[s]urface disturbance would also result in habitat fragmentation. Habitat fragmentation can affect species use of the area by reducing the landscape size for species that require large breeding or foraging ranges, increasing barriers to migration or movement, changing abiotic and biotic factors making the habitat less suitable, and reducing access to resources and potential mates." Id. These generalizations do not address the effect of severing pronghorn migration corridors or destroying winter range on pronghorn – or provide any baseline analysis of existing pronghorn numbers and movement.

c.    *Amphibians*

Although the FEIS discloses that western toad, Columbia spotted frog, and northern leopard frog—all Sensitive Species that BLM is mandated to conserve by its own policy and by FLPMA—may be present in the Project area, no amphibian surveys were conducted for the Project and no mitigation measures for amphibians were adopted.[6] The only amphibian specifically discussed in the FEIS is the western toad, and BLM paradoxically claims that impacts to the toad are unlikely while simultaneously admitting that "Western toads may be prevented from moving through disturbed upland habitats located between the limited amounts

---

[6] These three species are listed in BLM's Nevada Sensitive Species list for the Winnemucca District (Exh. 21).

of aquatic/riparian habitat in the Project area." FEIS at 4-48 (Exh. 2). Thus, impacts to Western toads are likely, but the FEIS ignores those impacts.

Overall, the FEIS lacks a credible baseline upon which to analyze Project effects to amphibians and has adopted no measures to avoid impacts to amphibians, even though the mine will lower the water table, affecting perennial and ephemeral waterbodies that these species use.

> d.    Springsnails

Two species of springsnails were found in the Project area during wildlife surveys, the Kings River pyrg (*Pyrgulopsis imperialis*) and the turban pebblesnail (*Fluminicola turbiniformis*). *See* FEIS Appx. G unnumbered p. 130 of 134 (Exh. 20). The Kings River pyrg is a critically imperiled endemic species at high risk of extinction, and the turban pebblesnail is a vulnerable species at moderate risk of extinction or elimination. The Kings River pyrg is on the State of Nevada's At Risk Tracking List of imperiled species, which are considered at highest risk of extirpation or extinction.[7] The turban pebblesnail is on the State of Nevada's Watch List of species of long-term concern.[8]

The FEIS completely overlooks the Kings River pyrg's high risk of extinction. The FEIS does not provide clear information as to the number of Kings River pyrg that were found, how many springs contained them, or which springs contained them, thus making it impossible for BLM to accurately assess risk to the pyrg. Instead, BLM merely states: "Springsnails were surveyed at 13 undeveloped springs in the survey area. During surveys for springsnails, the Kings River pyrg (*Pyrgulopsis imperialis*) was found at all springs collected." FEIS Appx. G at unnumbered p. 130 of 134 (Exh. 20).

Since the Kings River pyrg is an endemic species only known to exist in 13 locations, the local area might contain the **entire known population** of the Kings River pyrg, but BLM never considered that possibility. *See* Summary Report for Kings River pyrg (Exh. 22)(prepared in

---

[7] http://dcnr.nv.gov/uploads/heritage/2021-01-Track-List-Jan-2021.pdf (viewed May 25, 2021).

[8] http://dcnr.nv.gov/uploads/heritage/2021-01-Watch-List-Jan-2021.pdf (viewed May 25, 2021).

29

support of the Conservation Strategy for Springsnails: Nevada-Utah Springsnail Conservation Team, in cooperation with BLM)(Exh. 23). Threats and stressors to springsnails include water depletions, like the dewatering effects associated with the Mine. NDOW asked in its FEIS comments for monitoring of five of the 13 springs where Kings River pyrg were found to be present, but the ROD contains no commitment to monitoring those springs. NDOW comments at 4-5 (Exh. 4). Instead of disclosing and discussing springsnail threats, stressors, and extinction risk, the FEIS fails to mention either the Kings River pyrg or the turban pebblesnail by name in its impacts analysis and merely states that there will be no direct impacts to springsnails. FEIS at 4-48, 4-50 (Exh. 2).

