JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ARWYN CARROLL (MA Bar 675926)
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0465
Fax: (202) 305-0506
arwyn.carroll@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.*, | Case No. 3:21-cv-103-MMD-CLB |
| Plaintiffs, | **FEDERAL DEFENDANTS' OPPOSITION IN RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.,* | |
| Defendants | |
| and | |
| LITHIUM NEVADA CORP. | |
| Defendant-Intervenor | |

**Defs' Opp. in Response to Mot. for Prelim. Inj.**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARDS ....................................................................................... 3

    I.      A preliminary injunction is an extraordinary remedy ................................... 3

    II.     Administrative Procedure Act review of agency action................................ 4

    III.    The Mining Law of 1872 ........................................................................ 4

    IV.   Federal Land Policy and Management Act ................................................. 5

    V.    National Environmental Policy Act .......................................................... 5

ARGUMENT ..................................................................................................... 6

    I.      Plaintiffs cannot demonstrate imminent, irreparable harm........................... 7

         A.     Plaintiffs have not demonstrated irreparable harm from activities under the HPTP ............................................................................................ 7

         B.     Plaintiffs' claims do not support enjoining HPTP activities .............. 10

         C.     Plaintiffs' other alleged harms are not imminent............................. 12

    II.     Plaintiffs are not likely to succeed on the merits of their claims.................. 14

         A.     BLM's approval of the Project complied with FLPMA.................... 15

             1.     BLM's approval of the Project complied with FLPMA vis-à-vis the RMPs ...................................................................... 15

                  a.     FLPMA does not require mining operations to comply with the invoked RMPs............................................. 16

                  b.     The RMP provisions themselves exempt the Project approval ................................................................... 19

             2.     BLM did not, and was not required to, base its decision on "valid existing rights" ......................................................... 20

             3.     BLM's approval does not violate water- and air-quality standards.......................................................................... 24

         B.     BLM's environmental analysis complied with NEPA..................... 26

             1.     BLM described baseline conditions ...................................... 27

             2.     BLM analyzed cumulative impacts ...................................... 31

             3.     BLM considered mitigation measures ................................... 33

    III.    The public interest and balance of equities disfavor an injunction .............. 36

CONCLUSION ................................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005) ........................................................... 11

*Akiak Native Cmty. v. U.S. Postal Serv.*,
  213 F.3d 1140 (9th Cir. 2000) ............................................................. 36

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................... 3

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) .............................................................................. 12

*Andrus v. Shell Oil Co.*,
  446 U.S.657 (1980) ............................................................................... 16

*Apache Survival Coal. v. United States*,
  21 F.3d 895 (9th Cir. 1994) .................................................................. 11

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ............................................................... 6

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983) ........................................................................... 4, 27

*Best v. Humboldt Placer Mining Co.*,
  371 U.S. 334 (1963) ............................................................................... 5

*Bird v. Barr*,
  No. 19-cv-1581, 2020 WL 4219784 (D.D.C. July 23, 2020) ......................... 11

*Cal. Coastal Comm'n v. Granite Rock Co.*,
  480 U.S. 572 (1987) .............................................................................. 22

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) .................................................................. 6

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ............................................................. 7, 12

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) .............................................................. 33

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ................................................................ 4

*Conservation Cong. v. U.S. Forest Serv.*,
  720 F.3d 1048 (9th Cir. 2013) .......................................................... 3, 14

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
  833 F.3d 1136 (9th Cir. 2016) .............................................................. 36

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*,
  409 F. Supp. 3d 738 (D. Ariz. 2019) ................................................................. 23, 24

*Ctr. for Competitive Politics v. Harris*,
  784 F.3d 1307 (9th Cir. 2015) ........................................................................... 3

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) .......................................................................................... 31

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ........................................................................... 36

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ............................................................................. 36

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ............................................................................. 9

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) .......................................................................................... 36

*Edwardsen v. U.S. Dep't of the Interior*,
  268 F.3d 781 (9th Cir. 2001) ............................................................................. 26

*Freeman v. U.S. Dep't of the Interior*,
  83 F. Supp. 3d 173 (D.D.C. 2015) ..................................................................... 21

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
  844 F.3d 1095 (9th Cir. 2016) ............................................................. 32, 33, 34, 35

*Great Basin Res. Watch v. U.S. Dep't of the Interior*,
  No. 3:13–cv–00078–RCJ–VPC, 2014 WL 3696661 (D. Nev. July 23, 2014) ................. 22

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
  857 F.2d 505 (9th Cir. 1988) ............................................................................. 27

*Japanese Vill., LLC v. Fed. Transit Admin.*,
  843 F.3d 445 (9th Cir. 2016) ............................................................................. 34

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ........................................................................... 4, 9

*Lands Council v. Powell*,
  379 F.3d 738 (9th Cir. 2004) ............................................................................. 32

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .......................................................................................... 3

*McMaster v. United States*,
  731 F.3d 881 (9th Cir. 2013) ............................................................................. 4

*Mineral Policy Ctr. v. Norton*,
  292 F. Supp. 2d 30 (D.D.C. 2003) ..................................................................... 19

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................. 4

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ................................................................. 7

*N. Alaska Env't Ctr. v. Kempthorne*,
   457 F.3d 969 (9th Cir. 2006) ............................................................... 33

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*,
   No. 15-cv-1582, 2016 WL 420470 (D.D.C. Jan. 22, 2016) ................... 9

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002) ................................................................. 4

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
   137 F.3d 1372 (9th Cir. 1998) ............................................................. 32

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................... 17

*Oregon Nat. Res. Council Fund v. Brong*,
   492 F.3d 1120 (9th Cir. 2007) ............................................................. 19

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
   810 F.3d 631 (9th Cir. 2015) ............................................................... 11

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ........................................................................ 6, 33

*S. Fork Band Council v. U.S. Dep't of the Interior*,
   588 F.3d 718 (9th Cir. 2009) ............................................................... 34

*S. Utah Wilderness All. v. Bernhardt*,
   No. CV 20-3654 (RC), 2021 WL 106384 (D.D.C. Jan. 12, 2021) ........ 9

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
   472 F.3d 1097 (9th Cir. 2006) ............................................................. 37

*Steele v. United States*,
   No. 1:14-CV-1523 (RCL), 2020 WL 7123100 (D.D.C. Dec. 4, 2020) ... 11

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................. 12

*Te–Moak Tribe of W. Shoshone v. U.S. Dep't of the Interior*,
   608 F.3d 592 (9th Cir. 2010) ............................................................... 32

*Union Oil Co. v. Smith*,
   249 U.S. 337 (1919) ............................................................................. 16

*United States v. Locke*,
   471 U.S. 84 (1985) ................................................................................. 4

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
   435 U.S. 519 (1978) ...................................................................................... 31

*Western Exploration, LLC v. U.S. Dep't of the Interior*,
   250 F. Supp. 3d 718 (D. Nev. 2017) ............................................................ 19

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) .............................................................................. 3, 4, 7, 8

**Statutes**

30 U.S.C. § 21a ............................................................................................... 37

30 U.S.C. § 22 ............................................................................................ 4, 22

30 U.S.C. § 29 ......................................................................................... 21, 22

40 C.F.R. § 1503.1(b) ...................................................................................... 35

42 U.S.C. § 4332(2)(C) ..................................................................................... 6

43 U.S.C. § 1701(a) ..................................................................................... 5, 37

43 U.S.C. § 1712 ........................................................................................ 5, 16

43 U.S.C. § 1712(e) .......................................................................................... 17

43 U.S.C. § 1714(a) .......................................................................................... 16

43 U.S.C. § 1732(a) .......................................................................................... 16

43 U.S.C. § 1732(b) ..................................................................................... 5, 16

5 U.S.C. § 706(2) ............................................................................................... 4

54 U.S.C. § 300101(1) ...................................................................................... 37

54 U.S.C. § 306108 ...................................................................................... 7, 36

**Regulations**

36 C.F.R. § 800.1 ............................................................................................. 36

36 C.F.R. § 800.2(d) ........................................................................................ 12

36 C.F.R. § 800.6(a) ........................................................................................... 7

40 C.F.R. § 1501.3 ............................................................................................. 6

40 C.F.R. § 1502.14(f) ...................................................................................... 33

40 C.F.R. § 1502.15 .......................................................................................... 27

40 C.F.R. § 1502.16(h) ...................................................................................... 33

40 C.F.R. § 1506.13 ............................................................................................ 6

40 C.F.R. § 1508.7 ............................................................................................ 32

43 C.F.R. § 1610.5-3(a)..................................................................................... 18

43 C.F.R. § 3809.1(a)....................................................................................... 14

43 C.F.R. § 3809.100.................................................................................21, 23

43 C.F.R. § 3809.11(a)........................................................................................ 5

43 C.F.R. § 3809.411(d)(3)............................................................................. 17

*43 C.F.R. § 3809.412*...................................................................................... 14

43 C.F.R. § 3809.415(b)................................................................................... 23

43 C.F.R. § 3809.420........................................................................................ 17

43 C.F.R. § 3809.420(a)(3).............................................................................. 17

43 C.F.R. § 3809.420(b)...................................................................... 14, 24, 25

43 C.F.R. § 3809.423........................................................................................ 22

43 C.F.R. § 3809.5...............................................................................14, 18, 24

43 C.F.R. § 3809.590........................................................................................ 22

Nev. Admin. Code § 445A.429(3) (2020).................................................... 25

**Other Authorities**

85 Fed. Reg. 3413 (Jan. 21, 2020)........................................................8, 12, 18

85 Fed. Reg. 43,304 (July 16, 2020)................................................................. 6

85 Fed. Reg. 45,651 (July 29, 2020)........................................................2, 12, 18

85 Fed. Reg. 78,324 (Dec. 4, 2020)................................................................... 2

## TABLE OF ACRONYMS

| APA | Administrative Procedure Act |
|---|---|
| BLM | United States Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| HPTP | Historic Properties Treatment Plan |
| NDEP | Nevada Division of Environmental Policy |
| NDOW | Nevada Department of Wildlife |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NOI | Notice of Intent |
| SHPO | State Historic Preservation Officer |
| ROD | Record of Decision |
| VRM | Visual Resource Management |

## INTRODUCTION

Plaintiffs in this case challenge the United States Bureau of Land Management's decision to approve mining and exploration plans of operations for Lithium Nevada Corp.'s Thacker Pass lithium mine. The merits of their claims will be resolved in an orderly fashion, consistent the schedule adopted by the Parties in their Joint Proposed Case Management Report and Proposed Briefing Plan.[1] In a related action, Lithium Nevada has committed to provide 60 days' notice before commencing any major ground-disturbing activities authorized under the challenged ROD.[2] In the interim, the only ground-disturbing activities contemplated are limited surveys to collect and recover data under the Project's historical properties treatment plan (HPTP)—a plan developed in coordination between BLM and the State Historic Preservation Officer (SHPO) to ensure compliance with the National Historical Preservation Act (NHPA).