As for indirect impacts, the FEIS directs the reader to section 4.5.3 (potential impacts of groundwater drawdown to wildlife). FEIS at 4-53 to 4-56. But that section does not disclose whether there will be indirect impacts to springsnails or that the potential indirect impacts to wildlife in the Project area may include extinction. FEIS at 4-53 to 4-55. Nor does the FEIS propose any mitigation specifically for springsnails, or explain how the Kings River pyrg will maintain its representation, resiliency, and redundancy, which are all necessary for population integrity and species survival.

4.    Failure to Adequately Analyze Cumulative Impacts

NEPA requires BLM to consider cumulative impacts associated with actions it approves.

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. §1508.7. "In a cumulative impact analysis, an agency must take a 'hard look' at *all* actions' that may combine with the action under consideration to affect the environment." Great Basin Resource Watch, 844 F.3d at 1104 (*citing* Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior, 608 F.3d 592, 603 (9th Cir.2010))(emphasis in original). BLM did not do that here.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NEPA's obligation to consider cumulative impacts extends to all "past," "present," and "reasonably foreseeable future actions." 40 C.F.R. §1508.7. The FEIS must include "mine-specific or cumulative data," a detailed "quantified assessment" of other projects' combined environmental impacts, and "identify and discuss the impacts that will be caused by each successive project. Including how the combination of those various impacts is expected to affect the environment" within the area. Great Basin Resource Watch, 844 F.3d at 1104-06, *quoting* Great Basin Mine Watch v. Hankins, 456 F.3d 955, 973-74 (9th Cir. 2006).

The FEIS fails to adequately analyze the cumulative impacts from the other proposed activities within the cumulative effects study area on wildlife, air quality, and other potentially affected resources. The FEIS acknowledges the large "Cumulative Effects Study Area" (CESA) for critical resources that will be affected by the Project. FEIS at 5-1 (Exh. 2). BLM lists some of the other mining, oil/gas, and activities within the Thacker Pass CESA. FEIS at 5-2. Yet the FEIS contains little, if any, of the detailed analysis of these and other past, present, and reasonably foreseeable future activities within the CESA that may cumulatively affect these resources. BLM simply lists the acreages of these activities, with no detailed impacts analysis:

> Reasonably Foreseeable Future Actions
> RFFAs for the Thacker Pass Lithium Mine EIS cumulative effects analysis include other projects or actions that potentially affect those resources that would be affected by the Proposed Action during the same period of time (including final reclamation). RFFAs for which disturbance acreages can be quantified are presented in Table 5.2 and RFFAs for which disturbance acreages are unknown are described below. RFFAs identified in this section must also have been determined by the BLM as having a reasonable likelihood of moving toward forward towards development and to be located within the boundaries of the various CESAs for the Proposed Action.
>
> Other development predicted in the Winnemucca District Resource Management Plan that could contribute to cumulative effects includes renewable energy facilities, utility and road rights of way, vegetation treatments and hazardous fuels reduction, spread and invasion of noxious weeds, continued changes and possible intensification to Nevada's climate in association with global climate change, and increasing wildfire occurrence and intensity.

FEIS at 5-3 (relying on Table 5.2, which is just a simple listing of acreages of these projects).

The Ninth Circuit has repeatedly rejected similarly cursory analysis contained in BLM EISs for mines in Nevada, holding that listing other projects does not qualify as the required analysis:

1

2

3

4

5

6

> [I]n a cumulative impact analysis, an agency must take a 'hard look' at all actions" that may combine with the action under consideration to affect the environment. *Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (emphasis added). Furthermore, **simply listing all relevant actions is not sufficient.** Rather, "some quantified or detailed information is required. Without such information, neither the courts nor the public ... can be assured that the [agency] provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998).

7

8

9

10

11

12

Great Basin Resource Watch, 844 F.3d at 1104 (emphasis added). The Ninth Circuit in Great Basin Mine Watch v. Hankins specifically rejected BLM's argument that a list of other projects and their acreages satisfied NEPA's cumulative impacts analysis requirements: "**A calculation of the total number of acres to be impacted by other projects in the watershed** is a necessary component of a cumulative effects analysis, but **is not a sufficient description of the actual environmental effects that can be expected**." 456 F.3d at 973 (emphasis added).