Plaintiffs nonetheless seek the drastic and extraordinary remedy of an emergency injunction.[3] They have failed, however, to demonstrate that activities under the HPTP would irreparably harm them or that any of their claims entitle them to an injunction against those activities. And though Plaintiffs urge that an injunction is necessary to prevent Lithium Nevada's ground-disturbing mining operations from moving forward, they cannot rely on that activity to satisfy their burden under the preliminary injunction standard because those actions are not imminent.

Even if Plaintiffs could carry their burden of demonstrating imminent, irreparable injury, they have failed to establish the second requirement for a preliminary injunction: a likelihood of success on the merits of any of their claims under the National Environmental Policy Act (NEPA), the Federal Land Policy and Management Act (FLPMA), or the

---

[1] ECF No. 28.

[2] *See Bartell Ranch, LLC v. McCullough*, No. 3:21-cv-80-MMD-CLB (D. Nev. filed Feb. 11, 2021), ECF No. 39 ¶ 1 (order approving joint stipulation).

[3] Pls.' Mot. for Prelim. Inj. and Mem. in Supp. ("Pls.' Mem."), ECF No. 23.

Administrative Procedure Act (APA). Finally, the public interest and balance of equities favor denying a preliminary injunction under the facts and posture of this case. Plaintiffs' motion for a preliminary injunction should therefore be denied.

## BACKGROUND

In July 2019, Lithium Nevada submitted, under BLM's surface management regulations, 43 C.F.R. subpart 3809, proposed plans of operations to develop a lithium mine in the Thacker Pass area of Humboldt County, Nevada, and to explore for additional lithium resources in the vicinity of the proposed mine. On January 15, 2021, BLM issued a Record of Decision approving both plans. The mining and exploration plans of operations collectively comprise Lithium Nevada's Thacker Pass Lithium Mine Project ("the Project"). The project area encompasses approximately 18,000 acres of public lands, though actual disturbance is anticipated at approximately 5,700 acres.[4] None of the lands within the Project area have been withdrawn from the public land laws, including the mining laws.

Before approving the Project, BLM conducted a robust NEPA analysis. It issued its Notice of Intent (NOI) to prepare an Environmental Impact Statement (EIS) on January 21, 2020. It then engaged in a scoping period, during which it held public scoping meetings in Winnemucca and Orovada, Nevada, on February 5 and 6, and received 26 comment letters. It made the Draft EIS (DEIS) available to the public for comment on July 29, 2020,[5] then held two additional public meetings in August 2020 and received 63 letters commenting on the DEIS. BLM made the Final EIS (FEIS) available on December 4, 2020[6] and considered comments submitted during the 30-day review period before issuing its Record of Decision (ROD) approving the Project on January 15, 2021.

---

[4] Pls.' Ex. 1, ECF No. 23-1 ("ROD") at 3.

[5] 85 Fed. Reg. 45,651 (July 29, 2020).

[6] 85 Fed. Reg. 78,324 (Dec. 4, 2020).

Plaintiffs, a set of four environmental-advocacy organizations, filed their complaint a month later.[7] Through their nearly 300-paragraph complaint, Plaintiffs challenge a single, final administrative action: BLM's decision to approve the Project.[8] Because this decision complied with FLPMA's requirement that the Secretary of the Interior act to prevent "unnecessary or undue degradation," and because the underlying environmental analysis satisfied the procedural requirements of NEPA and its implementing regulations, Plaintiffs are unable to demonstrate a likelihood of success on the merits of their claims.

## LEGAL STANDARDS

### I.     A preliminary injunction is an extraordinary remedy

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008) (citation omitted). To obtain this extraordinary remedy, Plaintiffs must carry "the heavy burden of making a 'clear showing' that [they are] entitled to a preliminary injunction." *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015). The "requirement for substantial proof is much higher" for a motion for a preliminary injunction than it is for a motion for summary judgment. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

A plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter*, 555 U.S. at 20, 22). Alternatively, in the Ninth Circuit, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of a preliminary injunction," albeit only "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). Under either test, the

---

[7] Compl., ECF No. 1.

[8] *Id.* ¶ 1.

plaintiff must "establish that irreparable harm is *likely*, not just possible," *id.* at 1131, and a deficiency in any one of the required elements precludes extraordinary relief, *Winter*, 555 U.S. at 24.

## II.     Administrative Procedure Act review of agency action

The APA, 5 U.S.C. §§ 701–706, governs review of Plaintiffs' claims. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205–06 (9th Cir. 2004). Final agency action is reviewed under 5 U.S.C. § 706(2). Such review is highly deferential. *Lands Council v. McNair*, 537 F.3d 981, 992–94 (9th Cir. 2008), *overruled in part on other grounds*, *Winter*, 555 U.S. at 22. Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and choice made. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## III.     The Mining Law of 1872

Under the Mining Law, "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase," subject to applicable regulations and laws. 30 U.S.C. § 22. It thus "permit[s] citizens to enter and explore unappropriated federal lands in search of 'valuable mineral deposits,'" *McMaster v. United States*, 731 F.3d 881, 885 (9th Cir. 2013) (quoting 30 U.S.C. § 22), and to "go onto unappropriated, unreserved public land to prospect for and develop certain minerals," *United States v. Locke*, 471 U.S. 84, 86 (1985). Only "regulations prescribed by law" and "the local customs or rules of miners," so far as "not inconsistent with the laws of the United States," limit these permissions. 30 U.S.C. § 22.

In addition to this statutory right to remove minerals, the Mining Law further grants miners the option to establish and protect a property right to lands explored and occupied.

*See id.* §§ 23, 26, 35, 36, 42. A mining claimant must make a "discovery" of a valuable mineral deposit and comply with all other applicable laws and regulations in order to secure a property right in a mining claim that can be enforced against the United States. *Id.* § 23; *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963).

BLM manages surface disturbance connected with mining operations on the public lands under the Mining Law through its regulations at 43 C.F.R. subpart 3809. Those regulations, which apply (with exceptions not relevant here) to "all operations authorized by the mining laws on public lands," *id.* § 3809.2(a), require an approved "plan of operations" before mining operations or exploration causing more than five acres of surface disturbance can begin, *id.* § 3809.11(a). BLM's regulations require it to verify mining claim validity before approving a plan of operations only where the lands are withdrawn from the operation of the Mining Law. *Id.* § 3809.100.

## IV.    Federal Land Policy and Management Act

BLM manages the public lands within its jurisdiction under FLPMA's broad "multiple use and sustained yield" mandates. *See* 43 U.S.C. § 1701(a)(1)–(8). This mandate gives BLM broad discretion to determine the combination of land uses that will best meet the needs of the American people, and to use some lands for less than all of the resources. *Id.* § 1702(h). To achieve these ends, BLM develops land-use plans, which set forth goals and objectives for a particular area. *See id.* § 1712. Though FLPMA amended the Mining Law to require that, in managing the public lands, the Secretary of the Interior "shall, by regulation or otherwise, take . . . action necessary to prevent unnecessary or undue degradation of the lands," *id.* § 1732(b), BLM may not withdraw lands from the operation of the Mining Law using the land-use-planning process, *id.* § 1712(e)(3).

## V.    National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the

decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment[.]"42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.[9] The requirements of NEPA are procedural. *See Robertson*, 490 U.S. at 351. In reviewing the sufficiency of an EIS, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). A court should not "substitute its judgment for that of the agency," *id.*, or "'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies," *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1183–84 (9th Cir. 1997) (citation omitted). Once the Court is satisfied that the agency "has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Block*, 690 F.2d at 761 (citation omitted).

## ARGUMENT

Plaintiffs are not entitled to preliminary injunctive relief. They have not demonstrated an imminent threat of irreparable harm that merits that extraordinary remedy. Nor have they shown a likelihood of success on the merits of their claims. Finally, the balance of harms and public interest favor withholding injunctive relief. Plaintiffs have thus failed to show they are entitled to any relief, and certainly not the imposition of a preliminary injunction.

---

[9] The Council on Environmental Quality issued new NEPA-implementing regulations in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). Because the administrative actions challenged in this case were subject to the previous regulations, *see* 40 C.F.R. § 1506.13, all citations herein are to the version of the regulations in effect at the time the relevant decisions were made, 40 C.F.R. Part 1500 (2019).

## I.   Plaintiffs cannot demonstrate imminent, irreparable harm

Plaintiffs must show a "likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21. To do so, they must "*demonstrate immediate threatened injury*," not "merely allege imminent harm . . . ." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted). Mere "[s]peculative injury, does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.* (citation omitted). Plaintiffs identify two categories of actions through which they allege they will be harmed: activities under the HPTP and general mining operations. Because neither meets this standard, Plaintiffs have failed to carry their burden of demonstrating that they will suffer irreparable, non-speculative injury before the Court can address the merits of this action. On that basis alone, their motion should be denied.