13

14

15

16

17

The inadequate list of projects/acreages is especially insufficient here because the FEIS does not even mention the ongoing McDermitt lithium drilling project just to the north across the Oregon border that will have significant impacts on sage grouse, pronghorn, and other wildlife species. "Drilling Commences at McDermitt Lithium Project" (depicting and describing drilling and activities over thousands of acres)(Exh.24).

18

19

20

21

22

23

24

25

For the sage grouse, BLM arbitrarily cuts off its review of cumulative impacts at the Nevada/Oregon border, considering only the "Lone Willow PMU" which ends at the border. FEIS at 5-1 (Exh. 2). Yet the Lone Willow PMU is part of a larger sage grouse PAC (Priority Area of Conservation) that extends into Oregon. *See* COT Report at 14 (Figure 2)(Exh. 10). Thus, BLM's cumulative impacts analysis does not consider other projects in the Western Great Basin PAC that, along with the Thacker Pass Project, might contribute to impacts to the sage-grouse population there, including the McDermitt lithium drilling project, and others.

26

27

28

BLM also arbitrarily truncates its review of cumulative impacts to other wildlife at the nearby Oregon/Nevada border, even though it is obvious that wildlife movement and impacts do not recognize such an arbitrary line. For example, the FEIS limits its consideration of cumulative wildlife impacts to "General Wildlife" to just the "NDOW Hunt Unit 031" covering the

32

"Recreation CESA." FEIS at 5-1 (Table 5.1 "Cumulative Effects Study Areas by Resource,"). Yet BLM provides no analysis as to why the "Hunt Unit" area comprises all of the affected wildlife resources. There is no analysis to support these arbitrary limits to cumulative impacts to wide-ranging species such as migratory pronghorn.

5.    Failure to Adequately Analyze Mitigation Measures and Their Effectiveness

NEPA requires BLM to fully analyze mitigation measures, their effectiveness, and any impacts that might result from their implementation. An EIS must: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. §1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))," 40 C.F.R. §1502.16(h). NEPA thus requires that DOI/BLM review mitigation measures as part of the NEPA process – not in some future decision shielded from public review. BLM also has the duty under FLPMA to mitigate adverse impacts:

> [S]ections 302(b) and 303(a) of FLPMA, 43 U.S.C. 1732(b) and 1733(a), and the mining laws, 30 U.S.C. 22, provide the BLM with the authority to require mitigation. Mitigation measures fall squarely within the actions the Secretary can direct to prevent unnecessary or undue degradation of the public lands. An impact that can be mitigated, but is not, is clearly unnecessary.

65 Fed. Reg. at 70053 (Preamble to BLM Part 3809 mining regulations).

And finally, NEPA requires BLM to "respond to comments" and "discuss…any responsible opposing view…." 40 C.F.R. §1502.9(b). Where other federal and state agencies raise concerns about a proposal's environmental effects in comments, BLM may not simply give them "short shrift" by failing to respond "objectively and in good faith" or to make responsive changes. W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 493 (9th Cir. 2011). When "an agency… offers no meaningful response to serious and considered comments by experts, that agency renders the procedural requirement meaningless and the EIS an exercise in form over substance." Id. at 492-93.

Here, expert agencies alerted BLM that the FEIS and ROD contain neither the required analysis of mitigation measures for the affected resources, nor a credible analysis of the effectiveness of these measures. For the predicted groundwater pollution, as noted above, EPA

found that the FEIS lacked the required analysis because BLM's mitigation plan had not been developed in adequate detail. EPA's Detailed Comments at 1 (Exh. 17). EPA also highlighted how BLM failed to respond to serious concerns about the inadequate groundwater analysis and consequently failed to support the FEIS' conclusion that impacts to groundwater quality downgradient from the pit would be mitigated. Id.