### A.   Plaintiffs have not demonstrated irreparable harm from activities under the HPTP

Plaintiffs first assert that their enjoyment of the Thacker Pass area will be injured by a narrow set of actions taken in compliance with the HPTP developed through the NHPA consultation process.[10] The NHPA requires federal agencies to account for the effects of "undertakings" on "any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]." 54 U.S.C. § 306108. If an undertaking is determined to have "adverse effects," the agency is required to consult with the relevant parties "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate" those adverse effects. 36 C.F.R. § 800.6(a). This consultation process "is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

---

[10] Pls.' Mem. at 5, 36 (describing "initial mechanized ground disturbance"). Though initially planned to commence by June 23, 2021, the parties stipulated that these activities would not begin before July 29, 2021. *See* Order on Joint Motion and Stipulation, ECF No. 26.

BLM, in consultation with the Nevada SHPO, determined that the Thacker Pass Project would have an adverse effect on a number of historic properties within its "area of potential effect."[11] In its published NOI to prepare a DEIS for the Project, BLM invited the public to comment and consult on potential impacts to historical and cultural properties from the proposed Project.[12] In the published DEIS for the Project, BLM noted its determination that adverse impacts to historic or cultural properties were anticipated and that a plan would be developed to address them.[13] Plaintiffs' comments on the DEIS did not reference that anticipated plan and no interested party or member of the public requested consultation under the NHPA.[14] BLM then developed the HPTP, which was approved under a Memorandum of Agreement between BLM and the SHPO on November 5, 2020.[15]

Plaintiffs have not demonstrated that they are likely to suffer irreparable harm absent an injunction from actions under the HPTP. *See Winter*, 555 U.S. at 20. And they cannot do so because impacts to the Project area would be minimal and remediated. The first stage of the HPTP, which Plaintiffs seek to enjoin, requires data to be recovered from 21 identified historic properties.[16] At each location, a contractor will follow an approved, site-specific plan that includes collecting artifacts and samples from the surface—which does not require any ground disturbance—followed by data recovery through potential excavation by hand or, at seven locations, mechanical excavation.[17] Hand excavation is expected to go no deeper than

---

[11] ROD at 5–6; *see also* Declaration of Mark E. Hall ("Hall Decl.") ¶ 4.

[12] 85 Fed. Reg. 3413, 3414 (Jan. 21, 2020); Hall Decl. ¶ 5.

[13] Thacker Pass Lithium Mine Project Draft Environmental Impact Statement at 4-75–4-79, excerpts of which are attached as Defs.' Exhibit B; Hall Decl. ¶ 6.

[14] Hall Decl. ¶¶ 5–6; *see also* Pls.' Ex. 5, ECF No. 23-5 ("FEIS App'x R").

[15] Hall Decl. ¶¶ 7–9. A copy of the HPTP, with confidential information redacted, is attached to the Hall Declaration as Exhibit A.

[16] Hall Decl. ¶ 10(a); Hall Decl. Ex. A at 5–6, 19–23.

[17] Hall Decl. ¶ 10(a); Hall Decl. Ex. A at 19–22.

1.5 meters at up to 25 locations per identified property.[18] Mechanical excavation contemplated comprises trenching in a line between 20 and 40 meters long, likely to a depth of no more than a few meters, at 7 of those locations.[19] The contemplated excavation is anticipated to disturb between 0.15 and 0.25 acres total across the entire 18,000-acre Project area, with mechanical excavation disturbing approximately 0.04 acres.[20] All of these excavations must and will be backfilled to surface level and original compaction.[21] And these excavated areas may be re-seeded and monitored for vegetation success and weeds if the mine construction and development do not proceed as planned.[22] Plaintiffs simply have not established that this minimal, remediated disturbance constitutes irreparable harm to their enjoyment of the Thacker Pass area. *See S. Utah Wilderness All. v. Bernhardt*, No. CV 20-3654 (RC), 2021 WL 106384, at *5 (D.D.C. Jan. 12, 2021) (denying preliminary injunction where alleged harm from approved work was subject to strict remediation measures); *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, No. 15-cv-1582, 2016 WL 420470, at *11 (D.D.C. Jan. 22, 2016) (finding no irreparable harm for mining operations on small parcel subject to reclamation measures).

Casting a wide net, Plaintiffs contend that *any* actions that disturb the ground or vegetation across the entire 18,000-acre Project area, no matter how small, will cause them irreparable injury.[23] But the Court of Appeals has expressly "declined 'to adopt a rule that *any* potential environmental injury *automatically* merits an injunction.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (quoting *Lands Council*, 537 F.3d at 1005). In any event, Plaintiffs have not substantiated that contention. The bulk of Plaintiffs' support for

---

[18] Hall Decl. ¶ 10(a).

[19] *Id.* ¶ 10(a); Hall Decl. Ex. A at 19.

[20] Hall Decl. ¶ 11.

[21] *Id.* ¶¶ 10(a); 12; Hall Decl. Ex. A at 21.

[22] Hall Decl. ¶ 12.

[23] Pls.' Mem. at 35–36.

this proposition addresses potential harms arising from ground-disturbance connected to mining operations[24] but, as discussed below, ground-disturbing mining operations are not imminent. On their face, the two paragraphs on which Plaintiffs rely for the proposition that that activities under the HPTP would harm them raise only the potential for harm; they do not establish likely, actual harm.[25] And Plaintiffs' other affidavits offer only generalized allegations of harm from the proposed excavation without addressing with any specificity how their enjoyment of the entire area would be impaired by less than a quarter acre of disturbance.[26] Plaintiffs similarly have not demonstrated irreparable harm arising from those minimal intrusions on the greater sage grouse or sage-grouse habitat. The contemplated disturbance would occur over a mile away from the nearest lek and affect less than 0.0001% of the Lone Willow Sage Grouse Population Management Unit (PMU)—and a portion of the area disturbed may not even be suitable for greater sage grouse.[27]

Plaintiffs have thus failed to demonstrate that activities contemplated by the HPTP are likely to irreparably harm their enjoyment of the Thacker Pass environment. The Court should therefore deny their request to enjoin those activities.

### B.    Plaintiffs' claims do not support enjoining HPTP activities

Even were Plaintiffs likely to be injured by these actions—which they are not—Plaintiffs' claims do not provide a basis for enjoining activities under the HPTP. "When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not

---

[24] *See* Pls.' Mem. at 36–37.

[25] *See id.* (citing Fuller Decl. ¶ 27; Braun Decl. ¶ 30); Fuller Decl. ¶ 27, ECF No. 23-27 (contending that "disturbance . . . *could* harm sage-grouse and other wildlife" and that the "presence of a human being *can* be enough to disturb and harm golden eagles." (emphasis added)); Braun Decl. ¶ 30, ECF No. 23-30 (opining that excavations for cultural surveys "have the immediate *potential* to harm sage-grouse and its habitat by impacting sagebrush or forbs used by sage-grouse," and that "any kind of ground disturbance *can* act as a weed vector by removing native vegetation and destroying biological soil crusts . . . ." (emphasis added)).

[26] *See* Emmerlich Decl. ¶ 11, ECF No. 23-28; Fite Decl. ¶ 25, ECF No. 23-29.

[27] Hall Decl. ¶¶ 13–15.

have the authority to issue an injunction" *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631 (9th Cir. 2015); *see also Steele v. United States*, No. 1:14-CV-1523 (RCL), 2020 WL 7123100, at \*7 (D.D.C. Dec. 4, 2020) (the Court "cannot grant preliminary relief on claims not pleaded in the complaint."). Thus, "a proper motion for a preliminary injunction seeks to enjoin *the action that the complaint alleges is unlawful* prior to completion of the litigation." *Bird v. Barr*, No. 19-cv-1581, 2020 WL 4219784, at \*2 (D.D.C. July 23, 2020). Here, Plaintiffs allege deficiencies under NEPA and violations of FLPMA,[28] but no claims challenging the NHPA process.

Plaintiffs may argue that an injunction is proper despite this because the challenged ROD and FEIS acknowledge the obligations imposed on BLM by the NHPA, as well as the determination of adverse effects arising from the Project.[29] But no final administrative action challenged by Plaintiffs in this case authorizes the proposed data collection, data recovery, or mitigation under the HPTP. Approval of the plans of operations and the NEPA process, which Plaintiffs do challenge, are both governed by separate statutory and regulatory regimes from those imposing obligations under the NHPA. *See Apache Survival Coal. v. United States*, 21 F.3d 895, 906 (9th Cir. 1994) (despite similarities, "the obligations imposed by NHPA are separate and independent from those mandated by NEPA" (citation and internal quotations omitted)). So even were the Court to find a likelihood of success on the merits of the claims actually raised, it would have no basis to enjoin activities under the HPTP.

Plaintiffs' failure to comment on the Project's impact on historic and cultural properties also precludes such a claim. It is incumbent on "parties seeking judicial review of agency action to raise their issues before the agency during the administrative process in order to preserve those issues for judicial review." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005). Plaintiffs offer no support

---

[28] *See* Compl. ¶¶ 243–74.

[29] ROD at 5-6, 11; Pls.' Ex. 2, ECF No. 23-2 ("FEIS") at 4-82.

for their suggestion that "public review" of the HPTP was required prior to conducting activities under it.[30] And BLM did invite the public to comment and consult on the Project's impacts on historic properties during the scoping period and the comment period on the DEIS, consistent with 36 C.F.R. § 800.2(d).[31] Plaintiffs declined that invitation.[32]

### C.   Plaintiffs' other alleged harms are not imminent

Plaintiffs not demonstrated that any other alleged harm merits an injunction at this stage, either. Aside from data recovery under the HPTP, Plaintiffs have not identified any other activity that would allegedly cause them harm before the Court could rule on the merits. And they cannot, because no such activity is imminent.

As an initial matter, there is no presumption of irreparable harm from violation of a procedural statute like NEPA. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Though "[e]nvironmental injury, by its nature," may be irreparable, such an injury must still be "sufficiently likely," *id.*, as well as imminent, before a preliminary injunction can issue, *Caribbean Marine Servs.*, 844 F.2d at 674. Plaintiffs have not made that showing here: other than activities under the HPTP, Plaintiffs have not identified any other specific activity from which they allege they would suffer irreparable harm that is likely to occur before the Court can address the merits of this action. And their assertion that NEPA violations alone create an imminent irreparable injury, untethered to any actual environmental harm, finds no support in the case law. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (discussing procedural injury *in vacuo*).