Likewise, EPA specifically criticized the lack of such analysis for wildlife mitigation:

> **The Final EIS did not include a mitigation, monitoring, and adaptive management plan for wildlife mitigation measures** SSS-1 to SSS-9 (p. 4-62 to 4-65). Although the updated Plan of Operations included a monitoring plan in Appendix H, this did not include information on these measures. The EPA is concerned that several of these measures require additional monitoring and adaptive management to ensure mitigation success, such as creating the artificial burrowing system for western burrowing owls (SSS-7; p. 4-64, 65) and roosting bat habitat (SSS-9; p. 4-65).

Id. at 2 (emphasis added).

NDOW also followed up on concerns it had raised over the Draft EIS regarding noise impacts to sage-grouse and strongly recommended that:

> the noise monitoring plan and mitigation mentioned in the FEIS be given additional direction and commitment in the ROD to ensure it is properly completed. Specifically, we recommend the ROD include a commitment to complete noise monitoring, in compliance with all NDOW Protocols, on the Montana-10 and Pole Creek 01 leks during project construction and when mining activities are active.

NDOW Comments at 3 (Exh. 4). NDOW further stressed the need for more detail about monitoring, mitigation, and adaptive management as they related to sage-grouse:

> **The lack of disclosure on how BLM and LNC will be implementing monitoring, mitigation, and adaptive management leaves out the tremendous importance and efforts toward collectively conserving greater sage-grouse and is contrary to the ongoing efforts of the BLM to manage for this species.** The Department cannot stress enough how important it is to provide this information to the public and implement appropriate measures to protect sage grouse.

Id. (emphasis added).

BLM gave short shrift to these concerns. In response to comments received on the FEIS, BLM responded only that "[t]he BLM interdisciplinary team specialists reviewed these comments in full and determined that … the BLM has applied all reasonable and feasible mitigation within its regulatory authority regarding water resources, effects on eagles, and other

resource topics." ROD at 8 (Exh. 1). It did not change anything in the FEIS in response, and approved the Project without the mitigation analysis required by NEPA and deemed essential by the experts at NDOW and EPA.

BLM cannot cure its failure to provide a mitigation plan for public review and comment with a NEPA document by later adopting mitigation measures, especially where the mitigation plan proposes measures that were not discussed in the EIS. "[A] post-EIS analysis – conducted without any input from the public – cannot cure deficiencies in an EIS." Great Basin Resource Watch, 844 F.3d at 1104. Thus, while LNC recently submitted a mitigation plan that purportedly reduces the ground water pollution, it cannot make up for the FEIS' failure to adequately address groundwater mitigation. And further, as EPA pointed out, "[t]his revised monitoring plan includes a new potential future mitigation option for groundwater quality impacts that was not discussed in the Draft or Final EIS." EPA's Detailed Comments on FEIS, at 1 (Exh. 17). Likewise, should BLM adopt a mitigation plan for sage-grouse in the future as it purportedly intends to do, that would not fulfill its responsibilities under NEPA either. "Putting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking." Great Basin Resource Watch, at 1107.

## II.     **The Project Will Result in Immediate Irreparable Harm to Wildlife Habitat and Plaintiffs' Interests and Uses**.

"[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often . . . irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 545 (1987). The Project causes irreparable harm because "once the desert is disturbed, it can never be restored." Save Our Sonoran v. Flowers, 408 F.3d 1113, 1126 (9th Cir. 2005). Moreover, irreparable environmental injury follows from a NEPA violation. South Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior, 588 F.3d 718, 728 (9th Cir. 2009)("likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high").

BLM's approval of the Project authorizes LNC to begin "pre-production waste rock removal and stripping concurrent with process facility construction." FEIS Appx. B at 25 (LNC Mining Plan)(Exh. 3). "[P]re-stripping is scheduled to begin in 2021 and ore processing in 2022." Id. at 27. "Stripping," "Pre-stripping" and "waste rock removal" involves bulldozing, blasting, removal of all vegetation, and excavation and dumping of millions of tons of rock at the Project site. Id. at ii.