Plaintiffs' sweeping assertions that mining operations associated with the Project would cause irreparable harm because the desert would be disturbed at some point in the future[33] do not satisfy the immediacy requirement. *See Caribbean Marine Servs.*, 844 F.2d at

---

[30] *See* Pls.' Mem. at 5 (citing Brooks Decl. ¶ 7).

[31] *See* 85 Fed. Reg. 3413, 3414; 85 Fed. Reg. 45,651, 45,652; Hall Decl. ¶ 5.

[32] Hall Decl. ¶ 6.

[33] Pls.' Mem. at 35.

674 (requiring demonstration of "immediate threatened injury"). Lithium Nevada has represented in a stipulation filed in another case challenging the same ROD and FEIS that, with the exception of the activities under the HPTP described above, it does not presently anticipate conducting ground-disturbing activities on public lands associated with the Thacker Pass Project.[34] And its agreement in that case to provide 60-day notice before commencing major ground-disturbing activities authorized under the challenged ROD—which it likewise offered in this case before Plaintiffs filed this motion—would afford an opportunity to seek relief against any specific, immediate action contemplated before the merits of the actions are resolved under agreed-to schedules.[35]

Plaintiffs nevertheless attempt to create a sense of immediacy where there is none. They invoke a statement in the FEIS to the effect that "waste rock removal and stripping concurrent with process facility construction" was "scheduled to begin in 2021."[36] But they fail to note the preceding clause, which conditioned that schedule on Lithium Nevada "receiving the required authorizations and permits for the Project . . . ."[37] And Lithium Nevada has not yet completed that process. The ROD and BLM's regulations at 43 C.F.R. subpart 3809 make clear that, before Lithium Nevada can begin waste rock removal or construction of its mining facilities, several necessary conditions must be met. Specifically: (1) For any work approved in the ROD that impacts a cultural site, a permit to conduct the data collection under the HPTP described *supra* must issue and that collection must be

---

[34] *Bartell Ranch*, No. 3:21-cv-80-MMD-CLB, ECF No. 39 at 2 (order approving joint stipulation).

[35] *See id.* ¶ 1; *Bartell Ranch*, No. 3:21-cv-80-MMD-CLB, ECF No. 36 (approved schedule); Joint Case Management Report, ECF No. 28 (proposing similar agreed-to schedule)

[36] *See* Pls.' Mem. at 2.

[37] Pls.' Ex. 3, ECF No. 23-3 ("FEIS App'x B") at 27. Plaintiffs' attempt to build a sense of immediacy on a statement by Lithium Nevada's CEO to the effect that the company is on the "cusp of construction," Pls.' Mem. at 5, likewise fails when that phrase is placed in the context of the "decade of talking, meeting, and planning" that precedes it. *See* Hadder Decl. ¶ 18 and attached exhibit, ECF No. 23-26.

completed; (2) Lithium Nevada must obtain permits from the Nevada Division of Environmental Policy (NDEP), including permits for mine reclamation, water pollution control, and air quality, *see* 43 C.F.R. §§ 3809.420(b)(4), (5); and (3) Lithium Nevada must provide a financial guarantee, s*ee id.* § 3809.412, and BLM must determine that the form and amount of the guarantee are acceptable before Lithium Nevada may begin approved operations.[38] Because these conditions have not yet been met,[39] the harms Plaintiffs allege would arise from mining operations approved under the ROD are not imminent.

Finally, Plaintiffs' complaint that "BLM has refused to state plainly whether it plans to undertake other surface disturbing activities associated with the Project"[40] does not satisfy the harm element. As a legal matter, the ROD authorizes Lithium Nevada's actions, not BLM's. The regulations under which the Project was approved were designed to "[p]revent unnecessary or undue degradation of public lands by operations authorized by the mining laws." 43 C.F.R. § 3809.1(a). BLM is not an "operator" and does not conduct "operations authorized by the mining laws." *Id.*; *id.* § 3809.5. Thus, even were Plaintiffs to succeed on the merits of their claims and the Court to enjoin the actions approved by the ROD, the Court would have no basis to enjoin any potentially ground-disturbing action by BLM itself.

Plaintiffs thus have not established a likelihood of imminent, irreparable harm arising from *any* of the actions that they seek to enjoin. Because they have failed to carry their burden on that element, the Court should deny their motion for a preliminary injunction.

## II.     Plaintiffs are not likely to succeed on the merits of their claims

Plaintiffs must also demonstrate a likelihood of success on the merits of any of their claims to obtain preliminary injunctive relief. *Conservation Cong.*, 720 F.3d at 1054. They have not done so here as to any of their claims. Plaintiffs' claims under FLPMA are based on false premises, both legal and factual. And BLM's NEPA analysis satisfies the applicable

---

[38] Declaration of Kathleen L. Rehberg ("Rehberg Decl.") ¶ 4.

[39] *Id.* ¶¶ 4–8.

[40] Pls.' Mem. at 2.

standards in each of the three areas that Plaintiffs challenge. Because Plaintiffs have not demonstrated a likelihood of success on the merits of any of their claims, the Court should deny Plaintiffs' motion.

### A.     BLM's approval of the Project complied with FLPMA

Plaintiffs cannot succeed on the merits of claims based on the premise that BLM failed to comply with FLPMA in approving the Project. Plaintiffs first contend that the approvals violated the provisions of certain RMPs. But neither the law nor the RMPs themselves require such compliance in these circumstances. Plaintiffs' argument that BLM relied on, or was required to establish, "valid existing rights" likewise fails because BLM both did not assume, and was not required to establish, , the existence of "valid existing rights" before approving the Project. Finally, Plaintiffs cannot succeed on the merits of their claim that the Project would cause "unnecessary or undue degradation" by violating relevant air- or water-quality standards because BLM reasonably concluded that it would not do so.

### 1.     BLM's approval of the Project complied with FLPMA vis-à-vis the RMPs

Plaintiffs contend that the ROD, FEIS and Project approvals violated FLPMA by failing to comply with protections for the greater sage-grouse established in the 2015 BLM Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment ("2015 ARMPA") and the visual resource management (VRM) requirements of the Winnemucca RMP, also approved in 2015 (collectively, "the invoked RMPs").[41] They base their first two claims on the premise that, in issuing authorizations under 43 C.F.R. subpart 3809, BLM has an "obligation" to comply with or act consistently with the RMP provisions that Plaintiffs invoke.[42] Plaintiffs have not demonstrated a likelihood of success on the merits of these claims because their premise is

---

[41] *See* Pls.' Mem. at 8–19. Though invoked generally in that context, Plaintiffs cite no provision of the Winnemucca RMP or the ROD adopting the 2015 ARMPA relating to greater sage grouse that the Project approval allegedly violated.

[42] *See id.* at 11; Compl. ¶¶ 243, 248–49.

false: both the law and the RMPs themselves exempt BLM's approval of the Project from compliance with the provisions of the RMPs invoked by Plaintiffs.

### a.   FLPMA does not require mining operations to comply with the invoked RMPs

BLM was not obligated to ensure that its decision under 43 C.F.R. subpart 3809 complied with the invoked RMPs because no statute or regulation required it to do so. The Mining Law of 1872 contains "an express invitation to all qualified persons to explore the lands of the United States for valuable mineral deposits." *Union Oil Co. v. Smith*, 249 U.S. 337, 346 (1919); *accord Andrus v. Shell Oil Co.*, 446 U.S.657, 658 (1980) (the Mining Law "provides that citizens may enter and explore the public domain, and search for minerals"). Though Congress amended the Mining Law through the FLPMA, it did so only in four explicit ways. 43 U.S.C. § 1732(b) ("Except as provided in section 1744 [mining claim recordation], section 1782 [wilderness study areas], and subjection (f) of section 1781 of this title [California Desert Conservation Area] and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 . . . ."). None of those exceptions includes land-use planning under section 202 of FLPMA, 43 U.S.C. § 1712, or the multiple-use mandate in section 302(a) of FLPMA, *id.* § 1732(a).

Congress was unequivocal that the Secretary of the Interior may only withdraw public lands from the operation of the mining laws in compliance with Section 204 of FLPMA. *Id.* § 1714(a). Creation or application of land-use-planning restrictions that would prohibit exercise of the statutory right to enter, explore, and occupy public lands to conduct mining operations that otherwise comply with the requirements of 43 C.F.R. subpart 3809—such as a visual-resources or surface-disturbance cap that would effectively bar such operations— runs contrary to that intent. *See* 43 U.S.C. § 1732(b). Indeed, the land-use-planning provisions in section 202(e) of FLPMA expressly prohibit BLM from removing lands from

or restoring lands to the operation of the Mining Law using land-use planning. *See id.* § 1712(e). The invoked RMPs themselves acknowledge these limitations.[43]

Furthermore, on their face, the provisions of the invoked RMPs are mandatory only for discretionary actions—*i.e.*, actions where BLM has full discretion to impose additional conditions and also to refuse authorization.[44] But BLM does not have that level of discretion when approving plans of operations such as those challenged in this case. After reviewing a proposed plan and conducting a NEPA analysis, BLM may take only one of three actions: (1) approve the plan as submitted; (2) approve the plan subject to changes or conditions to meet the performance standards specified in 43 C.F.R. § 3809.420 and to prevent unnecessary or undue degradation; and (3) disapprove or withhold approval because the plan does not meet regulatory requirements. 43 C.F.R. § 3809.411(d)(3). And while the performance standards with which operators must comply require consistency with land-use plans, such compliance is not required where a planning provision would prohibit exercise of statutory rights under the Mining Law.[45] *See* 43 C.F.R. § 3809.420(a)(3) ("Consistent with the mining laws, your operations and post-mining land use must comply with the applicable BLM land-use plans"). BLM thus lacks authority to condition approval or deny approval

---

[43] Pls.' Ex. 7, ECF No. 23-7 ("Winnemucca RMP") at 2-52 (acknowledging that, with respect to mineral resources, "[p]ublic lands will remain open and available for mineral exploration and development subject to the provisions of FLPMA Section 204.").