According to LNC, initial mechanized ground disturbance is now planned to commence as soon as June 23, 2021. *See* Brooks Decl. ¶ 7 (describing LNC's stated plans to begin "mechanical trenching" up to 40 meters long and up to a "few meters" each at 7 undisclosed sites, plus additional excavations at 20 other sites up to 5 feet deep)(Exh. 25).

Dr. Clait Braun, one of the nation's leading sage-grouse experts, states that any such actions "that involve excavations and/or soil or vegetation removal…have the immediate potential to harm sage-grouse and its habitat by impacting sagebrush or forbs used by sage-grouse [and]…act[ing] as a weed vector by removing vegetation and destroying biological soil crusts, thus reducing resistance to cheatgrass invasion." Braun Decl. ¶ 30 (Exh. 30). "Since sagebrush, once destroyed, can take decades to re-establish," "destruction of fragile sagebrush habitats is a virtually permanent effect." Id. ¶¶ 28, 42. The ground disturbance in the high-value sage-grouse habitats slated to commence in June thus poses an imminent threat of irreparable harm to Plaintiffs' demonstrated interests in sage-grouse and sagebrush habitats in the Project rea. *See* Decl. of Kelly Fuller ¶¶ 10-13, 21, 23-24, 26-27 (Exh. 27).

Further, full project development, including stripping away of all surface vegetation, is slated to begin in September or October of this year, per LNC's counsel's March representation. The CEO of LNC stated in an Op-ed in a local paper on April 28, 2021, that LNC is on the "cusp of construction." *See* Hadder Decl. ¶ 18 (*quoting* Op-ed)(Exh. 26). Since Federal Defendants have represented that they will not serve the Administrative Record in this case until July 30, this case will likely not be able to be resolved on the merits before full development begins.

Preliminary relief is therefore necessary to prevent irreparable harm to Plaintiffs' interests in the aesthetic and scenic values, wildlife, water, and air quality of Thacker Pass and the surrounding community. The Project's unalterable damage to the over 5,600 acres of public land directly impacted is undisputed. All of these tremendous impacts will irreparably harm Plaintiffs and their members. As shown in the attached declarations, members of Plaintiffs groups use the Project site for recreation, cultural, and aesthetic enjoyment – which will be eliminated by the Project. *See* Decls. of Hadder/GBRW (Exh. 26), Fuller/WWP (Exh. 27), Emmerich/BRW (Exh. 28), and Fite/WD (Exh. 29). Plaintiffs are further injured by BLM's procedural violations in its rush to approve the Project, which will result in impacts to the environment that BLM has never considered or disclosed. Id. (Declarations).

In addition to immediately destroying fragile sagebrush habitats—a "virtually permanent effect"—the Project will cause immediate and irreparable impacts to sage-grouse from human occupancy and noise associated with initial construction. Braun Decl. ¶¶ 33-39. Planned operations in September and October would destroy sage-grouse winter habitats in the Project area right as winter begins. That is a time when sage-grouse depend upon sagebrush almost entirely as a food source and rely on areas where sagebrush is available above the snow. Id. ¶ 17. As development proceeds into the spring of 2022, noise from the Project and exploration increase the likelihood that the key Montana-10 lek will be abandoned and decrease juvenile recruitment, exerting population-level effects on sage-grouse. Id. ¶¶ 34-39. BLM's failure to impose required mitigation measures ensures adverse effects to sage-grouse will occur, and its failure to understand baseline sage-grouse populations and use of the Project area means they will likely go unnoticed. Such violations of NEPA, combined with environmental impacts threatening Plaintiffs' interests, cause irreparable harm. *See* South Fork Band Council, 588 FR.3d at 728. One would be hard-pressed to find a stronger case for irreparable harm occurring during this lawsuit.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.    The Balance of Hardships and the Public Interest Tip Sharply in Favor of Plaintiffs.**

The public interest weighs heavily in favor of preserving the *status quo* and preventing irreparable environmental and other harms until this Court has fully reviewed the merits. As the Ninth Circuit has stated in the mining context:

> The public interest strongly favors preventing environmental harm. Although the public has an economic interest in the mine, there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the mine's operation.