[44] *See, e.g.*, *id.* at 2-101 (defining "Discretionary Actions" to "include livestock grazing, mineral leasing, and some lands actions.")); Pls.' Ex. 19, ECF No. 23-9 ("2015 ARMPA") at 2-30 (providing for locatable minerals that certain management objectives apply "to the extend allowed by law").

[45] BLM Surface Management Handbook, H-3809-1, at 8–14 (2012), excerpts of which are attached as Defs.' Exhibit C ("The land use plan can be used to establish the objectives for post-mining land uses" but "must recognize the rights granted by the Mining Law . . . ."). While RMPs provide management direction for *BLM* actions and decisions, subsequent to the promulgation of 43 C.F.R. § 3809.420(a)(3), RMPs do not create enforceable obligations for the public and are "normally not used to make site-specific implementation decisions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004) (citing BLM policy guidance).

based on lack of compliance with land-use-planning provisions if the operator meets the requirements of the regulations.

For the same reasons, BLM was not required to amend the Winnemucca RMP before approving the Project or ensure its compliance with that RMP's VRM requirements.[46] BLM also did not "admit," as Plaintiffs argue, that it was required to amend that RMP before it could approve the plans of operations. Plaintiffs' assertion to that effect[47] rests wholly on the NOI that was published on January 21, 2020, which informed the public of BLM's intent, at the time, to prepare a "Land Use Plan Amendment addressing visual resources . . . to conform with the visual resource management class-2 designation in the current RMP[.]"[48] Despite this statement in the NOI, as explained above, no statute or regulation authorizes BLM to require plans of operations to comply with RMPs. BLM clarified its position in its Notice of Availability for the DEIS, explaining that, "[u]pon further review the BLM has determined than an amendment to the Winnemucca District [RMP] is not necessary."[49]

Plaintiffs' argument that because 43 C.F.R. § 3809.5's defines "unnecessary or undue degradation," in part, to include "conditions, activities, or practices that . . . [f]ail to comply with. . . other Federal and state laws related to environmental protection," BLM must "ensure that all environmental protection standards will be met at all times" is undeveloped and, in any event, inapposite because the invoked RMPs are neither Federal nor state laws.[50] And Plaintiffs' argument that BLM's resource-management-planning regulations, which provide that "all future resource management authorizations and actions . . . shall conform to the approved plan," 43 C.F.R. § 1610.5-3(a), as well as its 43 C.F.R. subpart 3809 obligation to "prevent unnecessary or undue degradation" of the lands, required compliance

---

[46] *See* Pls.' Mem. at 16–18.

[47] *Id.* at 9.

[48] 85 Fed. Reg. 3413, 3414.

[49] 85 Fed. Reg. 45,651, 45,652.

[50] Pls.' Mem. at 8.

with the RMPs[51] is undercut by the limitations on withdrawal through land-use planning discussed above as well as the specific language of the RMPs discussed below.

Finally, the authority on which Plaintiffs rely for this argument does not support it. This Court's discussion of the Sage Grouse RMPs in *Western Exploration, LLC v. U.S. Dep't of the Interior*, 250 F. Supp. 3d 718, 747 (D. Nev. 2017), addressed only the sufficiency of BLM's analysis in support of the net-conservation-gain standard set forth in those RMPs. It has no bearing on whether any of the provisions in the RMPs bind BLM's approval of mining plans of operations which, for the reason set forth above, fall outside the relevant FLPMA requirements. And discussion of the application of land-use plans to plans of operations in *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 49 (D.D.C. 2003), addressed the sufficiency of BLM's regulations—not whether provisions in land-use plans could be used to reject a plan of operations that otherwise complied with BLM's regulations.

**b.     The RMP provisions themselves exempt the Project approval**

Even if the invoked RMPs governed approval of plans of operations under 43 C.F.R. subpart 3809 generally, BLM reasonably concluded, based on their plain language, that the specific provisions invoked by Plaintiffs did not apply to approval of the plans of operations here. For example, Plaintiffs contend that BLM failed to comply with the 2015 ARMPA's 3-percent disturbance cap.[52] Yet the 2015 ARMPA expressly contemplates that operations conducted under the Mining Law are exempt from the disturbance cap requirement.[53] It also applies noise restrictions only to "discretionary activities" which, as discussed above, does

---

[51] Pls.' Mem. at 8. *Oregon Natural Resource Council Fund v. Brong*, 492 F.3d 1120, 1128 (9th Cir. 2007), on which Plaintiffs rely for the proposition that project approvals must comply with land-use plans, does not address approval of a mining plan and so does not address this issue.

[52] Pls.' Mem. at 12.

[53] 2015 ARMPA at 2-7 (MD SSS 2.A.2) (making application of the 3 percent disturbance cap "subject to applicable laws and regulations, such as the 1872 Mining Law, as amended"); *see id.* at 2-30 (MD MR 15) (stating that BLM would, "to the extent allowed by law, apply MDs SSS 1 through SSS 4 when reviewing and analyzing projects and activities proposed in GRSG habitat").

not include such authorizations.[54] Plaintiffs similarly contend that the Project was obligated to comply with 2015 ARMPA's "Required Design Features," such as "lek buffer distances," "seasonal restrictions to manage surface-disturbing activities," noise limits during the breeding season, and other "management or mitigation actions" based on habitat and population triggers.[55] But as the 2015 ARMPA expressly acknowledged, these restrictions could only be applied "consistent with applicable law."[56] And BLM acknowledged these limitations, explaining in the FEIS for the Project that "proposed locatable minerals resource projects" are not subject to or precluded by those provisions of the 2015 ARMPA.[57] Importantly, and as discussed below, BLM did not base its view that the provisions of the invoked RMPs did not apply on any "assumption" that Lithium Nevada's mining claims constituted "valid existing rights."

### 2.    BLM did not, and was not required to, base its decision on "valid existing rights"

Plaintiffs are unlikely to succeed on the merits of their third claim, which is likewise based on a false premise. Specifically, Plaintiffs contend that BLM approved the plans of operations based on the "assumption" that Lithium Nevada held "valid existing rights" under the Mining Law.[58] But BLM made no such assumption and, in any event, no determination as to "valid existing rights" was required before approval.

First and foremost, nothing in the FEIS or ROD—not even the pages specifically cited by Plaintiffs—supports the proposition that BLM made any such assumption.[59] The

---

[54] Pls. Ex. 14, ECF No. 23-14 ("2015 ARMPA App'x E") at E-2; 2015 ARMPA at 2-9 (MD SSS 2.F).

[55] Pls.' Mem. at 12 (citing MD SSS 2B).

[56] 2015 ARMPA at 2-8 (MD SSS 2.B (mitigation), SSS 2.C (RDFs), SSS 2.D (lek buffer-distances), SSS 2.E (seasonal restrictions)).

[57] *See* Pls.' Ex. 12, ECF No. 23-12 ("FEIS App'x N") at N-5 (BSU disturbance caps); N-6–N-7 (seasonal restrictions); N-8, N-10 (noise limits).

[58] Pls.' Mem. at 18.

[59] *See id.* at 18 (citing FEIS at 4-45; FEIS App'x N at N-25, N-6, N-9, N-19, and Table N.4)

FEIS recognized that "any exceedances of the [disturbance] cap" set by the 2015 ARMPA "do not preclude a locatable mineral resources project with existing valid rights from BLM approval," but drew no such conclusion as to this Project.[60] BLM further acknowledged that "Required Design Features" and other "management or mitigation actions" based on sage-grouse habitat and population triggers may apply to approvals "consistent with valid and existing rights and applicable law in authorizing third-party actions" but noted, consistent with the applicable law—the Mining Law—that "locatable minerals resource projects are not subject" to such requirements.[61]

And BLM did not need to make any such a determination. No law, regulation, or Departmental policy obligates BLM to establish the existence of valid mining claims or sites—or, in Plaintiffs' terms, "valid existing rights"—before approving the Thacker Pass Project, as Plaintiffs allege in their first through third claims and argue in their motion,[62] because no property rights were at issue here. While the Department of the Interior *may* investigate mining claim validity at any time, there are few circumstances in which it *must* determine validity—and this is not one of them. Mandatory validity investigations occur only when a mining claimant is seeking to confirm or obtain a property right from the United States, such as when a mining claimant has applied for a mineral patent, *see* 30 U.S.C. § 29; has proposed operations on lands withdrawn from operation of the mining laws, *see* 43 C.F.R. § 3809.100; or has alleged a "taking" under the Fifth Amendment of rights associated with their mining claim, *see Freeman v. U.S. Dep't of the Interior*, 83 F. Supp. 3d 173 (D.D.C. 2015), *aff'd sub nom. Freeman v. U.S. Dep't of the Interior*, 650 F. App'x 6 (D.C. Cir. 2016). The proposed action here—approval of a plan of operations under 43 C.F.R. subpart 3809 on lands that are not withdrawn—does not fall into any of these categories.

---

[60] FEIS at 4-45.

[61] *E.g.*, FEIS App'x N at N-6; *see also id.* at N-9. Plaintiffs' other citations contain no reference at all to "valid existing rights." *Id.* at N-19, N-25, and Table N.4.

[62] *See* Compl. ¶¶ 245, 250, 253–254. *See also* Pls.' Mem. at 18–19.

BLM thus had neither a reason nor a legal obligation to make mining claim validity the basis for, or even a consideration in, the challenged decision.

Despite this, Plaintiffs construct an elaborate but erroneous argument that Interior was required to have determined "valid existing rights" before authorizing Lithium Nevada to "permanently occupy" public lands.[63] First, the challenged decision does not authorize "permanent occupation." A miner's occupation under the Mining Law can only be characterized as "permanent" if a patent is issued. *See* 30 U.S.C. § 29; *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 575 (1987). That is not the case here. Once the project is reclaimed and the financial guarantee is released, *see* 43 C.F.R. § 3809.590, the plans of operations will be closed and Lithium Nevada will no longer be authorized to engage in the approved mining operations on these public lands.[64]

Second, the Mining Law nowhere imposes a requirement to determine mining claim validity before approving a plan of operations under 43 C.F.R. subpart 3809 based on the type of operations proposed. *See Great Basin Res. Watch & W. Shoshone Def. Proj.*, 182 IBLA 55, 67–68 (2012) (BLM need not determine validity of claim before approving a plan of operations); *Great Basin Res. Watch v. U.S. Dep't of the Interior*, No. 3:13–cv–00078–RCJ–VPC, 2014 WL 3696661, at *8 (D. Nev. July 23, 2014) ("Because the land at issue was not withdrawn from entry under the Mining Law, BLM was not required to assess the validity of [the proponent's] mining claim before approving the Project."). It provides instead, without such limitation, that "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase . . . under regulations prescribed by law." 30 U.S.C. § 22. BLM's regulations also require an operator's use to be

---

[63] Pls.' Mem. at 18–19.