S.E. Alaska Conservation Council v. U.S. Army Corps of Engineers, 472 F.3d 1097, 1101 (9th Cir. 2006). A temporary delay in Project operations while this Court considers the merits does not outweigh the impending irreparable injuries:

> Because the jobs and revenue will be realized if the project is approved, the marginal harm to the intervenors of the preliminary injunction is the value of moving those jobs and tax dollars to a future year, rather than the present. The LOWD plaintiffs' irreparable environmental injuries outweigh the temporary delay intervenors face in receiving a part of the economic benefits of the project.

League of Wilderness Defs. v. Connaughton, 752 F.3d 755, 765-66 (9th Cir. 2014).

The public interest in favor of a PI is especially acute when faced with violations of environmental laws. As the Ninth Circuit held in considering a PI against a large mining project: "Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending a project until that consideration has occurred thus comports with the public interest." South Fork Band Council, 588 F.3d at 728. "The preservation of our environment, as required by NEPA … is clearly in the public interest." Sierra Club. v. Bosworth, 510 F.3d 1016, 1033 (9th Cir. 2007). Overall, because Plaintiffs seek to enforce federal laws designed to protect the environment, and because the injunction would preserve the *status quo* until the case is resolved, the injunction would serve the interests of the public.

BLM's interests in this Motion are negligible and are not sufficient to outweigh the interests of Plaintiffs and the public in preventing irreparable environmental harm. The temporary economic impacts to LNC are also not irreparable and can be redeemed in the future if

this Court upholds BLM's actions. <u>League of Wilderness Defs. v. Connaughton</u>, 752 F.3d at 765-66. "It is well established, however, that such monetary injury is not normally considered irreparable." <u>Los Angeles Memorial Coliseum Commission v. NFL</u>, 634 F.2d 1197, 1202 (9th Cir. 1980). *See* <u>South Fork Band Council</u>, 588 F.3d at 728 (finding economic injuries to mining company temporary).

### IV.    <u>No More Than a Nominal Bond Is Appropriate in this Case.</u>

Under F.R.C.P. 65(c), in order to obtain a preliminary injunction, a plaintiff may be required to post a bond as the court deems proper. However, the "court has discretion to dispense with the security requirement, or to request a mere nominal security, where requiring security would effectively deny access to judicial review." <u>Cal. ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency</u>, 766 F.2d 1319, 1325-26 (9th Cir. 1985)(no bond where plaintiffs were public interest organizations seeking to protect the environment); *see also* <u>Friends of the Earth v. Brinegar</u>, 518 F.2d 322, 323 (9th Cir. 1975)($1,000 bond). The imposition of more than nominal bond would pose a real financial hardship and prevent Plaintiffs from vindicating their rights and frustrate judicial review. Hadder Decl. ¶¶ 22-23 (Exh. 26), Molvar Decl. ¶¶ 4-8 (Exh. 31), Emmerich Decl. ¶¶ 22-24 (Exh. 28), and Fite Decl. ¶¶ 35-36 (Exh. 29).

Respectfully submitted this 27th day of May, 2021.

*/s/ Christopher Mixson*
Christopher Mixson (NV Bar#10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
c.mixson@kempjones.com

Attorney for Plaintiffs

*/s/ Roger Flynn*
Roger Flynn, (Colo. Bar #21078), *Pro Hac Vice*
Jeffrey C. Parsons, (Colo. Bar #30210), *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2

Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Attorneys for Plaintiffs GBRW, BRW, and WD

*/s/ Talasi Brooks*
Talasi B. Brooks (ISB #9712), *Pro Hac Vice*
Western Watersheds Project
P.O. Box 2863
Boise ID 83701
(208)336-9077
tbrooks@westernwatersheds.org

Attorney for Plaintiff WWP

Certificate of Service

I, Roger Flynn, hereby attest that I served the foregoing and all attachments on all parties via this Court's ECF system, this 27th day of May, 2021.

*/s/ Roger Flynn*