[64] *See* 43 C.F.R. § 3809.423; BLM Surface Management Handbook, H-3809-1, at Fig. 4.2-6. *See generally* FEIS at 2-16–2-17 (describing reclamation and final closure timelines); FEIS App'x B at 86–106 (describing reclamation practices).

"reasonably incident" to prospecting, mining, or processing operations, and uses defined in 43 C.F.R. subpart 3715, *see* 43 C.F.R. § 3809.415(b), but as discussed above, only require a validity examination where the lands are withdrawn, *id.* § 3809.100. BLM's policy guidance is consistent with this statutory and regulatory framework,[65] as is the Department of the Interior's legal interpretation.[66] In light of the applicable statutory and regulatory framework, and the agency's policy and legal guidance, BLM appropriately did not investigate mining claim validity prior to issuing the decision challenged here, nor did it purport to base that decision on the existence of a valid mining claim.

Nor have any other courts concluded that a mining plan of operations may be approved only if all surface mining operations will occur over valid mining claims, as Plaintiffs suggest.[67] Crucially, Plaintiffs' sole cited case for this proposition did not involve BLM, "public lands," or FLPMA. *See Ctr. for Biological Diversity*, 09 F. Supp. 3d 738, 758 (D. Ariz. 2019) ("[A] grant to use the surface when the administrative record shows such a right does not exist would contravene the *Forest Service's* duty to protect the *forest* from depredations and offer an opinion that runs contrary to the evidence." (emphasis added to show original wording altered by Plaintiffs)). Rather, that case involved a challenge to an agency decision under a different regulatory framework: the United States Forest Service's regulations at 36 C.F.R. Part 228 Subpart A, governing mining operations conducted on National Forest

---

[65] *See* BLM Surface Management Handbook, H-3809-1, at 4-40 ("Provided the subject land is open to entry under the Mining Law, a validity examination is not required to process a Plan of Operations and the NEPA analysis does not need to address mining claim status or validity").

[66] *See also Legal Requirements for Determining Mining Claim Validity Before Approving a Mining Plan of Operations*, M-37012 (Nov. 14, 2005), attached as Defs.' Exhibit D (the "suggest[ion] that validity examinations might be required under certain circumstances where the claimant is proposing to use mining claims solely for purposes ancillary to mining without also developing minerals from those claims . . . conflicts with current Departmental regulations"); *Authorization of Reasonably Incident Mining Uses on Lands Open to Operation of the Mining Law*, M-37057 (Aug. 17, 2020), attached as Defs.' Exhibit E (same).

[67] Pls.' Mem. at 18–19.

System lands reserved from the public domain. *Id.* at 747 (not including FLPMA or BLM's 43 C.F.R. subpart 3809 under the "pertinent statutory authority" or "pertinent Forest Service regulatory authority"). It would have been unreasonable for BLM to make such a determination here, when the agency is bound by the Interior Department's own longstanding interpretations to the contrary.[68]

### 3.    BLM's approval does not violate water- and air-quality standards

Plaintiffs next claim that BLM violated FLPMA because the Project would violate relevant air- or water-quality standards and thus cause "unnecessary or undue degradation" as defined in BLM's regulations at 43 C.F.R. subpart 3809. But Plaintiffs cannot succeed on the merits of this claim because the Project would not, in fact, violate those standards.

**Water Quality**. Plaintiffs claim that release of antimony into the groundwater would exceed water quality standards and, therefore, that BLM's approval of the plans of operations violates FLPMA's mandate to prevent unnecessary or undue degradation as well as BLM's regulations at 43 C.F.R. § 3809.420(b)(4).[69] As discussed above, BLM defines "unnecessary or undue degradation," in part, as "conditions, activities, or practices" that fail to comply with the "performance standards in [43 C.F.R.] § 3809.420," or with "other Federal and state laws related to environmental protection . . . ." *Id.* § 3809.5. And 43 C.F.R. § 3809.420(b) requires "[a]ll operators" to "comply with applicable Federal and state water quality standards . . . ." *Id.* § 3809.420(b)(5). Plaintiffs cannot succeed on this claim because the Project approval simply does not authorize Lithium Nevada to violate relevant Nevada law or regulations.

Based on BLM's comment response to the effect that "pore water in [the mine pit] backfill will exceed MCLs [Maximum Contaminant Levels] for longer than 20 pore volumes," Plaintiffs charge that release of antimony into the groundwater would surpass

---

[68] *See* M-37012; M-37057.

[69] Pls.' Mem. at 22–25.

water quality standards and, thus, approval of the project violates BLM's obligation to prevent FLPMA.[70] But Plaintiffs identify no provision of Nevada law to the effect that a potential future exceedance of a water-quality standard is a per se violation of state law.[71] And, in any event, BLM reasonably concluded that proposed operations would not violate applicable water-quality standards.

Specifically, Plaintiffs' complaint that groundwater from the mine pit "would exceed standards" fails to disclose that, in fact, antimony is the *only* constituent that BLM might expect to find in the groundwater of the pit backfill at levels above any regulatory standard as a result of the Project, and then only above the *drinking water* standard for antimony—not the ambient water quality standard.[72] But the pit area (whether backfilled or a lake) is not intended as a source of drinking water. And the hydrogeologic modeling demonstrated that, even after 300 years, groundwater from the pit area would not leave the mine footprint or reach any existing water wells (either human or stock water).[73] Because the antimony levels would not exceed applicable ambient water quality standards,[74] BLM reasonably concluded that approving the Project would not lead to unnecessary or undue degradation.

**Air Quality**. Plaintiffs likewise have not demonstrated a likelihood of success on their claim that BLM violated FLPMA by failing to ensure the Project complied with "all applicable air quality standards."[75] Operators must "comply with applicable Federal and state air quality standards . . . ." 43 C.F.R. § 3809.420(b)(4). The FEIS here concluded that

---

[70] Pls.' Mem. at 22 (quoting FEIS App'x R at R-121).

[71] Nevada's specific pit-lake regulations do not require pit lakes to meet Nevada water quality standards. Rather pit lakes in Nevada are regulated on a case-by-case basis to prevent degradation of surrounding groundwater or adverse effects on the health of human, terrestrial, or avian life. Nev. Admin. Code § 445A.429(3) (2020).

[72] FEIS at 4-13.

[73] *Id.* at 4-14.

[74] *Id.* at 4-14, 4-24 – 27.

[75] Pls.' Mem. at 2-3.

"the project would not have a substantial effect on air quality," based on an analysis that demonstrates "that the estimated maximum ambient concentrations for all pollutants and averaging periods are less than the applicable NAAQS and Nevada Standards."[76] BLM is entitled to take into account the mitigating effect of Clean Air Act regulation by the Nevada Department of Environmental Protection in the form of NAAQS. *See Edwardsen v. U.S. Dep't of the Interior*, 268 F.3d 781, 789 (9th Cir. 2001) (upholding agency's conclusion that no significant impacts to air quality would occur based on agency's finding that NAAQS would not be exceeded). Plaintiffs have not identified any other air-quality standards with which they contend the Project fails to comply. Absent an alleged violation of "Federal and state air quality standards" or "other Federal and state laws related to environmental protection," Plaintiffs cannot establish that the Project's emissions constitute "unnecessary or undue degradation" in violation of FLPMA.

For these reasons, and for those explained in the previous subsections, Plaintiffs have not carried their burden of demonstrating a likelihood of success on the merits on any of their claims challenging the Project's approval under the FLPMA.[77]

**B.    BLM's environmental analysis complied with NEPA**

Finally, Plaintiffs assert three claims challenging BLM's NEPA analysis: first, Plaintiffs assert that BLM's wildlife analysis failed to disclose baseline data about four species; second, Plaintiffs argue that BLM's analysis of cumulative impacts was insufficiently detailed; finally, Plaintiffs challenge the sufficiency of BLM's consideration of mitigation

---

[76] FEIS at 4-80; *see also* Pls.' Ex. 18, ECF No. 23-18 ("FEIS App'x K") at 24 (Table 16).

[77] For the reasons set forth in this section, as well as the following  includes Plaintiffs' catch-all ninth claim alleging that the various "violations of NEPA, FLPMA, and other laws/regulations noted in [their] Complaint constitute 'unnecessary or undue degradation'" prohibited under the FLPMA and that "BLM's failure to protect public resources" challenged through other claims "also violated the [unnecessary or undue degradation] standard." Compl. ¶ 272; Pls.' Mem. at 20.

measures. But because these analyses satisfy NEPA, Plaintiffs have failed to demonstrate a likelihood of success on the merits of these claims as well.

### 1.    BLM described baseline conditions

Plaintiffs cannot succeed on their claim alleging that the approval decision violated NEPA based on an alleged failure to take a hard look at impacts from the Project on certain birds and wildlife.[78] An EIS must "succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration" such that "[t]he descriptions shall be no longer than is necessary to understand the effects of the alternatives." 40 C.F.R. § 1502.15. Accordingly, in order to assess the impact of the Project on wildlife, BLM accounted for the baseline conditions of each species affected. See *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) (effects determination requires baseline conditions). The Court's review of such technical determinations is "at its most deferential." *Balt. Gas & Elec.*, 462 U.S. at 103. The FEIS's analysis of wildlife impacts, including a discussion of the baseline conditions and the affected environment for greater sage-grouse, pronghorn, amphibians, and springsnails, fully satisfies this standard and complies with NEPA.

**Sage Grouse**. The FEIS includes substantial baseline information related to greater sage grouse and the potential effects the Project thereon, including identification of an active lek in the vicinity of the Project, as well as acknowledged field surveys documenting greater sage grouse within the Project area.[79] Contrary to Plaintiffs' assertion that "no details are provided" about BLM's determination that potential for occurrence for greater sage-grouse was "High/confirmed-observed in surveys,"[80] BLM's descriptions of the affected environment contain ample information to support the agency's conclusion. For example,

---

[78] Pls.' Mem. at 26–30.

[79] FEIS at 4-42; Pls.' Ex. 20, ECF No. 23-20 ("FEIS App'x G"), at G-18.

[80] Pls. Mem. at 27 (citing Pls.' Ex. 19, ECF No. 23-19 ("FEIS App'x H") at H-19).

Appendix G of the FEIS specifies that "sage-grouse activity has been documented within the Project area by NDOW, who reported 63 tracking locations generated by at least 30 radio-marked birds" and that "[d]uring baseline surveys, one sage-grouse was observed in the Project area."[81] It also described other sampling efforts, including "surveying 113 transects in 15 sample units across approximately 49,165 acres" and discussed suitable habitat (although considerably modified by wildfire and invasive annual grasses), as well as signs of use by greater sage grouse.[82] The FEIS also included an appendix devoted entirely to reviewing, among other things, the existing conditions for greater sage grouse.[83]

Plaintiffs have offered no authority to support their proposition that the "FEIS fails to provide sufficient information to assess impacts" on greater sage grouse because it identifies by name the population management unit (the Lone Willow PMU) only and not the larger Priority Area for Conservation in which the Project is located.[84] Such information is available to the public; moreover, Plaintiffs do not even attempt to explain how identification of the larger unit is necessary to analyze impacts to sage grouse.

**Pronghorn**. The FEIS likewise provided ample disclosure with respect to baseline conditions of pronghorn habitat and movement corridors in the Project area.[85] For example, the FEIS noted that "[in] northern Nevada, salt desert shrub communities are often used as a winter range" for pronghorn, and that the population of pronghorn in NDOW's Hunt Unit 31 has "remained stable, though the rest of the hunt units" in the area have experienced a

---

[81] FEIS App'x G, at G-18 (citations omitted).

[82] *Id.*

[83] *See* FEIS App'x N at N-17 ("Existing disturbance within [the project scale study] area include 172 acres of roads, 2,335 acres of mining disturbance, 109 acres of utility powerlines, and 726 acres of other disturbance for a total of 3,343 acres" of existing surface disturbance."); *id.* (observing that "[s]easonal GRSG habitat within the Project area has been identified by" NDOW).

[84] Pls.' Mem. at 27.

[85] FEIS at 4-38; Pls.' Ex. 11, ECF No. 23-11 ("FEIS App'x A") Figure 4.5-7.

slight decline in populations compared to previous years.[86] The FEIS also discussed pronghorn range and use of the Project area.[87] Though Plaintiffs raise concerns about the amount of pronghorn winter range affected by the Project,[88] the FEIS accounted for that, observing that that the "[m]apped pronghorn antelope winter range distribution within the Project area" constituted a mere 1.26% of the "total winter range mapped distribution within" the hunt unit at issue.[89]

      The FEIS also clearly establishes baseline information about pronghorn movement corridors, identifying and mapping two movement corridors and discussing how both "facilitate access between limited use and winter range habitat to the south of the Project area and winter range, summer range, and year-round habitat range to the north of the Project area."[90] The FEIS also established a baseline for recreational hunting for pronghorn, stating that in 2018 there were 191 hunting tags with a 50 percent harvest rate.[91] Additionally, the baseline pronghorn evaluation used NDOW mapping of pronghorn habitat to establish that under Alternative A and B, the Project would impact 427 acres of summer habitat and 4,960 acres of winter habitat.[92] As with the greater sage grouse, Plaintiffs' assertions that BLM's discussion of the baseline conditions for pronghorn provided "[n]o details" or that its analysis of the effects on pronghorn "is limited to vague generalizations" are unfounded.

---

[86] FEIS App'x G at G-14.

[87] *Id.* at G-14 (noting "limited use habitat mapped in the Project area, which may be used by pronghorn throughout the year depending on forage availability and conditions" and that "[w]inter range, summer range, limited use range, and year-round range are all found within a four-mile buffer.").

[88] Pls.' Mem. at 28.

[89] FEIS at 4-38; *see also* FEIS App'x G at G-13–G-14.

[90] FEIS App'x G at G-14.

[91] *Id.* at G-50.

[92] *See id.* at G-14.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Amphibians**. BLM similarly satisfied its obligations to disclose baseline conditions for amphibians. The FEIS acknowledges that "three special status amphibians have the potential to occur in the Project area," including the Columbia spotted frog, the northern leopard frog, and the western toad.[93] It noted, however, that the potential for occurrence of habitat for northern leopard frog and Columbia spotted frog were both low, and that NDOW and the Nevada Natural Heritage Program (NNHP) had no records of occurrence for either of these species in the Project area. [94] It also makes clear that only one Pacific tree frog was "incidentally" observed in the Project area, and that "[n]o other amphibian species were found during the survey."[95] And though Plaintiffs take aim at BLM's analysis of western-toad habitat, BLM further observed that they had "limited habitat and . . . low probability of occurrence in the Project area," in part because of a low incidence of riparian vegetation.[96] BLM's discussion of the baseline conditions for amphibians therefore satisfied the applicable standard.

**Springsnails**. Finally, Plaintiffs contend that the FEIS failed to provide "clear information" regarding baseline conditions within the Project area for two species of springsnails.[97] Most of Plaintiffs' assertions center on the Kings River pyrg and Plaintiffs' assertion that BLM's analysis "overlook[ed] the Kings River pyrg's high risk of extinction."[98] But the record reflects otherwise. The FEIS discusses BLM's survey findings for 56 sites within the project area and a 20-mile radius.[99] Although both the Kings River pyrg and turban

---

[93] *Id.* at G-18; *see also id.* at G-15 (noting in the list of reptiles and amphibians reported by NDOW or observed during baseline surveys included Pacific tree frog).

[94] FEIS App'x H at H-7 (Table H.1).

[95] FEIS App'x G, at G-18; *id.* at 129 of 134; *see also* FEIS at 4-49–4-50 (analysis of noise under Alt C, noting that no amphibians were identified at the SP-059 survey location).

[96] FEIS at 4-48.

[97] Pls.' Mem. at 29.

[98] *Id.*

[99] FEIS App'x G at G-12 (noting the collection of springsnails common to the region from some of the seeps, springs, and wetlands around the Project area), G-17 (noting that of the

1

2  pebble snail were detected during baseline surveys within the survey area, the FEIS makes

3  clear that these springsnails were not detected within the direct footprint of the Project or in

4  any area likely to be adversely affected by the Project.[100] BLM's disclosure of the baseline

5  conditions for springsnails thus more than satisfied the applicable standard.

### 2.   BLM analyzed cumulative impacts

6

7  Plaintiffs also are unlikely to succeed on the merits of their claim that BLM violated

8  NEPA through a failure to "adequately analyze the cumulative impacts from the other

9  proposed activities within the cumulative effects study area on wildlife, air quality, and other

10  potentially affected resources"[101] because Plaintiffs have waived those claims and because,

11  in any event, BLM's analysis satisfied NEPA's requirements.

12  As an initial matter, Plaintiffs did not raise their concerns about effects of the

13  McDermitt lithium-drilling project or about the boundary of the cumulative effects study

14  areas for greater sage-grouse or "other wildlife"[102] during the comment process. Having failed

15  to put BLM on notice during their participation in the administrative proceedings that the

16  public was concerned about these issues, Plaintiffs have waived their opportunity to raise

17  them now. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (objections not raised

18  during the public comment process afforded by NEPA are "forfeited" on judicial review);

19  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553–54 (1978).

20

21  _____

potentially suitable habitat at 29 springs in the project area, Kings River pyrg and turban
pebblesnail were collected).

22

23  [100] *See* FEIS App'x G at 129 of 134; FEIS at 4-10 and 4-48 (noting that SP-001 and SP-003
were "determined to be ephemeral, or seasonal, and no springsnails occur in these springs");
FEIS at 4-49–4-50 (analysis of noise impacts under Alternative C, noting that no springsnails

24  were identified at the SP-059 survey location); FEIS at 4-55 (analysis of water quality under
Alternative A, noting that the proposed action would directly affect SP-001 and that "no

25  springsnails occur in these springs"); FEIS App'x A at Figure 4.3-8 (showing locations of
described springs); FEIS App'x H at H-27 (stating that "[n]o springsnails were detected" at

26  the four sites visited during the survey).

27  [101] Pls.' Mem. at 31–33.

28  [102] Indeed, none of the comments raised these concerns. *See* FEIS, App'x R.

Even were Plaintiffs' challenges not waived, BLM's cumulative-impacts analysis fully complied with the applicable requirements under NEPA. In analyzing cumulative effects, "an agency must take a hard look at all actions that may combine with the action under consideration to affect the environment." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) (quoting *Te–Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)). Under the applicable regulations, BLM's analysis was required to account for "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7. A cumulative impact was defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1378 (9th Cir. 1998); 40 C.F.R. § 1508.7. A "reasonably foreseeable" action, for which cumulative impacts must be analyzed, included "proposed actions." *Lands Council v. Powell*, 379 F.3d 738, 746 (9th Cir. 2004) *rev'd on other grounds*, 395 F.3d 1019 (9th Cir. 2005).

BLM took the requisite hard look here. Chapter Five of the FEIS contains a comprehensive analysis of the cumulative impacts of the Project.[103] Contrary to Plaintiff' assertion, in conducting this analysis, BLM did not "simply list" other relevant actions and their acreage without any further analysis.[104] Rather, BLM followed three steps in considering cumulative effects. First, BLM identified, described, and mapped the cumulative effects study areas for each resource.[105] Next it identified past, present and reasonably foreseeable future actions, including commercial/public and mining operations with disturbed areas, and over 22,000 acres of disturbance from wildfires, along with acreage estimates.[106] BLM then described and quantified (where possible) the impacts of those other

---

[103] FEIS 5-1 to 5-20.

[104] Pls.' Mem. at 30–31.

[105] *See* FEIS at 5-1–5-2, Table 5.1.

[106] *See id.*

projects in its detailed analyses of the Project's cumulative impacts on at least 20 resources.[107] With the exception of the McDermitt project, which was waived, Plaintiffs fail to identify with specificity any aspect of BLM's cumulative impacts analysis that is allegedly infirm.[108] Plaintiffs have thus failed to demonstrate a likelihood of success on the merits of this claim.

### 3.    BLM considered mitigation measures

Plaintiffs contend that BLM violated NEPA by failing to adequately analyze mitigation measures or their effectiveness in the FEIS or to "respond to comments" by adopting mitigation measures proposed by EPA and NDOW in letters commenting on the FEIS after its publication.[109] But Plaintiffs have not demonstrated a likelihood of success on the merits of these claims, either, for several reasons.

First, BLM fully complied with NEPA's requirement that BLM consider measures that may mitigate the adverse impacts of a proposed project. 40 C.F.R. §§ 1502.14(f), 1502.16(h). NEPA "requires only that an EIS contain 'a reasonably complete discussion of possible mitigation measures.'" *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006) (quoting *Robertson*, 490 U.S. at 352). While "[p]utting off an analysis of possible mitigation measures" entirely "until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking," *Great Basin Res. Watch*, 844 F.3d at 1107 (quotation omitted), "NEPA does not require an agency to formulate and adopt a complete mitigation plan," *N. Alaska Env't Ctr.*, 457 F.3d at 979. Instead, the mitigation discussion need only contain "sufficient detail to ensure that environmental consequences have been fairly evaluated," *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1154 (9th Cir.

---

[107] *See* FEIS at 5-1–5-20.

[108] Pls.' Mem. at 32–33. Plaintiffs also argue that "truncat[ing] its review of cumulative impacts to other wildlife at the nearby Oregon/Nevada border" was arbitrary and capricious, but do not identify any other projects in Oregon that should have been accounted for. *Id.*

[109] Pls.' Mem. at 33–35 (citing Pls.' Ex. 4 (ECF No. 23-4), Jan. 24, 2021 NDOW Letter; Pls.' Ex. 17 (ECF No. 23-17), Jan. 4, 2021 EPA Letter).

1997), and disclose the effectiveness of the identified mitigation, *S. Fork Band Council v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).

Plaintiffs contend that BLM failed to adequately analyze plans to monitor and mitigate the impact of mining operations on groundwater and air quality in the FEIS.[110] But, before any environmental impacts could occur, BLM specifically addressed and considered "three proposed mitigation options . . . designed to directly mitigate" groundwater potentially affected by antimony in the FEIS.[111] And each option was "expected to be an effective control to counter contaminant migration, if required."[112]

The "additional BLM recommended" monitoring and mitigation measures that Plaintiffs challenge, which are also described in the FEIS as just that,[113] contemplate an *additional* "comprehensive groundwater quality monitoring plan" provided to both BLM and the NDEP "for review and approval prior to commencement of mining."[114] Because the analysis of monitoring and mitigation measures included in the FEIS satisfies NEPA's hard-look requirement, development and implementation of *additional* monitoring and mitigation plans does not violate the statute. *See Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 459 (9th Cir. 2016). And some specific measures being determined on a case-by-case basis was appropriate given the low probability for their occurrence. *Great Basin Res. Watch*, 844 F.3d at 1107 (BLM's "wait and see" mitigation approach was reasonable "given the relatively low probability and temporal remoteness of adverse impacts to ground water").

---

[110] *See* Pls.' Mem. at 23–26, 33–34.

[111] *See* FEIS at 4-24; FEIS App'x P, Part 1 at 154–59, attached as Defs.' Exhibit F.

[112] *Id.*

[113] *See* FEIS at 4-24,

[114] *Id.* at 4-26.

1
2
3
4
5
6
7
8
9
10

     With respect to air resources, BLM determined that mining under the proposed action did not require additional mitigation measures because air-quality standards would be met.[115] Plaintiffs principally complain that the FEIS does not contain sufficient information regarding the effectiveness of Lithium Nevada's system for mitigating emissions from the sulfuric acid plant—which allows the Project to be a net exporter of carbon-free electricity. Because BLM's determination that no mitigation measures were necessary sufficed, consideration of any *additional* mitigation plans do not constitute an improper effort to "cure deficiencies in an EIS," as Plaintiffs allege.[116] BLM thus "complied with NEPA by considering 'extensively the *potential* effects and mitigation processes.'" *Great Basin Res. Watch*, 844 F.3d at 1107 (quotation omitted).

11
12
13
14
15
16
17
18
19
20
21

     Finally, BLM sufficiently considered the EPA's and NDOW's comments on the FEIS. Consistent with its policy guidance, BLM "review[s] any comments on the final EIS to determine if they have merit; for example, if they identify significant new circumstances or information relevant to environmental concerns and bear upon the proposed action."[117] If the comments do, the decisionmaker determines whether to supplement the EIS, or if minor changes can be made to the existing EIS.[118] But BLM is "not required to accept public comments after publishing the FEIS." *Japanese Vill.*, 843 F.3d at 467 (citing 40 C.F.R. § 1503.1(b)). Here, BLM's "interdisciplinary team specialists reviewed" the twelve comment letters received during this period "in full."[119] It "determined that the FEIS analysis was completed using standard protocols . . . including the best data and science available at the

22
23

[115] FEIS at 4-82 ("[A]ll pollutant concentrations within the project would be less than the NAAQS and Nevada standards, and that effects on AQRVs in Class I areas would be negligible. Therefore, no mitigation is required.").

24

[116] Pls.' Mem. at 35 (quoting *Great Basin Resource Watch*, 844 F.3d at 1104).

25

[117] BLM NEPA Handbook, H-1790-1, at 102 (2008), excerpts of which are attached as Defs.' Exhibit G.

26

[118] *Id.*

27

[119] ROD at 7.

28

time," and that BLM had "applied all reasonable and feasible mitigation within its regulatory authority regarding water resources . . . and other resource topics" raised in the post-FEIS comments.[120] BLM thus "consider[ed] these agencies' initial concerns, address[ed] them, and explain[ed] why it found them unpersuasive." *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146–47 (9th Cir. 2000).

Though BLM must consider and respond to substantive comments received during the NEPA process, it is not obligated to accept or adopt all recommendations or proposed measures by other agencies. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1150 (9th Cir. 2016). Far from giving these post-FEIS comments "short shrift," the record indicates that BLM did indeed consider the other agencies' criticisms and concerns, as well those raised the general public, thus satisfying the applicable legal standard. *See id.*

### III.   The public interest and balance of equities disfavor an injunction

Plaintiffs must prove that a preliminary injunction would serve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the analyses of the public interest and balance of equities merge, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). Absent the necessary showing on the first two elements a court "need not dwell on the final two factors" and, "when considered alongside the [movant's] failure to show irreparable harm, the final two factors do not weigh in favor of a stay." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778–79 (9th Cir. 2018). But strong public interests outweigh Plaintiffs' anticipatory and speculative allegations of irreparable harm.

First, the strong public interest in continuation of the NHPA consultation process weighs against an injunction. The NHPA is designed to consider potential impacts of an agency's undertaking on National Register-eligible historic properties, 54 U.S.C. § 306108, and to "accommodate historic preservation concerns with the needs of Federal undertakings," 36 C.F.R. § 800.1. This furthers the policies of "foster[ing] conditions under

---

[120] *Id.* at 8.

which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations" and "administer[ing] federally owned, administered, or controlled historic property in a spirit of stewardship for the inspiration and benefit of present and future generations." 54 U.S.C. § 300101(1), (3). Data recovery, undertaken in the manner described in the HPTP with immediate remediation, advances these policies in a manner consistent with preservation of the desert environment. In any event, the equities certainly disfavor enjoining these actions when Plaintiffs could not obtain such relief even if they succeeded on the merits.

Second, in enacting FLPMA, Congress invoked a policy that "public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21a) as it pertains to the public lands. . . ." 43 U.S.C. § 1701(a)(7), (8), (12). And, through the Mining Law, Congress opened public lands to encourage mineral exploration and development deemed valuable to the country—including the Project area. An injunction would impede pursuit of these statutory objectives.

Plaintiffs dismiss BLM's interests in whether this extraordinary relief is granted as "negligible" and, relying on *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006), suggest that the Ninth Circuit Court of Appeals has announced a presumption in favor of preliminary injunctions against mining.[121] But no such presumption was adopted and, in that case, the injunction in place still allowed the company to act, short of the enjoined construction of a permanent dam, to mitigate environmental harm. Here, because Plaintiffs have not identified any imminent construction or operations activities, no injunction is necessary at this time to prevent those activities from beginning before the Court has considered the merits of this action. And the activities contemplated by

---

[121] Pls.' Mem. at 38.

the HPTP further interests identified by Congress. The public interest factors therefore weigh against an injunction.

## CONCLUSION

Plaintiffs have not carried their burden of demonstrating any of the elements required to obtain preliminary injunctive relief. They have not demonstrated a likelihood of irreparable harm because the only immediate harms they allege arise under a statutory procedure not challenged in Plaintiffs' claims and, in any event, are de minimis and reparable. They have not demonstrated a likelihood of success on the merits of their claims because their claims under FLPMA are based on legal and factual assumptions that do not hold and because BLM's analysis under NEPA satisfied the applicable standards. Finally, the public interest and equity factors weigh against an injunction in this case. The Court should therefore deny Plaintiffs' motion.

Respectfully submitted this 24th day of June, 2021.

JEAN E. WILLIAMS
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

 /s/ Arwyn Carroll
ARWYN CARROLL
Trial Attorney, Natural Resources Section
Massachusetts Bar No. 675926
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  202-305-0465
Fax:  202-305-0506
arwyn.carroll@usdoj.gov

*Attorneys for Federal Defendants*