Laura K. Granier (Nevada Bar No. 7357)
Erica K. Nannini (Nevada Bar No. 13922)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511-2094
Phone: 775.327.3000
Fax: 775.786.6179
lkgranier@hollandhart.com
eknannini@hollandhart.com

*Attorneys for Defendant-Intervenor
Lithium Nevada Corp.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT; GREAT BASIN RESOURCE WATCH; BASIN AND RANGE WATCH; and WILDLANDS DEFENSE, | **Case No. 3:21-cv-00103-MMD-CLB** |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF LAND MANAGEMENT; and ESTER M. McCULLOUGH, District Manager, BLM's Winnemucca Office, | **LITHIUM NEVADA CORP.'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants, | **EVIDENTIARY HEARING REQUESTED** |
| and | |
| LITHIUM NEVADA CORP., | |
| Defendant-Intervenor. | |

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

**HOLLAND & HART LLP**
**5441 KIETZKE LANE, SUITE 200**
**RENO, NV 89511-2094**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

I.      Judicial Review under the APA & Standard for Preliminary Injunction......................... 2

II.     Plaintiffs are not Likely to Succeed on the Merits............................................. 3

        A.      The Project Complies with the Resource Management Plan ("RMP") ............... 4

                1.      The Project Complies with Applicable Sage-grouse Provisions ............. 4

                2.      The Project Complies with the RMP Visual Resource Provisions .......... 7

                3.      BLM Appropriately Considered Rights under Federal Mining
                        Laws ............................................................................... 8

        B.      BLM Prevented Unnecessary or Undue Degradation to Protected Wildlife ...... 11

        C.      BLM Satisfied its Obligations under NEPA and FLPMA .................................. 13

                1.      BLM fully analyzed and ensured compliance with water quality
                        standards ......................................................................... 13

                2.      BLM fully analyzed and ensured compliance with air quality
                        standards ......................................................................... 16

                3.      BLM Took a Hard Look at Baseline Conditions and Wildlife
                        Impacts ........................................................................... 20

                4.      The FEIS Adequately Analyzes Cumulative Impacts ........................... 25

                5.      BLM analyzed mitigation and its effectiveness.................................... 32

III.    Plaintiffs Fail to Demonstrate Irreparable Harm Absent Preliminary Injunctive
        Relief ............................................................................................. 36

IV.     The Balance of Hardships and Public Interest Disfavors the Requested Injunction ...... 37

CONCLUSION ........................................................................................................... 39

CERTIFICATE OF SERVICE ................................................................................... 40

EXHIBIT INDEX .................................................................... **Error! Bookmark not defined.**

i

# TABLE OF AUTHORITIES

### FEDERAL CASES

Page(s)

*BedRoc Ltd. v. United States*,
    541 U.S. 176 (2004)................................................................................10

*Cascadia Wildlands v. Bureau of Indian Affairs*,
    801 F.3d 1105 (9th Cir. 2015) ...........................................................34, 35

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................45

*Charlton v. Est. of Charlton*,
    841 F.2d 988 (9th Cir. 1988) ....................................................................1

*City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) ...........................................................40, 43

*Conservation Congress v. Finley*,
    774 F.3d 611 (9th Cir. 2014) ..................................................................23

*Ctr for Biological Diversity v. USFWS*,
    409 F.Supp.3d 738 (D. Ariz. 2019) ........................................................13

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) ..................................................................44

*Earthworks v. U.S. Dep't of the Interior*,
    496 F. Supp. 3d 472 (D.D.C. 2020)...................................................10, 13

*Ecology Ctr. v. Castaneda*,
    574 F.3d 652 (9th Cir. 2009) ..................................................................31

*Envtl. Def. Ctr. v. EPA*,
    344 F.3d 832 (9th Cir. 2003) ....................................................................3

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ....................................................................4

*Gardner v. BLM*,
    638 F.3d 1217 (9th Cir. 2011) ................................................................24

*Great Basin Mine Watch v. Hankins*,
    456 F.3d 955 (9th Cir. 2006) .............................................................33, 34

*Great Basin Resource Watch v. BLM*,
    844 F.3d 1095 (9th Cir. 2016) .............................................18, 19, 40, 43

*Great Basin Resource Watch v. Hankins*,
    884 F.3d 1095 (9th Cir. 2016) ................................................................................. 33

*Hapner v. Tidwell*,
    621 F.3d 1239 (9th Cir. 2010) ................................................................................... 9

*Japanese Vill. v. Fed. Transit Admin.*,
    843 F.3d 445 (9th Cir. 2016) ................................................................................... 29

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
    962 F. Supp. 2d 1230 (D. Or. 2013) .......................................................................... 9

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*,
    387 F.3d 989 (9th Cir. 2004) ................................................................................... 34

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ......................................................................................... 35, 36

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ................................................................................... 4

*McFarland v. Kempthorne*,
    545 F.3d 1106 (9th Cir. 2008) ................................................................................... 3

*McMaster v. U.S.*,
    731 F.3d 881 (9th Cir. 2013) ................................................................................... 10

*Moapa Band of Paiutes v. U.S. BLM*,
    2011 U.S. Dist. LEXIS 116046 (D. Nev. Oct. 6, 2011) ...................................... 24, 25, 26, 27

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ............................................................................................... 44

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ................................................................................. 22

*Nat'l Parks & Conservation Ass n v. United States Dep't of Transp.*, 222 F.3d
    677, 681 n.4 (9th Cir. 2000)................................................................................... 40

*Nat. Res. Def. Council, Inc. v. F.A.A.*,
    564 F.3d 549 (2d Cir. 2009)........................................................................... 36, 38, 39

*Nat'l Mining Ass'n v. Zinke*,
    877 F.3d 845 (9th Cir. 2017) ................................................................................. 3, 43

*Native Ecosystems Council v. Marten*,
    888 F.3d 783 (9th Cir. 2018) ................................................................................... 19

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)................................................................................................... 9

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

*Nw. Env't Advocates v. Nat'l Marine Fisheries Serv.*,
   460 F.3d 1125 (9th Cir. 2006) ................................................................. 30

*Okanogan Highlands v. Williams*,
   236 F.3d 468 (9th Cir. 2000) ........................................................... 40, 43

*Pac. Coast Fed'n of Fishermen Assn's v. Blank*,
   693 F.3d 1084 (9th Cir. 2012) ................................................................ 28

*Pit River Tribe v. U.S. Forest Serv.*,
   469 F.3d 768 (9th Cir. 2006) ................................................................... 3

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004) ........................................................... 44, 45

*Protect Our Cmtys. Found. v. Jewell*,
   825 F.3d 571 (9th Cir. 2016) ....................................................... 26, 40, 41

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) ................................................................. 3

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .......................................................... 28, 29, 40

*S. Fork Band Council of W. Shoshone of Nev. v. Dep't of Interior*,
   2012 U.S. Dist. LEXIS 988 (D. Nev. 2012) ........................................... 16

*S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*,
   588 F.3d 718 (9th Cir. 2009) ................................................................... 9

*Sampson v. Murray*,
   415 U.S. 61 (1974) .............................................................................. 44

*San Diego Bev. & Kup v. United States*,
   997 F. Supp 1343 (S.D. Cal. 1998) ...................................................... 45

*San Jan Citizens All. v. Stiles*,
   654 F.3d 1038 (10th Cir. 2011) ............................................................ 22

*Selkirk Conservation Alliance v. Forsgren*,
   336 F.3d 944 (9th Cir. 2003) ................................................. 35, 36, 38, 39

*Sierra Club v. Bosworth*,
   510 F.3d 1016 (9th Cir. 2007) .............................................................. 35

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   744 F. Supp. 2d 151 (D.D.C. 2010), *aff'd*, 661 F.3d 66 (D.C. Cir. 2011) ........................ 35, 38

*Theodore Roosevelt Conservation Partnership v. Salazar*,
   661 F.3d 66 (D.C. Cir. 2011) ................................................................ 24

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

iv

*United States v. Locke,*
    471 U.S. 84 (1985)......................................................................................10

*W. Watersheds Project v. Bernhardt,*
    2021 U.S. Dist. LEXIS 27434 (D. Idaho Feb. 11, 2021)........................5, 8

*W. Watersheds Project v. Bureau of Land Mgmt.,*
    552 F. Supp. 2d 1113 (D. Nev. 2008)....................................................29

*Western Exploration v. Department of the Interior,*
    250 F. Supp. 3d 718 (D. Nev. 2017).................................................14, 15

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008).............................................................................4, 44, 45

### FEDERAL STATUTES

5 U.S.C. §§ 701-06 .............................................................................................3

5 U.S.C. § 706(2)(A)..........................................................................................3

16 U.S.C. 1451 ..................................................................................................14

16 U.S.C. § 410aaa-49(a) (2006) ....................................................................10

16 U.S.C. § 478 .................................................................................................12

30 U.S.C. § 22 .......................................................................................10, 11, 12

30 U.S.C. §§ 610-615 ......................................................................................12

30 U.S.C. § 612 .................................................................................................12

30 U.S.C. § 612(a) ............................................................................................13

30 U.S.C. § 1602 ...............................................................................................11

42 U.S.C. § 7410(a)(1).....................................................................................23

42 U.S.C. § 7410(a)(2)......................................................................................23

43 U.S.C. § 1701(a)(12).....................................................................................12

43 U.S.C. § 1701 note (h) ..................................................................................5

43 U.S.C. § 1744 ...............................................................................................11

Appropriations Act (106 Stat. 1374 (1992), codified at 30 U.S.C. § 28f)....................12

Clean Air Act ....................................................................................................23

Federal Land Policy and Management Act Section 302(b), 43 U.S.C. § 1732(b)................. *passim*

FLPMA Section 204 .........................................................................................................8

Mining and Minerals Policy Act of 1970 (30 U.S.C. § 21(a))........................................11

Mining Law (30 U.S.C. §§ 23, 26, 28, 35) ....................................................................11

National Environmental Policy Act ...................................................................... *passim*

### STATE STATUTES

Administrative Procedure Act............................................................................................3

Bald and Golden Eagle Protection Act ...........................................................................32

General Mining Law of 1872................................................................................. *passim*

National Historic Preservation Act .................................................................................45

NRS 501.181(1) ..............................................................................................................39

NRS 501.181(3) ..............................................................................................................39

The Organic Act...............................................................................................................13

Surface Use Act ...............................................................................................................12

### OTHER AUTHORITIES

40 C.F.R. § 1502.2(b) ...............................................................................................29, 30

40 C.F.R. § 1502.16(h) (2019)..................................................................................28, 30

40 C.F.R. § 1508.7 ..........................................................................................................35

43 C.F.R. § 3809.05 ..................................................................................................14, 16

43 C.F.R. § 3809.415 ......................................................................................................15

43 C.F.R. §3809.415(a)....................................................................................................14

43 C.F.R. § 3809.420(a)(3) .............................................................................................14

40 CFR Part 60, Subpart H .............................................................................................23

66 Fed. Reg. 54834 (Oct. 30, 2001)................................................................................15

1955 U.S.C.C.A.N. 2474 .................................................................................................13

1955 U.S.C.C.A.N. 2483 .................................................................................................13

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

BLM § 3809 ...........................................................................................................14, 15

BLM § 3809.420 ..................................................................................................14, 15

BLM § 3809.420(a)(4) ...............................................................................................16

H.R. Rep. No. 84-730 ..............................................................................................13

https://eplanning.blm.gov/eplanning-ui/project/1503166/570 .......................................2

https://sagebrusheco.nv.gov/uploadedFiles/sagebrusheconvgov/content/Resources
/Nevada%20Strategic%20Action%20Plan%20Final.pdf ........................................37

Nev. Admin Code 445B.308 ......................................................................................23

Nevada Administrative Code 504.210 ........................................................................38

President Biden's Executive Order 14017 ....................................................................2

1955 U.S.C.C.A.N. 2476 ...........................................................................................13

White House Statements and Releases, *FACT SHEET: Securing America's
Critical Supply Chains*, (Feb. 24, 2021) ....................................................................2

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

## INTRODUCTION[1]

"The Thacker Pass Project is critically important for our Nation and the world. . .the impacts from this mine are relatively benign.  The environmental value of this lithium producing mine, however, is enormous." Ex. 1, Dec. Of G. Miller, Ph.D.

The Thacker Pass Project ("Project") will be an open-pit lithium mine on Lithium Nevada's unpatented mining claims approximately 17 miles from Orovada. Record of Decision ("ROD") at 1 (Pl. Ex. 1). The Project's environmental review was extensive, thorough and required many years of work, including collection of significant environmental baseline data. Lithium Nevada's commitment to mitigation is substantial, including millions of dollars to relocate the Project to avoid the Montana Mountains and environmental concerns with mining there. The Environmental Impact Statement ("EIS") provides full discussion of significant environmental impacts and reasonable alternatives in compliance with the National Environmental Policy Act ("NEPA").

After years of environmental baseline data collection and coordination with the Bureau of Land Management ("BLM") on environmental mitigation measures, including a Project redesign to avoid areas identified as priority habitat management areas ("PHMA") for greater sage-grouse ("sage-grouse" or "GSG"), Lithium Nevada submitted the Plan of Operations to BLM in August 2019. Motion to Intervene, Ex. 2 (ECF No. 15) at ¶¶ 7-12. BLM issued a Draft EIS in July 2020. The Final EIS ("FEIS"), published in December 2020, responded to comments on the Draft, including Plaintiffs'.[2] On January 15, 2021, BLM issued the ROD approving the proposed action

---

[1] Lithium Nevada Corp. ("Lithium Nevada") submits these points and authorities in opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 23, "Motion") and requests  an evidentiary hearing. Charlton v. Est. of Charlton, 841 F.2d 988, 989 (9th Cir. 1988) (unless a party waives its right, an evidentiary hearing should be held where essential facts are in dispute).

[2] The Draft and Final EIS can be found at the same webpage as the ROD.  https://eplanning.blm. gov/eplanning-ui/project/1503166/570.

1

with conditions of approval, applicant-committed design features, and other measures to avoid, minimize, or mitigate environmental effects. ROD at 2, 11-19, 23.

The Project is important to leveraging domestic lithium reserves to secure our nation's critical supply chain. The Department of Interior has identified Lithium as a critical mineral. President Biden's Executive Order 14017 (Ex. 2), identifies the need for the U.S. to better leverage sizeable lithium reserves to expand electric vehicle battery production to help "tackle the climate crisis."[3] President Biden also seeks to ensure that the U.S. is not dependent on foreign sources for critical minerals as a matter of national security.[4] Given the extensive environmental review, mitigation required by BLM, and that the activity the Plaintiffs seek to enjoin is cultural resource mitigation work on less than 0.5 acre of land, there is no irreparable harm, no legal basis to enjoin work on the Project, and to do so would be contrary to the public interest in development of a project with strategic importance to national security.

## **ARGUMENT**

### I.    **Judicial Review under the APA & Standard for Preliminary Injunction**

The Administrative Procedure Act ("APA") provides a limited scope of judicial review of agency actions. 5 U.S.C. §§ 701-06; *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006). A court may reverse an agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision may be overturned only if the agency relied on factors Congress did not intend it consider, entirely

---

[3] *See also* White House Statements and Releases, *FACT SHEET: Securing America's Critical Supply Chains*, (Feb. 24, 2021) (explaining President Biden's EO to help create more resilient and secure supply chains for critical and essential goods) (Ex. 2).

[4] *See also* Ex. 2 ("Critical minerals are an essential part of defense, high-tech, and other products. From rare earths in our electric motors and generators to the carbon fiber used for airplanes—the United States needs to ensure we are not dependent upon foreign sources or single points of failure in times of national emergency.").

2

failed to consider an important aspect of the problem, offered an explanation counter to the evidence before it, or is so implausible it could not be ascribed to a difference in view or the product of agency expertise. *McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017). The APA does not allow courts to overturn agency decisions because they disagree with the decision or with the agency's conclusions about environmental impacts. *River Runners v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). A court "may not substitute its judgment for that of the agency." *Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 858 n.36 (9th Cir. 2003).

A preliminary injunction is "an extraordinary and drastic remedy" that requires the movant, "*by a clear showing*," to "carr[y] the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To obtain a preliminary injunction, a plaintiff must, at a minimum, demonstrate four elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that the balance of equities tips in its favor, and (4) that the injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (rejecting a "possibility" of irreparable harm standard).

**II.     Plaintiffs are not Likely to Succeed on the Merits.**

Success on the merits is the most important factor in the Court's analysis; when Plaintiffs fail to demonstrate a likelihood of success on the merits, the Court need not consider the remaining factors. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

**A.      The Project Complies with the Resource Management Plan ("RMP")**

**1.      The Project Complies with Applicable Sage-grouse Provisions**

Plaintiffs allege the Project violates (i) the 3% disturbance cap; (ii) required design features, such as lek buffers, seasonal restrictions, and noise limits; and (iii) net-conservation-gain requirements of the RMP as amended by the GSG Approved Resource Management Plan Amendments ("ARMPA"). Plaintiffs ignore the explicit language in the ARMPA limiting the applicability of certain of the requirements to locatable minerals.

BLM has limited authority to impose conditions when authorizing uses under the Mining Law. This limitation stems from Section 302(b) of Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(b), which specifies that it does not amend the Mining Law, except in four discrete ways, none of which apply to land-use planning. *See also* 43 U.S.C. § 1701 note (h) ("All actions by the Secretary concerned under this Act shall be subject to valid existing rights."). Therefore, operators are required to comply with RMP provisions only to the extent they are consistent with the Mining Law. *Cf. W. Watersheds Project v. Bernhardt*, 2021 U.S. Dist. LEXIS 27434 *25-26 (D. Idaho Feb. 11, 2021) ("'Only a withdrawal from location and entry under the Mining Law can prevent the establishment of new mining claims and provide certainty that lands not encumbered by mining claims will not be developed.' Thus, federal agencies 'have less discretion with respect to when and where mineral exploration and mining under the Mining Law is conducted, as compared to other agency authorizations.'").

The ARMPA recognizes this limited authority, noting that the GSG management decisions (MD SSS 1 to SSS 4) apply in the context of locatable minerals only "to the extent allowed by law." ARMPA at 2-30 (Pl. Ex. 9). The 3% disturbance cap (MD SSS 2A) cited by Plaintiffs is expressly "subject to applicable laws and regulations, such as the 1872 Mining Law, as amended, and valid existing rights." *Id.* at 2-7. The ARMPA recognizes that, "[a]lthough locatable mine sites

4

are included in the degradation calculation, mining activities under the 1872 mining law may not be subject to the 3% disturbance cap." *Id.*, App. E at E-2. Plaintiffs' arguments that BLM was required to impose the disturbance cap or convene a technical team for an exception to the cap are without merit because the cap does not apply to the Project.

This is also true for lek buffers (MD SSS 2D), seasonal restrictions (MD SSS 2E), and noise limits (MD SSS 2F). As noted above, the ARMPA recognizes that MD SSS 1 through SSS 4 apply to locatable minerals only "to the extent allowed by law." *Id.* at 2-30. The lek-buffer provision further reiterates that the application of such buffers must be "consistent with valid and existing rights and applicable law in authorizing third-party actions." *Id.* at 2-8; *see* FEIS, App. N at N-6 ("Proposed locatable minerals resource projects are not subject to lek buffer distances identified in Appendix B of the GRSG Amendment.") (Pl. Ex. 12). The seasonal restrictions and noise limitations apply only to "discretionary" activities. ARMPA at 2-8 to 2-9; *see* FEIS, App. N at N-6 to N-7 (seasonal and noise restrictions do not apply to locatable minerals). As the EIS for the ARMPA recognizes, "[m]ineral exploration and the development of locatable mineral deposits are nondiscretionary actions allowed under the General Mining Law of 1872 on all BLM-administered and National Forest System lands, unless they are withdrawn from mineral entry[.]" Nevada and Northeastern California Greater Sage-Grouse Proposed LUPA/Final EIS at 3-139 (Ex. 3). Thus, Plaintiffs' assertions that the Project is subject to these provisions are wrong.

Plaintiffs are also unlikely to succeed with respect to their arguments regarding the reasonable design features (MD SSS 2C) specific to locatable minerals. Those requirements also apply only "to the extent allowed by law," ARMPA at 2-30, which means that they cannot be imposed when they interfere with rights under the Mining Law. Nonetheless, Lithium Nevada has committed a variety of measures to minimize effects to sage-grouse similar to the reasonable design features, such as "limiting disturbance areas, performing breeding bird surveys before

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

ground disturbance, fencing areas surrounding the plant emergency pond and the [clay tailings filer stack] reclaim ponds, and conducting concurrent reclamation." FEIS at 4-4 (Pl. Ex. 2). The concurrent reclamation will use a seed mix that is designed to restore wildlife habitat in the area. *Id*., App. B at 93 (Pl. Ex. 3). Lithium Nevada has also committed to the development of a noise monitoring plan and identification of effective noise reduction measures. *Id*., App. R at R-184 (Pl. Ex. 5). It will also implement a raven-control plan to minimize the potential for raven predation of sage-grouse. *Id*. at 4-44 and App. R at R-136. And Lithium Nevada specifically cited the Project facilities away from the high Montana Mountains area to avoid sage-grouse focal areas ("SFAs"). *Id*., App. B at 75; ARMPA at 1-5 (SFAs shown in Figure 1-3); Ex.12, Dec. of A. Zawadzki ¶5-8.

Plaintiffs' arguments regarding mitigation fair no better. The ARMPA's "net conservation gain" mitigation requirements (MD SSS 2B) do not apply to locatable minerals. ARMPA at 2-8 (noting that MD SSS 2B must be "consistent with valid existing rights and applicable law."). Nevertheless, Lithium Nevada has worked with the Nevada Sagebrush Ecosystem Technical Team ("SETT") to calculate the amount of compensatory mitigation that would be required to offset the Project's sage-grouse impacts through use of the Nevada Conservation Credit System ("CCS"). FEIS at 4-44–45. The robust habitat quantification tool used by the SETT, which requires on-the-ground analysis of habitat conditions, accounts for habitat disturbance and noise impacts; it has calculated that the Project would yield 1,375 term debits to be offset by the purchase of credits, *id*., and Lithium Nevada is required to purchase those credits under the ROD. ROD at 11; *see also Thacker Pass Project, Greater Sage-Grouse Habitat Quantification Report* (March 2019) (Ex. 4). The ARMPA recognizes that the CCS yields a net conservation gain to sage-grouse. ARMPA at 2-8. As BLM noted, it is "applying all regulatory requirements *applicable* to proposed non-discretionary minerals projects from the respective Greater Sage-grouse [LUPAs] (2015 and 2019)

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

6

according to current mineral policy." FEIS, App. R at R-210 (emphasis added). Thus, Plaintiffs' arguments regarding compliance with RMP requirements for sage-grouse are unlikely to succeed.

### 2.    The Project Complies with the RMP Visual Resource Provisions

Plaintiffs claim that BLM violated FLPMA because the ROD conflicts with RMP requirements for visual resources. But the relevant provisions of the RMP do not mandate compliance with visual resource objectives for locatable mineral projects where the project obviously cannot be relocated. The RMP recognizes valid existing rights. RMP at 2-2 (Pl. Ex. 7). It also recognizes under the locatable mineral resource section that public lands remain "open and available for mineral exploration and development subject to FLPMA Section 204." *Id*. at 2-52. FLPMA Section 204, governing withdrawal of lands from mineral entry, does not apply to the Project Area. The withdrawal of lands is the only way to put mining "off limits" on public lands, *W. Watersheds Project,* 2021 U.S. Dist. LEXIS 27434 at *25-26, which is why the ARMPA proposed withdrawing the SFAs from mineral entry. ARMPA at 2-30; *see also* Nevada and Northeastern California Greater Sage-Grouse Proposed LUPA/Final EIS at 3-140 ("To restrict locatable mineral development, the BLM or Forest Service must petition the Secretary of the Interior for withdrawal actions"). Comparing the RMP provisions for saleable versus locatable minerals also supports this. Because saleable minerals do not enjoy the same rights as locatable minerals, under the RMP, they may be developed "except where incompatible with important resource values." RMP at 2-52. The locatable mineral provisions do not include that restriction.

BLM retains "a great deal of discretion in deciding how to achieve" compliance with the applicable land-use plan. *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004)). BLM may choose the appropriate manner to achieve RMP objectives. BLM's interpretation of its own regulations, including land-use plans, is entitled to deference. *Hapner v. Tidwell*, 621 F.3d 1239,

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1251 (9th Cir. 2010) ("[a]gencies are entitled to deference to their interpretation of their own regulations, including Forest Plans"). Accordingly, the Ninth Circuit has upheld denial of a preliminary injunction where plaintiffs alleged that BLM violated FLPMA by approving a hardrock mining project that would not likely meet the relevant visual-impact standards. *S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 725 (9th Cir. 2009).

### 3.  BLM Appropriately Considered Rights under Federal Mining Laws

Plaintiffs erroneously argue that BLM must confirm all mining claims contain valuable mineral deposits before recognizing rights under the Mining Law to occupy and use public lands. This argument conflicts with more than a century of law, the plain language of numerous federal statutes, and BLM's regulations. Plaintiffs conflate properly located mining claims that are legally valid with *perfected* mining claims with a proven discovery to argue that claims of unknown validity are not governed by the Mining Law. But, "the Mining Law, its implementing regulations, and related case law have never required Interior or BLM to verify the validity of a claim by independently confirming discovery." *Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 492 (D.D.C. 2020).  Mining claims are treated as *de facto* "valid" until proven otherwise. *Id.* The *Earthworks* court refused to "strain to read . . . the FLPMA as silently working such a fundamental change to longstanding practice under the Mining Law." *Id.* at 493.

The law does not require that BLM evaluate claim validity before approving a plan of operations. Where Congress intended to require a validity determination prior to such approval, it expressly included that requirement. For example, legislation creating the Mohave National Preserves provides: "[t]he Secretary shall not approve any plan of operations prior to determining the validity of the unpatented mining claims . . . affected by such plan within the preserve . . . ." 16 U.S.C. § 410aaa-49(a) (2006). No such mandate exists under the Mining Law on lands open for mineral entry. *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("[t]he preeminent canon

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

8

of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'").

The Mining Law "permit[s] citizens to enter and explore unappropriated federal lands in search of 'valuable mineral deposits.'" *McMaster v. U.S.*, 731 F.3d 881, 885 (9th Cir. 2013) (quoting 30 U.S.C. § 22). It allows citizens "to go onto unappropriated, unreserved public land to prospect for and develop certain minerals." *United States v. Locke*, 471 U.S. 84, 86 (1985). Under the Mining Law's plain language, all lands belonging to the U.S. "shall be free and open" to mining and mining-related operations, with no mention of mining claims. 30 U.S.C. § 22.[5] This statutory right to access and use public lands for mining and mining-related activities requires no mining claim at all. It is independent from the statutory rights to locate mining claims established by other provisions of the Mining Law (30 U.S.C. §§ 23, 26, 28, 35). The Mining Law's creation of rights to locate mining claims to exclude others did not limit the right to access and use public lands open to mineral entry.[6] 30 U.S.C. § 22.

One of the limited ways FLPMA amended the Mining Law was to require claimants to record each mining claim with BLM by filing a copy of the notice of location and file annual proof of having completed assessment work for each claim. 43 U.S.C. § 1744. However, Congress did not require BLM to determine validity of mining claims to accept these filings. Congress created

---

[5] The exception to this general right is where lands are not "open" to mineral entry because either through Congressional or administrative action, the lands have been "withdrawn from mineral entry." There is no dispute here that the Project area has not been withdrawn from mineral entry.

[6] Congress affirmed its commitment to encouraging mining in the Mining and Minerals Policy Act of 1970 (30 U.S.C. § 21(a)) ("it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in . . . the development of economically sound and stable domestic mining . . . to help assure satisfaction of industrial, security and environmental needs") and again in 1980 in the National Materials and Minerals Research, Policy and Development Act declaring "it is the continuing policy of the United States to promote an adequate and stable supply of materials necessary to maintain national security, economic well-being and industrial production . . . ." 30 U.S.C. § 1602.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

no distinction in FLPMA based on the discovery status of a claim, directing that lands open to mineral entry be managed "in a manner which recognizes the Nation's need for domestic sources of minerals," *id.* § 1701(a)(12), and directing that rights under the Mining Law not be impaired. *Id.* § 1732(b). In 1992, Congress again protected rights under active mining claims in the Appropriations Act (106 Stat. 1374 (1992), codified at 30 U.S.C. § 28f), which required holders of unpatented mining claims, without regard to discovery status, to pay an annual maintenance fee.

Plaintiffs ignore Congress' numerous actions that have preserved and protected rights under the Mining Law and, that Lithium Nevada's mining claims are active claims in good standing because it has complied with FLPMA filing and fee requirements. Plaintiffs argue BLM cannot authorize placement of waste rock, stockpiles, and tailings on mining claims because use and development of mining claims is only authorized on lands that contain a "valuable mineral deposit." This argument overlooks that the storage of waste rock and tailings fits squarely within the statutorily enumerated list of mining-related activities permitted on public lands under the federal mining statutes—it is part of, and encompassed within, "explor[ing]," "prospecting," "developing," "mining," and "processing" and is "reasonably incident" to mining. 30 U.S.C. §§ 22, 612; 16 U.S.C. § 478. Plaintiffs' suggestion the BLM should ignore these statutory rights finds no basis or support in law. In 1955, Congress amended the Mining Law while taking care to preserve the broad rights under Section 22 when it enacted the Surface Use Act to prohibit non-mining use of mining claims and occupation of lands open to mineral entry for activities and facilities **unrelated** to mining. 30 U.S.C. §§ 610-615. In the Surface Use Act, Congress broadly defined legitimate mining activity to include "prospecting, mining or processing operations and uses reasonably incident thereto." *Id.* § 612(a). The House Report (H.R. Rep. No. 84-730, *reprinted* in 1955 U.S.C.C.A.N. 2474, 2483) ("Report")) recognized that the "Federal mining law has been designed to encourage individual prospecting, exploration, and development of the public

10

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

domain" acknowledging the necessary use of public lands or active claims for all mining related activities, including reasonably incident uses such as storage of waste rock.[7] 1955 U.S.C.C.A.N. at 2476. Uses reasonably incident to mining such as storage areas do not require a mining claim at all and, as *Earthworks* made clear, when it occurs on a mining claim, does not require demonstration of "validity" or discovery of a valuable mineral. Plaintiffs' citation (at 18) to *Ctr for Biological Diversity v. USFWS*, 409 F.Supp.3d 738 (D. Ariz. 2019) is inapposite and the *Earthworks* Court found it of limited relevance to the issue of whether the BLM must evaluate claim validity to approve a plan. 493 F.Supp.3d at 490 n.12 (noting that although it examined the Mining Law, that case dealt with a site-specific application of Forest Service regulations and a statute unique to the Forest Service, the Organic Act).

## B. BLM Prevented Unnecessary or Undue Degradation to Protected Wildlife

BLM's Part 3809 regulations explain how a mining operator prevents "unnecessary or undue degradation" ("UUD") while conducting operations on public lands. An operator prevents UUD by "[c]omplying with §3809.420, as applicable; the terms and conditions of your notice or approved plan of operations; and other Federal and State laws related to environmental protection and protection of cultural resources". 43 C.F.R. §3809.415(a); *id*. § 3809.5 (using similar language to define UUD). BLM's approval of the Project satisfied these requirements. ROD at 21. Plaintiffs

---

[7] Consistent with the *Earthworks* decision, the Report also discusses that by proper location of a claim, the locator "without further requirement under Federal law, as of that moment, acquires the immediate right to exclusive possession, control and use of the land within the corners of his location stakes . . . and may remove the minerals from the land without first proceeding to patent." Id. at 2477-78. The Report recognizes the rights to use properly located and maintained claims— with no mention of proving "validity" or evidence of a discovery. The Report notes that the "language, carefully developed, emphasizes the committee's insistence that this legislation not have the effect of modifying long-standing essential rights springing from location of a mining claim. Dominant and primary use of the locations hereafter made, as in the past, would be vested first in the locator . . . ." Id. at 2483. Congress has never required evidence of a discovery to vest essential rights "springing from the location of a mining claim."

have not demonstrated otherwise. Plaintiffs (at 20) are equating the ARMPA's requirements with a "federal law" "related to environmental protection." (quoting 43 C.F.R. § 3809.05). But the ARMPA is a land-use plan, not a federal law. Thus, ARMOA compliance falls under the 3809.420 performance standards, which explain: "*Consistent with the mining laws*, your operations and post-mining land use must comply with the applicable BLM land-use plans and activity plans, and with coastal zone management plans under 16 U.S.C. 1451, *as appropriate*." 43 C.F.R. § 3809.420(a)(3) (emphasis added). As discussed above, BLM required adherence to the applicable provisions of the land use plan, consistent with the Mining Law.

Plaintiffs erroneously argue that *Western Exploration v. Department of the Interior*, 250 F. Supp. 3d 718, 747 (D. Nev. 2017), supports their assertion that the ARMPA's sage-grouse standards must be met to comply with BLM's duty to prevent UUD under FLPMA. But, as the court explained, the government expressly recognized that the ARMPA establishes "a more protective" standard than required by UUD. 250 F. Supp. 3d at 747. The court merely concluded that the ARMPA was not inconsistent with FLPMA's multiple-use standard; it did not conclude that compliance with the ARMPA sage-grouse standards is required to avoid UUD.[8] *Id.*

Plaintiffs also appear to be asserting that the BLM Special Status Species Manual imposes a standard that must be satisfied to comply with UUD. However, as noted above, an operator prevents UUD by complying with the performance standards in Section 3809.420, its Plan of Operations, and other federal and state laws related to environmental protection and protection of

---

[8] Plaintiffs cite (at 20) the preamble of the November 2000 Part 3809 regulations. Those regulation were revised in 2001 as a result of litigation over the regulation's treatment of the UUD standard. 66 Fed. Reg. 54834 (Oct. 30, 2001). The 2001 regulations significantly revised the 3809.420 performance standards, and the preamble did not contain the language Plaintiffs cite from the superseded regulations.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

cultural resources. 43 C.F.R. § 3809.415. The Special Status Species Manual does not fall under any of these categories. Thus, Plaintiffs' argument is without support.

Similarly, the language the Plaintiffs quote from the government's brief in *Western Exploration*, Motion at 21, does not show that the Manual imposes requirements to avoid UUD; it merely recognizes that the "net conservation gain" standard is consistent with BLM's Special Status Species Manual. The very next sentence in that brief states: "The unnecessary or undue degradation standard is a minimum standard for BLM's land management policy, but it does not restrain BLM's discretion to implement a mitigation standard that calls for improvements in land conditions beyond the *status quo*." Federal Brief in Western Exploration, at 26 (Pl. Ex. 16). This recognition that the mitigation requirements of the ARMPA go beyond the UUD standard explicitly contradicts Plaintiffs' assertion that adherence to the ARMPA's "net conservation gain" or the Manual is required to demonstrate compliance with the UUD standard.

Plaintiffs' assertion that the UUD standard requires BLM to impose mitigation measures is also without support. This Court rejected a similar argument:

> [T]he Tribes' contention that these regulations place a duty on BLM to require mitigation is a misreading of the regulations' plain language. Section 3809.420(a)(4) merely requires that [the operator] take any mitigation measures that BLM specifies, and § 3809.5 deems it an unnecessary or undue degradation for [the operator] to fail to comply with such performance standards. But neither provision imposes any duty on BLM to specify any particular mitigation measures.

*S. Fork Band Council of W. Shoshone of Nev. v. Dep't of Interior*, 2012 U.S. Dist. LEXIS 988, *21-*22 (D. Nev. 2012). Plaintiffs' arguments find no support in the record or the law.

### C.   BLM Satisfied its Obligations under NEPA and FLPMA

#### 1.   BLM fully analyzed and ensured compliance with water quality standards

Plaintiffs assert that BLM violated the RMP because antimony will be released into the groundwater in violation of water quality standards. But, as Plaintiffs acknowledge, BLM required

mitigation in the event that constituent concentrations exceed established regulatory thresholds. As described in more detail below, the ROD includes a condition of approval that Lithium Nevada monitor groundwater sources according to Nevada Department of Environmental Protection (NDEP) standards and maintain water quality to State of Nevada standards for wildlife, livestock, and human consumption. ROD at 11. The ROD also includes applicant-committed environmental protection measures, that incorporate standards required under the State of Nevada Water Pollution Control Permit ("WPCP"), and monitoring and adaptive management mitigation measures identified in Appendices B and H of the Plan of Operations. ROD at 11, 14. A technical advisory group—comprised of BLM staff and federal, state, or local agency representatives with direct interest in water quality and quantity and Lithium Nevada—will evaluate the monitoring data and identify mitigation methods and triggers for implementation of mitigation. ROD at 14. As discussed below, this adaptive approach provides for timely mitigation given that any issue relating to antimony migration is not expected until over 65 years after operations begin. FEIS, App. P, Figure 6.5 (showing antimony concentrations at 25 years post-closure) (Ex. 5).

The ROD also requires Lithium Nevada to update the groundwater model on a schedule not to exceed five years. ROD at 11. If updated models continue to support the assumption that backfilled pits would exhibit flow-through at low rates with minimal water quality degradation, Lithium Nevada will adopt mitigation strategies early to minimize or eliminate the risk of groundwater impairment through strategies determined with BLM and NDEP concurrence. The ROD also requires Lithium Nevada to monitor its activity to identify or prevent impacts according to the operating plans and all permits in Appendix O of the EIS, which includes the WPCP. *Id.*

Plaintiffs quote sections of the Environmental Protection Agency's ("EPA's") comment letter to support their argument that BLM failed to analyze impacts to water quality and ensure against any exceedance of water quality standards. Plaintiffs argue that BLM should have provided

a more detailed monitoring plan for potential future mitigation. As discussed *infra*, this wholly ignores Section 8 of the May 2020 Water Quantity and Quality Impacts Report—the project Monitoring and Mitigation Plan that concludes that each of three mitigation options specific to antimony migration would be an effective control, if needed. FEIS, App. P at 149-159 (Ex. 6). Section 8.2.1 describes a pump-back system for antimony mitigation. *Id*. at 155. The Plan was updated in October 2020 and finalized in February 2021 after EPA review. Plan of Operations, Ex. H, Ex. 7. It provides for implementation of a pump-back system for any antimony capture, as needed, proposes two effective configurations for the system. *Id.* at 15-16. The final requirements will be memorialized in the pending State WPCP, along with final locations for monitoring wells and, therefore, is mandated under the ROD. *Id.*, Att. A at 15. BLM concluded in the FEIS that the proposed Plan contains effective water-quality controls, if triggered, and this plan will be finalized before operations begin after receiving final input from NDEP. FEIS at 4-24–27, App. R at R-4. Since possible impacts to water quality are not associated with, at a minimum, the first 10-15 years of operations, BLM's decision to evaluate data and optimize mitigation techniques during initial years of operation is reasonable and consistent with adaptive management.

Finally, Plaintiffs argue (at 24) that BLM's "late analysis" with reports and mitigation measures were not subjected to public review, citing *Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016). This too is answered by BLM's careful adaptive management approach, *infra*, designed to monitor and address impacts, if and when they occur decades down the road. And the *Great Basin* case supports BLM's approach here: the Ninth Circuit upheld BLM's decision to rely solely on groundwater monitoring, with mitigation to be developed later given that impacts were not likely to occur for decades. 844 F.3d at 1107.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

**2.    BLM fully analyzed and ensured compliance with air quality standards**

BLM thoroughly analyzed the Project's direct and indirect impacts on air quality in accordance with NEPA, FLPMA, and the RMP. Contrary to Plaintiffs' assertions, BLM took the requisite "hard look" at the air quality impacts of the Project and reasonably concluded the Project would comply with applicable air quality standards. *Native Ecosystems Council v.  Marten*, 888 F.3d 783, 795 (9th Cir. 2018) ("An EIS complies with NEPA if it shows that the agency took a 'hard look" at the environmental consequences of its proposed action."). The final determination regarding the Project's compliance with air quality standards, including associated control technologies and emission limits, is being performed by NDEP—and without NDEP permits, construction on the Project cannot begin. Within this framework, BLM properly assessed the Project's impacts and reviewed the efficacy of proposed control technologies.

In order to assess the Project air quality impacts, BLM conducted a thorough review of Project emissions. This assessment began with an extensive emissions inventory performed for each emissions unit throughout the Project's life cycle, from construction to commercial production to closure and reclamation. FEIS at 4-77–79. BLM's analysis of the commercial production phase, for example, includes inventories of emissions from the mining, mineral processing, purified lithium solution, lithium end products, and the sulfuric acid plant. *Id.*, App. K, NEPA Air Quality Impact Analysis Report at 3-7 (Pl. Ex. 18). The emissions inventory accounted for operating limits, emissions controls, and emissions rates of each proposed emission unit. *Id.*, App. A of App. K. BLM used these inventories to perform advanced dispersion modeling to assess ambient air pollutant concentration levels in the Project area. *Id.* at 12-26; FEIS at 4-79. To model the effect of air emissions from the Project, BLM relied on estimated emissions from Phase 2—when air emissions would be highest—to model all aspects of Project operations. FEIS at 4-79 and App. K at 19. Ultimately, the model showed that "the estimated maximum ambient

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

concentrations for all pollutants and averaging periods are less than the applicable [National Ambient Air Quality Standards] and Nevada standards." FEIS at 4-80.

Plaintiffs' assertions that BLM failed to consider and disclose the effectiveness of the scrubbing technology for sulfur dioxide ("$SO_2$") emissions from the sulfuric acid plant ignore both the record evidence and the deference due BLM's technical determinations. Plaintiffs claim (at 25) that BLM does not disclose the control technology for $SO_2$ emissions but fail to acknowledge the FEIS's statement that "[s]ulfur dioxide, sulfuric acid mist, and particulate (primarily consisting of sulfuric acid mist as condensable particulate matter) emissions from the sulfuric acid plant will be controlled by a tail gas scrubber." FEIS App. K at 6-7. Similarly, the emissions inventory in the FEIS also clearly identifies the "tail gas scrubber" as the emissions "control system" for the sulfuric acid plant for both Phase 1 and 2 of the Project. FEIS App. K App. A at 4 (Phase 1), 10 (Phase 2).[9] To the extent the Plaintiffs raise concerns with the choice of reagent, (at 25), the FEIS makes clear that "[s]ince completing the [Impact Analysis Report], LNC has concluded that the sulfuric acid plant tail gas scrubber will utilize a sodium sulfate scrubbing solution containing sodium hydroxide." FEIS App. R at R-57. Additionally, "[t]he scrubber pH and sulfate concentration will be maintained to optimize the scrubber control efficiency." *Id*. Despite the record evidence discussing the specific $SO_2$ control technology, Plaintiffs baldly assert (at 35) that "no currently existing technology is capable of achieving these emissions reductions." To the contrary, a tail gas scrubber dramatically reduces emissions by increasing the flow rate of the caustic solution in the scrubber.  FEIS App. R at R-57 ("[t]he NEPA Air Quality Impact Analysis was completed based on guidance and specifications from a sulfuric acid plant manufacturer, which included manufacturer guaranteed emission levels."). Based on its assessment, BLM

---

[9] This information was also available in the same locations in the Draft EIS, so the public had an opportunity to comment on this control technology.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

concluded that emissions from the sulfuric acid plant "will be well below" the relevant federal performance standard, FEIS, App. K at 6, and will not impact state and federal air quality standards. FEIS at 4-80.

The basis for the calculation of emissions from the sulfuric acid plant also is properly supported and documented throughout the NEPA process. The FEIS references the sources of the emissions factors for the sulfuric acid plant's tail gas scrubber, which also are fully detailed in the "Emissions Inventory References." FEIS App. A of App. K at 4, 10, and Emissions Inventory References.   The manufacturers' guidance and specifications were provided to BLM for their review and validation. Ex. 12, Dec. of A. Zawadzki ¶19.

BLM's determinations fall squarely within the "technical and scientific judgments within the [BLM's] area of expertise" in the realm of air quality that are entitled to deference. *San Jan Citizens All. v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011). An agency is "afforded deference in choosing its scientific method for modeling data" and "the court is not to impose its own scientific judgment on the agency." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1080 (9th Cir. 2011) (deferring to the agency selected geographic boundary and air quality data for NEPA air modeling, "even if they did not include the air quality model preferred by Petitioners or air quality data" from outside the selected boundaries). BLM reliance here on manufacturers' guidance and specifications to estimate emissions from the sulfuric acid plant and model air quality impacts was a technical and scientific judgment entitled to deference. Emissions from the sulfuric acid plant were fully inventoried, and BLM conservatively applied the highest estimated emissions for both the Phase 1 and Phase 2 modeling. FEIS at 4-78 (Table 4.10), App. K at 9 (Tables 7 and 8). Plaintiffs' arguments to the contrary mischaracterize the record and should be rejected.

Plaintiffs question (at 25) the accuracy of modeling, arguing that "SO2 emissions will essentially remain the same in Phase 2, despite the fact that production would be doubled." As the

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

Impact Analysis Report makes clear, however, this discrepancy is due to the decision to "conservatively use[] the Phase 2 emission levels from the sulfuric acid plant tail gas for Phase 1, as well." FEIS, App. K at 8. "Because of this assumption, the total process emissions show only a small increase between Phases 1 and 2, whereas the fugitive emissions almost double based on the doubling of production between Phases 1 and 2." *Id.* Plaintiffs' cherry-picking of statements takes BLM's modeling out of context and must be rejected.

Ultimately, Plaintiffs' technical critiques fail to account for the procedural nature of NEPA and are better directed to the agency tasked with issuing and enforcing air permits for this Project. *Conservation Congress v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014) ("NEPA does not provide substantive protections, only procedural ones—it 'exists to ensure a process.'") (citation omitted). NDEP, as the federally delegated permitting authority under the Clean Air Act, must ensure that emission from Project construction and operations will not result in violations of applicable air quality standards. 42 U.S.C. § 7410(a)(1), (2). Under this framework, Lithium Nevada has applied for a minor source (Class II) air permit, which NDEP must issue before construction on the Project can begin. FEIS, App. K at 9.  A prerequisite of NDEP permit issuance is an environmental evaluation, including modeling, that demonstrates the controls and limits will ensure that the relevant air quality standards are not violated. Nev. Admin Code 445B.308. Additionally, as the FEIS acknowledges, "emission limits for the sulfuric acid plant, starting with Phase 1, will be enforced through the [NDEP] Air Quality Operating Permit for the Thacker Pass Project" and the "emissions must be maintained below the Federal standards in 40 CFR Part 60, Subpart H" for sulfuric acid plants. FEIS, App. R at R-57. In light of the ongoing comprehensive NDEP review, BLM reasonably "assumed in its determination that regulatory agencies charged with permit enforcement would ensure compliance with the permit requirements." *Moapa Band of Paiutes v. U.S. BLM*, 2011 U.S. Dist. LEXIS 116046, at *19 (D. Nev. Oct. 6, 2011).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

19

Plaintiffs make a passing claim (at 25) that the Project air quality impacts violate FLPMA's UUD standard. But, as discussed above, UUD merely requires the Project comply with BLM's performance standards, not that any particular mitigation be employed. BLM has a "great deal of discretion" in determining how best to implement the "unnecessary or undue degradation" standard. *Gardner v. BLM*, 638 F.3d 1217, 1222 (9th Cir. 2011). Indeed, the UUD standard does not require BLM to prevent all degradation. *Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66, 78 (D.C. Cir. 2011). Here, BLM's extensive air quality impact analysis and mitigation requirements are sufficient to avoid UUD.

### 3. BLM Took a Hard Look at Baseline Conditions and Wildlife Impacts

Plaintiffs' assertions that BLM failed to take a hard look at baseline conditions and impacts to wildlife are based on selective citations to the FEIS and misstatements about BLM's obligations under NEPA. A thorough review of the FEIS demonstrates that BLM satisfied its NEPA obligations for each of the species cited by Plaintiffs.

#### (a) Greater Sage-Grouse

With respect to sage-grouse baseline conditions, the FEIS discloses the location of leks in proximity to the Project area (in the text and on a map); the number of sage-grouse that have been documented in the Project area; the fact that the closest lek would not have a direct line of sight to the Project area; the amount of PHMA and General Habitat Management Area ("GHMA") in the Project area; the quality of sage-grouse habitat within and in the vicinity of the Project area; the status of the sage-grouse population in Lone Willow population management unit (PMU), within which the Project is located; and the amount of existing disturbance within the PMU. FEIS at 4-42–43, 4-51–53, G-18, N-5. As for potential Project impacts to the sage-grouse, the FEIS describes the indirect effects of noise, lighting, dust, vibration, human presence, and traffic on the species and its leks; the amount of PHMA and GHMA that the Project would disturb and the habitat

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

fragmentation impacts from such disturbance; the fact that the Project's disturbance of PHMA would represent less than two percent of PHMA in the PMU; the potential for increased establishment and spread of invasive and noxious weeds; the potential for the sage-grouse to collide with fences or other structures; the possibility of increased predation; and the impacts to sage-grouse habitat associated wet meadows, springs, and seeps as a result of groundwater drawdown from the Project. *Id.* at 4-42–43, 4-51–54, G-18, N-5. The FEIS also describes the mitigation measures Lithium Nevada will implement to offset these impacts, including the purchase of mitigation credits through the Nevada CCS. *Id.* at 4-44–45.

Plaintiffs erroneously allege (at 27) that BLM overlooked that "the Project will completely sever the southern half of the eastern portion of the Lone Willow PMU from the northern portion." But the FEIS discusses impacts to the PMU, including habitat fragmentation and barriers to movement by sage-grouse to preferred habitat areas; notes that such fragmentation could lead to diminished species health; and displays the location of the Project area in relation to the PMU. FEIS at 4-42–43, App. A Figure 4.5-12.

Plaintiffs' assertion about noise impacts similarly overlooks that the FEIS includes a detailed discussion of modeled noise increases at local leks, *id.* at 4-52–53, and a specific response to the Nevada Department of Wildlife's (NDOW's) comments about noise effects. *Id.*, App. R at R-184. Plaintiffs' claim about the lack of detail about the potential for sage-grouse occurrence ignores the fact that the FEIS specifically states that "GRSG have been documented within the Project area during field surveys and by NDOW, who reported 63 tracking locations generated by at least 30 radio-marked birds (NDOW 2018)." *Id.* at 4-42.

The fact that the FEIS does not identify the GSG Priority Area for Conservation (PAC) where the Project is located is a mere flyspeck. *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) (rejecting a NEPA challenge where "Plaintiffs merely 'fly speck' the EIS

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

rather than identify consequential flaws that would prevent the agency from sufficiently grasping the Project's potential environmental consequences."). BLM manages GSG by "biologically significant units," which are subsets of PACs. ARMPA at 2-6, 2-7. The BSU for the Project is the Lone Willow PMU, which the FEIS discusses fully. FEIS at 4-42–43, N-5.

### (b)    Pronghorn

The FEIS provides sufficient baseline information about the pronghorn. It discloses that the Project area encompasses a variety of suitable habitats and seasonal ranges for pronghorn antelope and provides a map that shows where the species seasonal ranges are located within and in the vicinity in the Project area. *Id.* at 4-38; App. A Figure 4.5-7. It places the amount of winter range in the Project area in the context of how much winter range is available in the applicable hunt unit: "mapped pronghorn antelope winter range distribution within the Project area constitutes approximately 1.26 percent of the total winter range mapped distribution within Hunt Unit 31." *Id.* at 4-38. It also explains that the pronghorn antelope population in Hunt Unit 31 has remained stable. *Id*., App. G at G-14. The FEIS further discloses that two pronghorn movement corridors—which facilitate access between limited use and winter range habitat to the south of the Project area and winter range, summer range, and year-round habitat to the north of the Project area—lie within the Project area. *Id*. at 4-38.

Citing the general wildlife discussion in the FEIS, Plaintiffs assert (at 28) that BLM's consideration of impacts to pronghorn is limited to vague generalizations. This ignores the FEIS's specific discussion of big game impacts. The FEIS discloses the impacts of clearing 4,960 acres of pronghorn winter range and puts the habitat-loss impacts in the context of the relevant pronghorn population. FEIS at 4-38. The FEIS also acknowledges that (1) the construction of Project facilities and the associated loss of habitat is likely to prohibit or impede pronghorn movement between seasonal habitats, (2) fragmenting the habitat of big game species could result

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

in big game species traveling farther to meet their nutritional and energy needs, and (3) during the initial development phase of the Project, it is likely that big game would be displaced from a larger area than the actual disturbed sites due to an avoidance response. *Id*. at 4-38–39. The FEIS's baseline and impact analysis for pronghorn complied with NEPA.

### (c)    Amphibians

Plaintiffs' assertion (at 28-29) that BLM failed to take a hard look at impacts to three special-status amphibians by not adopting mitigation measures fails for two reasons. *First*, NEPA is a procedural statute that does not require the implementation of any mitigation measures. *Pac. Coast Fed'n of Fishermen Assn's v. Blank*, 693 F.3d 1084, 1104 n.16 (9th Cir. 2012). *Second*, and more important, the FEIS indicates that impacts to the special-status amphibians are unlikely because they each have a low probability of occurring in the Project area, FEIS at 4-48, App. H at H-7, H-8, which obviates the need for any discussion of potential mitigation. 40 C.F.R. § 1502.16(h) (2019) (requiring a discussion of "[m]eans to mitigate *adverse* environmental impacts") (emphasis added); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 371 (1989) ("one important ingredient of an EIS is the discussion of steps that can be taken to mitigate *adverse* environmental consequences") (emphasis added).

With respect to the western toad, Plaintiffs appear to be making the curious argument (at 28-29) that BLM has ignored impacts to the species by quoting the FEIS's discussion of possible impacts. The FEIS explains that there is limited habitat available for the western toad in the Project area, and thus there is a low probability of the species occurring there. FEIS at 4-48. It also states that "[r]iparian vegetation, which is used by amphibians for cover and breeding, is extremely minimal or lacking within the Project area, due to both the seasonal or ephemeral nature of water presence, and/or heavy livestock use." *Id*. Nonetheless, the FEIS acknowledges the *possibility* that "[w]estern toads *may* be prevented from moving through disturbed upland habitats located

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

23

between the limited amounts of aquatic/riparian habitat in the Project area." *Id.* (emphasis added). Plaintiffs' assertion that impacts to the western toad are "likely" is not supported by the record, nor is the assertion that BLM ignored such impacts.

It appears that Plaintiffs are asserting that the FEIS lacks a credible baseline for amphibians because BLM did not conduct any surveys for individual amphibians in the Project area. But NEPA does not require site-specific surveys for individuals of any species that may occur in the Project area. *Cf. W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113, 1128 (D. Nev. 2008) (upholding use of a representative sensitive species to describe the affected environment rather than an analysis of "each individual species within the approximately 70 species of mammals, 273 species of birds, and 28 species of reptiles and amphibians.").[10] By describing the limited habitat available for the species in the Project area and low likelihood of their occurrence, the FEIS provides sufficient baseline information regarding these species, especially in light of NEPA's direction to discuss issues in proportion to the significance of the anticipated impacts. *Japanese Vill. v. Fed. Transit Admin.*, 843 F.3d 445, 468 (9th Cir. 2016) ("NEPA regulations require 'only brief discussion of other than significant issues.' 40 C.F.R. § 1502.2(b) ('Impacts shall be discussed in proportion to their significance.').").

### (d) Springsnails

The FEIS explains that 56 seeps and springs within the Project area and a 20-mile radius were surveyed for springsnails and that the Kings River pyrg and turban pebblesnail were identified during those surveys. FEIS, App. G at G-17. However, the only spring that occurs in the Project footprint, SP-001, is a man-made stock pond that does not contain any springsnails. *Id.* at

---

[10] The FEIS went beyond the NEPA analysis upheld by the court in *Western Watersheds Project* by providing an analysis of the preferred habitat and likelihood of occurrence for 97 special-status species potentially occurring in the Project area. FEIS, App. H, Table H.1.

4-48. Two springs, SP-003 and SP-058, occur outside the Project area but within the 10-foot drawdown contour. Those springs are also ephemeral, man-made stock ponds that are not anticipated to be affected by drawdown associated with open-pit mining and do not contain springsnails. *Id*. at 4-48, 4-54. Thus, BLM does not anticipate any direct or indirect impacts to springsnails from the Project. Because no impacts to springsnails are anticipated, Plaintiffs' arguments about the need for additional discussion of threats, stressors, or extinction risk for the Kings River pyrg or mitigation for springsnail impacts are without merit. 40 C.F.R. § 1502.2(b) ("Impacts shall be discussed in proportion to their significance."); *Nw. Env't Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, (9th Cir. 2006) (where a proposed action would have virtually no effect on salinity, cataloguing past projects' effects on salinity would not have informed assessments about the project); 40 C.F.R. § 1502.16(h) (requiring a discussion of mitigation for only *adverse* effects).

### 4. The FEIS Adequately Analyzes Cumulative Impacts

#### (a) The FEIS goes beyond "simply" listing acreages of other projects

Plaintiffs argue the FEIS fails to adequately analyze the cumulative impacts from other proposed activities within the cumulative effects study areas ("CESAs") by "simply" listing acreages of various other projects in the area with no impacts analysis. However, BLM's cumulative impacts analysis is more thorough than Plaintiffs acknowledge, providing more than just a mere listing of acreages. FEIS Section 5.1 lists relevant past, present, and reasonably foreseeable future actions within the resource CESAs, along with the nature and individual acreage of those actions, where such acreages are known.[11] It also qualitatively describes reasonably

---

[11] BLM could have foregone any detailed breakdown of past and present actions. *See, e.g., Ecology Ctr. v. Castaneda*, 574 F.3d 652, 666-67 (9th Cir. 2009) ("an aggregated cumulative effects analysis that includes *relevant* past projects is sufficient.").

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

foreseeable future actions where acreages are not known. Sections 5.2 through 5.17 of the FEIS then provide additional information as to the environmental impact of these actions together with the impact of the Project. For example, Section 5.2 of the FEIS regarding geology and minerals provides a high-level overview of the geological disturbances in the CESA resulting from other actions; a breakdown and description of the specific mines that have caused the impacts, the nature of those impacts, and how those impacts relate to the total area within the CESA; and a discussion of the Project's increase cumulative impacts. FEIS at 5-3 to 5-4. Section 5.9, which focuses on air quality and greenhouse gas emissions, provides thorough emissions data and information about the resulting pollutant concentrations from existing sources, along with projections about air quality impacts from reasonably foreseeable future actions based on economic and population growth projections, regulatory requirements, and the potential for wildfires. *See, e.g., id.* at 5-12 through 5-14, Tables 5.3-5.4, Section 4.9.1.1, and App. K.

Further, Section 5.5 regarding wildlife and special status species quantifies the amount of habitat disturbance caused by past, present, and reasonably foreseeable future actions within the CESA by category of activity and the incremental increases the Project would cause, the majority of which would be temporary, and notes that impacts from mine-related disturbances have been or will be reclaimed. *Id.* at 5-8 to 5-9; *see also id.* at 5-7 ("Cumulative losses for vegetation resources potentially would include the reduction of native ecosystem functions such as soil stability, erosion control, livestock and wildlife forage, and wildlife habitat."). Because the FEIS supports the U.S. Fish and Wildlife Service's proposed issuance of an eagle take permit under the Bald and Golden Eagle Protection Act ("Eagle Act"), this section has a special focus on impacts to golden eagles, providing estimates of both authorized and unauthorized take due to past, present, and reasonably foreseeable actions, providing a detailed analysis of these estimates in light of the requirements of the Eagle Act and the anticipated impacts to eagles from the Project.  *Id.* at 5-9 and App. Q.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

26

The FEIS also describes how the surface-disturbing activities in the CESA have impacted wetland and riparian areas, noting that:

> These activities may result in the temporary or permanent loss of riparian and wetland vegetation. Wildfires have had varying impacts on riparian and wetland habitats, depending on the condition and moisture levels of the riparian zone prior to the wildfire. Grazing has affected and would continue to affect riparian zones and wetland areas to varying degrees. Depending on the level of management, livestock grazing may have minimal to extensive impacts on riparian vegetation. Grazing in the annual hot season, combined with the establishment of noxious weeds and non-native invasive plant species has an increased potential for impacts to riparian and wetland resources through loss of habitat and decrease and/or loss of vegetation.

*Id.* at 5-7. For social and economic conditions, Section 5.11 incorporates the analysis of the socioeconomic effects of past and present actions described in great detail in FEIS Appendix G and analyzes the effect of reasonably foreseeable future actions on local employment, expenditures, and production based on, inter alia, previous BLM projections regarding hardrock mining employment. *Id.* at 5-15 to 5-16.

Section 5 of the EIS goes far beyond "simply listing" acreages without providing "some quantified or detailed information" and instead provides a robust, thoughtful "hard look" at all actions that may combine with the Project to potentially impact the environment. This cumulative impact analysis distinguishes the FEIS from the cases Plaintiffs cite. In *Great Basin Resource Watch v. Hankins*, the Ninth Circuit remanded an EIS that did not quantify the cumulative air impacts of the proposed action together with another nearby mine, vehicle emissions, or other development activities and failed to support its use of baseline values of zero for certain pollutants. 884 F.3d 1095, 1105 (9th Cir. 2016). By contrast, the FEIS here includes detailed information for emission levels from all existing sources in the Project county—including industrial processes, vehicles, and petroleum industries—and qualitatively evaluates the impacts of future sources for which emissions cannot be quantified. FEIS at 5-12 to 5-14 and App. K. It also uses non-zero

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

representative baseline values that were determined by reviewing nearby ambient monitoring stations, rather than using the zero values suggested by the state agency. FEIS App. K at 19-20.

In *Great Basin Mine Watch v. Hankins*, the Ninth Circuit rejected a cumulative impact analysis that contained no discussion of the environmental impact of past projects on an individual basis. 456 F.3d 955, 974 (9th Cir. 2006). Noting that a mere calculation of the acres impacted by other projects is insufficient, the court faulted BLM for failing to discuss other mine projects in the cumulative impact analysis.[12] *Id*. Here, as discussed above, rather than merely totaling the acres of surface disturbance from other actions, the FEIS provides a breakdown of specific projects and categories of actions, including their acreages, and analyzes the impacts of those actions.

The Ninth Circuit has explained that an agency "is free to consider cumulative effects in the aggregate or to use any other procedure it deems appropriate. It is not for this court to tell the [agency] what *specific* evidence to include, nor how *specifically* to present it." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1112 (9th Cir. 2015) (citation omitted). The FEIS's analysis of cumulative impacts satisfied NEPA's "hard look" standard. Accordingly, Plaintiffs are not likely to succeed on the merits of this argument.

        **(b)**        **BLM's CESA geographic scope is entitled to deference**

Plaintiffs further argue that BLM arbitrarily narrowed the geographic scope of its cumulative impacts analysis as to wildlife. For example, with regard to sage-grouse, Plaintiffs suggest that BLM's analysis should have extended beyond the "Lone Willow PMU," which stops

---

[12] The language that Plaintiffs quote from *Great Basin Mine Watch* regarding a total number of acres is from *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989, 995 (9th Cir. 2004). That case is also distinguishable because a considerable portion of the cumulative effects analysis discussed only the direct effects of the project at issue, the table regarding other three other proposed timber sales provided no quantification of impacts, and the table of five future foreseeable timber sales merely provided an estimate of the total acres to be harvested with no analysis of their impacts. *Id*. The FEIS does not suffer from these flaws.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

at the Nevada/Oregon border, because the PMU is part of a larger sage-grouse PAC that extends into Oregon. *Id.* Plaintiffs fail to acknowledge, however, that courts afford considerable deference to an agency's determination of the geographic scope of a cumulative effects analysis. *See Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976); *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1030 (9th Cir. 2007) ("the determination of the extent and effect of [cumulative effect] factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies . . . .").

Once the resources affected have been identified, the geographic range occupied by those resources can be used to determine the appropriate geographic range for the cumulative impact analysis. Deference to the agency's determination of the appropriate analysis area makes sense where, as here, that determination "requires a complicated analysis of several factors, such as the scope of the project considered, the features of the land, and the type of species in the area." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003). The proper scope of a cumulative impact analysis is limited to those past, present and reasonably foreseeable future actions that involve effects on a resource value that will overlap with the proposed project's effects on that same resource value. 40 C.F.R. § 1508.7.

While NEPA requires a cumulative impact analysis, "it does not require an unbounded analysis of an entire species range." *Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151, 163 (D.D.C. 2010), *aff'd*, 661 F.3d 66 (D.C. Cir. 2011) (concluding that BLM's decision to limit the geographic scope of its analysis of potential impacts to sage-grouse within and around the project area was entitled to deference). In *Selkirk*, the Ninth Circuit upheld the agency's decision limiting the CESA to a particular bear management unit ("BMU"), despite requests to expand the CESA to a nearby forest and despite the agency's understanding that the bear species do not observe BMU demarcations, citing concerns that expanding the study area

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

would "skew the analysis" of the project by improperly spreading out the impact on a larger area. 336 F.3d 944, at 951. In holding that the agency's decision to limit its analysis of a project on grizzly bears to a specific geographic area satisfied NEPA, the Ninth Circuit held an agency "is allowed to consider 'practical considerations of feasibility' in its selection of a geographic scope for an EIS." *Id.* at 960 (*citing Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)); *Nat. Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 560 (2d Cir. 2009) (affirming agency's designation of a CESA that omitted adjacent counties where it was based on consultation with other agencies and factors related to both biological and administrative boundaries).

Here, the Court should defer to the agency's decision within its special competency to analyze cumulative impacts to wildlife within a reasonable geographic scope, which notably includes different scopes as necessary when considering the type of species, BLM's prior management of the species, and related factors. For example, with regard to golden eagles, the FEIS explains a basis for its decision is rooted the species' characteristics–noting that the "geographic extent of the analysis of cumulative impacts to Golden Eagles is within a 175-kilometer (109-mile) radius surrounding the project, which represents the average natal dispersal distance of Golden Eagles, or Local Area Population." FEIS at 5-9.

Regarding Plaintiffs' argument (at 32) that BLM should have analyzed sage-grouse impacts within a larger geographic area, the FEIS (at 4-45) recognizes the following:

> Under Management Decision SSS 2A of the 2015 GRSG Amendment the BLM is required to conduct analysis of the area of disturbance at the local or project scale, in addition to analysis of disturbance densities across the biologically significant unit (BSU) according to the methodology presented in 2015 GRSG Amendment Appendix E.

The BSU in this instance is the Lone Willow PMU, which comprises over 480,000 acres, well exceeding the Project area but encompassing the managed area of potentially impacted species. FEIS, App. N at N-5. Moreover, the BSUs were developed in collaboration with several agencies

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

to reflect actual sage-grouse use of the region based on Nevada biologists' refined understanding of how sage-grouse interact with the landscape, as compared with the earlier-designated PMUs. *See* Nevada Strategic Action Plan 2016, Nevada SETT at 27[13] ("Originally, the Nevada Department of Wildlife (NDOW) designated GRSG PMUs in 2001 based on GRSG distribution, available telemetry data, and personal knowledge of Nevada Biologists. In 2015, the PMUs were consolidated into 18 distinct BSUs based upon further knowledge of how GRSG interact with the landscape and with adjacent populations. These larger geographic management and planning units provide opportunities for more efficient planning by [local-area working groups], land managers, and the State and federal resource management agencies."); *see* Nevada and Northeastern California GSG Proposed LUPA/Final EIS at 2-76 ("The scale used to monitor for application of the adaptive management triggers are the Biological Significant Units (BSUs; Map 2-1) developed in collaboration with the Nevada SETT, NDOW, CDFW, and USGS. These areas represent local GRSG population use areas in the sub-region.") (Ex. 9). Accordingly, notwithstanding Plaintiffs' argument about sage-grouse's ability to cross BSU lines, BLM was not required to conduct an "unbounded analysis of an entire species range" (*Theodore Roosevelt Conservation P'ship*, 744 F. Supp. 2d at 163), and the CESA was selected in a manner and based on factors similar to the CESA selections the Ninth Circuit upheld in *Selkirk* and *Natural Resources Defense Council.*

BLM's selection of the BSU (i.e., Lone Willow PMU) is an appropriate area of analysis for cumulative impacts and is consistent with BLM's prior management of the species according to BSUs. *See, e.g.*, ARMPA at 2-6, 2-7; FEIS at 4-43 (noting that the 2019 SETT had determined that the Lone Willow PMU had crossed a habitat trigger, consistent with the Nevada GSG Conservation Plan adaptive management process). Given that BLM's selection of the sage-grouse

---

[13] *Available at* https://sagebrusheco.nv.gov/uploadedFiles/sagebrushconvgov/content/
Resources/Nevada%20Strategic%20Action%20Plan%20Final.pdf.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CESA was appropriate, Plaintiffs' argument regarding the exclusion of the McDermitt lithium drilling project across the Oregon border lacks merit because that project is located outside of the Lone Willow PMU and the selected CESA. *See* Pl. Ex. 24, Figure 2 (depicting the McDermitt exploration target area as entirely within the state of Oregon).

Likewise, the FEIS analyzes general wildlife within NDOW Hunt Unit 031—an area that greatly exceeds the Project area (FEIS, App. A Figure 4.5-1)—as designated by Nevada Administrative Code 504.210. This regulation was adopted by the Board of Wildlife Commissioners, which is charged with, among other duties, establishing broad policies for protection and management of wildlife in the state and cooperating with federal agencies on wildlife programs. *See* NRS 501.181(1), (3). The unit has logical geographic boundaries, being bounded to the west by the Bilk Creek Range, to the north by the Trout Creek Range, and to the east by the Montana Mountains and the Double H Mountains. *See* NDOW Hunting Information Sheet (Ex. 10). NDOW tracks big game populations by hunt unit. *See* NDOW 2019-2020 Big Game Status (Ex. 11). Thus, like in *Selkirk* and *Natural Resources Defense Council*, this study area for general wildlife reflects an administrative boundary established based on NDOW's local familiarity and management of species within the hunt unit. Accordingly, the Court should exercise the significant deference afforded to agencies to determine the geographic scope of a CESA, which BLM selected here based on appropriate factors, including the type of species potentially impacted, biological use of the area, and prior management of the subject species.

**5.      BLM analyzed mitigation and its effectiveness**

Plaintiffs argue that BLM did not fully develop a mitigation and monitoring plan and, therefore, BLM failed to take a hard look at impacts as required under NEPA, including the effectiveness of proposed mitigation. But BLM's reliance on an adaptive management approach, in addition to identified mitigation measures, to address some impacts was reasonable given

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

inherent uncertainties in predicting the timing and extent of impacts, and the years, and even decades, before those groundwater and wildlife effects are anticipated to occur. NEPA requires that an EIS contain a "reasonably complete discussion of possible mitigation measures." *Okanogan Highlands v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)). Mitigation must be discussed in "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Protect Our Cmtys. Found.*, 825 F.3d at 582 (citation omitted).  However, a mitigation plan does not need to be in "final form to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass n v. United States Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000). A "conceptual" framework for monitoring and mitigation is sufficient, particularly where impacts are uncertain and will occur years and even decades in the future. *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1153-54 (9th Cir. 1997); *Great Basin Res. Watch*, 844 F.3d at 1107 ("Faced with an adverse impact [mine pit discharges] that is predicted to be insignificant and that will not occur for decades, BLM in this case reasonably decided to rely on a monitoring scheme to develop future mitigation measures."). Courts have approved of adaptive management approaches that provide "flexibility in responding to environmental impacts through a regime of continued monitoring and inspection." *Protect Our Cmtys.*, 825 F.3d at 582.

Here, the monitoring and mitigation plan, which incorporates adaptive management among other mitigation, is reasonable given that groundwater impacts will not occur for a decade or longer, will be minor, and can be addressed through robust monitoring and mitigation. Hydrological modeling predicts that groundwater seepage into the mine pit (i.e., drawdown of the local water table) will not *begin* until 2035, at least 14 years from now. FEIS at 4-7–9. At the end of mining in 2065, drawdowns will only have propagated as far as 1.2 miles from the mine and 1.5 miles from the water supply well. *Id*. Surface water flow reductions in the three creeks within the

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1    impact area are anticipated to remain between 1-4%, a decrease too small to even be measured by

2    flow monitors. *Id*.; *see* FEIS, App. P. Piteau Groundwater Model Report (Ex. 6). Geochemical

3    modeling predicts that after mining, and once the pit is backfilled, pore water in the pit may exceed

4    drinking water standards for antimony, but water from the pit will migrate no farther than one mile

5    over the entire simulated 300-year post-closure period. *Id.* at 4-13–14.

6

7          To address these minor direct effects to water quantity and quality, and potential indirect

8    effects to wildlife in the case of reduced surface water flows, Lithium Nevada proposed a rigorous

9    monitoring and mitigation plan. *Id.*, App. P at 149-160. The adaptive management plan is a living

10   document intended to evolve over time in response to data collection and in coordination with the

11   Water Resources Technical Advisory Group ("TAG") organized and managed by BLM.  *Id.* at 4-

12   25. The groundwater monitoring network will provide an early warning system for drawdowns

13   that *may* occur beginning in 2035. *Id.* at 4-25–26. Those drawdowns, to the extent they affect

14   surface flows or groundwater users, would be mitigated primarily through replacement water.

15   FEIS, App. P at 157. Groundwater quality monitoring, and mitigation options discussed in

16   Appendix P (at 154-57), will effectively mitigate any impacts of antimony seepage from the

17   backfilled mine pit. FEIS at 4-26– 27. As BLM explained in response to comments, "The adaptive

18   management approach . . . is appropriate for the project in light of . . . acknowledged uncertainties

19   associated with groundwater model predictions, [and will] allow for the early implementation of

20   appropriate mitigation measures." *Id.*, App. R at R-4. The biological resources focused TAG would

21   also develop appropriate wildlife mitigation and evaluate its success. *Id*. at 4-62, App. R. at R-79.

22

23          BLM's ROD approved the Project subject to the monitoring and mitigation plan. ROD at

24   11 (requiring compliance with plan of operations, which incorporates monitoring and mitigation

25   plan). Consistent with BLM's ROD and in furtherance of the adaptive management approach,

26   Lithium Nevada submitted an updated monitoring plan in December 2020 (see Ex. 7), which was

27

28

34

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

reviewed by BLM and EPA (*see* EPA Letter, Pl. Ex. 17), and finalized in February 2021. The updated plan includes a more detailed discussion of potential monitoring and mitigation measures, including data collection from 16 groundwater monitoring wells and flow and water quality data collection at 21 surface water locations. Ex. 13 at 9, 11. Mitigation triggers would be developed by BLM's Technical Advisory Group, which will incorporate input from federal and state water quality agencies. *Id*. at 8. Initial triggers are set to require mitigation if an exceedance of water quality standards occurs. Mitigation methodologies, such as pump back capture, would be triggered if thresholds are exceeded. *Id*., App. A. at 19.

Comments from EPA and NDOW do not undermine BLM's adaptive management approach. First, even EPA acknowledged that new mitigation approaches with greater effectiveness continue to be developed to address antimony concerns. EPA Ltr. at 1-2. Where groundwater drawdowns are not anticipated to begin until 2035, and antimony groundwater exceedances may not propagate until after 2065, BLM determined adaptive management was both prudent and necessary to allow for implementation of new and updated mitigation strategies as they are developed and in response to real world data. BLM considered EPA's and NDOW's concerns, but ultimately concluded that the EIS analyzed the best data and science available at the time, and that the agency had applied all reasonable and feasible mitigation. ROD at 8. *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 868 (9th Cir. 2017) ("[C]onclusions reached by the agency need not reflect the unanimous opinion of its experts." (citation omitted)); *City of Carmel-By-The-Sea*, 123 F.3d at 1154-55 (interagency criticisms alone are not sufficient to invalidate the discussion of environmental impacts and mitigation measures). BLM was not obligated to provide a more detailed plan in the face of inherent uncertainties.

BLM's adaptive management approach has been upheld in similar situations. In *Great Basin Resource Watch*, plaintiffs challenged an open-pit molybdenum mine in Nevada, arguing in

part that the monitoring and mitigation plan took an improper "wait and see" approach. 844 F.3d at 1106-07. The Ninth Circuit rejected plaintiffs' argument, holding that BLM's choice to discuss *only* monitoring was reasonable given that groundwater quality impacts, should they occur, were decades away and could be addressed by development of future mitigation measures. *Id.* at 1107. *See also Okanogan Highlands*, 236 F.3d at 476-77 (holding that monitoring and mitigation plan stated in "general terms" for open-pit gold mine was adequate where "exact environmental problems that will have to be mitigated are not yet known because the Project does not exist"); *Carmel-By-The-Sea*, 123 F.3d at 1154 (upholding "flexible" and "conceptual" mitigation plan for highway project, "despite agency criticisms"). Here, BLM took a hard look at impacts to water quantity and quality, as well as wildlife. The agency reasonably determined that, in the face of uncertainty and given that impacts are not likely to occur for decades, an adaptive management approach was prudent to monitor real world data and respond accordingly. Plaintiffs fail to demonstrate that BLM's approach was arbitrary and capricious.

**III.     Plaintiffs Fail to Demonstrate Irreparable Harm Absent Preliminary Injunctive Relief**

        Plaintiffs must demonstrate that they are likely to suffer irreparable harm in the absence of an injunction to be entitled to relief. *Winter*, 555 U.S. at 22; *Sampson v. Murray*, 415 U.S. 61, 88 (1974). There is no "thumb on the scales" in favor of injunctive relief in NEPA matters—a finding of a NEPA violation alone does not demonstrate irreparable harm. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157-58 (2010). The Ninth Circuit has rejected arguments that "*any* potential environmental injury automatically merits an injunction." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (emphasis in original, quotations omitted). Even where Plaintiffs demonstrate irreparable harm, an injunction must be narrowly tailored to avoid only the specific harms shown. *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

Here, Plaintiffs allege immediate injury from limited "mechanical trenching" of up to seven sites within the Project area as soon as June 23, 2021, and future plans to begin pre-production work in 2021. For purposes of injunctive relief, the only relevant activity is that which might occur before the court is able to reach a decision on the merits—i.e., the immediately proposed work that amounts to less than half an acre of ground disturbance. Ex. 12, Dec. of A. Zawadzki ¶26**.** Moreover, the proposed minor disturbance is the first step to implementing a Historic Properties Treatment Plan approved by BLM and the State Historic Preservation Officer in November 2020. This separate approval, necessary to resolve cultural resource impacts under the National Historic Preservation Act, is not before the Court. Plaintiffs did not challenge it. Thus, the Court has no jurisdiction in this case to enjoin work under the cultural resources plan—i.e., the Court cannot grant relief "narrowly tailored" to the alleged irreparable harm. *Price*, 390 F.3d at 1117.

Further, even if the court could grant Plaintiffs relief, the very minor disturbance of less than half an acre for cultural resource mitigation does not amount to irreparable injury. Ex. 12. To qualify as irreparable harm, the injury must be "both certain and great." *San Diego Bev. & Kup v. United States*, 997 F. Supp 1343, 1347 (S.D. Cal. 1998). It must also be irreparable in the sense that it is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006). The possibility that "corrective relief will be available at a later date" weighs heavily against a claim of irreparable harm. *Id*. Here, where the cultural resource mitigation work is minor and can and will be remedied through reclamation (recontouring and reseeding), Plaintiffs fail to demonstrate a "great" injury "beyond remediation."

## IV.     The Balance of Hardships and Public Interest Disfavors the Requested Injunction

Courts "must balance the competing claims of injury and consider the effect on each party of granting or withholding injunctive relief with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.  Here, the balance of

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

hardships and public interest tip sharply against the requested injunction. Battery storage is "vital to combatting climate change and very lithium dependent." Ex. 8, Dec. of J. Lowry ¶14. Global lithium demand is forecasted to triple by 2025 and to outstrip supply as electrification of the transportation sector intensifies.  The current U.S. demand for lithium is approximately 18,000 tons per year of lithium carbonate equivalent ("tpa LCE"). By 2025, the U.S. is forecasted to require approximately 100,000 tpa LCE, increasing to about 350,000 tpa LCE by 2030.  The U.S. currently produces less than 5,000 tpa LCE from just one facility.  At a proposed capacity of 66,000 tons per year LCE at full buildout, the Thacker Pass project is positioned to become a cornerstone of the U.S. lithium supply for batteries necessary for renewable energy objectives.  There are no other U.S. alternative to Thacker Pass that provide the scale, grade or timeline to production that is required to keep pace with electrification of the transportation sector and reduction of carbon, in addition to providing the lithium products required by the military for national security. Ex.12 ¶¶21-24; Ex. 8, Dec. of J. Lowry ¶¶11, 13-14, 15-18.  "Thacker Pass is critical to the domestic and global lithium demand necessary to combatting climate change, transportation electrification and expanding renewable energy sources that require battery storage."  Ex. 8, Lowry Dec. ¶14.

Because cultural resource mitigation must be completed prior to pre-construction infrastructure installation and can only be completed during certain times of the year due to weather, delay of this mitigation disturbing less than half an acre would halt development of the largest and most advanced lithium mine in the U.S. with no alternative, eliminating the only currently known domestic source of lithium to meet demands for combatting climate change and important to national security. Ex. 12 ¶25; Ex. 8, Dec. of J. Lowry.  In addition, safety of Lithium Nevada employees requires installation of fencing and a temporary on-site office trailer to avoid continuing hardship and interference with Lithium Nevada's authorized operations.  Ex. 12 ¶27.

**HOLLAND & HART LLP**
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

Thacker Pass provides important economic development, employment, and tax revenue opportunities in Humboldt County. Ex. 13, Dec. of Commissioner French. Lithium Nevada has engaged with the Fort McDermitt Tribe and other partners to build a local, skilled workforce for the Project. Ex. 14, Dec. of M. Anderson (describing one-on-one meetings, completed training sessions with numerous tribal members, numerous job opportunities and significant tribal interest). Tribal Members are supportive of the Project and feel strongly about its importance to the community. **Ex.** 15, Dec. of A. Crutcher ¶¶13-14. Dr. Glenn Miller, for more than 40 years, has advocated for environmental responsibility in the mining industry and for stringent environmental requirements for mining in Nevada.  After having reviewed many of the NEPA documents, examined processes used to extract the lithium and disposal of the extracted waste, met with NDEP and reviewed certain of their documents related to the tailings facility and final closure plans for the mine, he opines that "the impacts from this mine are relatively benign." Ex. 1 ¶¶2-6.  Dr. Miller describes Thacker Pass as critically important for our Nation and the world from an environmental sustainability perspective and a relatively benign mine for environmental disturbance at the project site. Ex. 1.

## CONCLUSION

For all of these reasons Plaintiffs' Motion for a Preliminary Injunction should be denied.

DATED this 24thth day of June, 2021.

HOLLAND & HART LLP

/s/ Laura K. Granier
Laura K. Granier, Esq (SBN 7357)
Erica K. Nannini, Esq (SBN 13922)

lkgranier@hollandhart.com
eknannini@hollandhart.com

*Attorneys for Defendant-Intervenor*
*Lithium Nevada Corp.*

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 24, 2021, I filed the foregoing using the United States District Court CM/ECF, which caused all counsel of record to be served electronically.

<u>/s/ *Laura K. Granier*</u>
Laura K. Granier, Esq (SBN 7357)

1

**EXHIBIT INDEX**

2

3

| EXHIBIT | DESCRIPTION | # OF PAGES |
|---|---|---|
| 1. | Glenn Miller Declaration | 3 |
| 2. | Executive Order 14017 and White House Statements and Releases, FACT SHEET | 9 |
| 3. | Nevada and Northeastern California Greater Sage-Grouse Proposed LUPA/Final EIS (Section 3.13) | 21 |
| 4. | Thacker Pass Project, Greater Sage-Grouse Habitat Quantification Report | 49 |
| 5. | FEIS, App. P (Part 4 of 8) | 30 |
| 6. | FEIS, App. P (Part 1 of 8) | 188 |
| 7. | Plan of Operations, Ex. H | 75 |
| 8. | Joe Lowry Declaration | 5 |
| 9. | Nevada and Northeastern California Greater Sage-Grouse Proposed LUPA/Final EIS (Section 2.7 | 21 |
| 10. | NDOW Hunting Information Sheet | 1 |
| 11. | 2019-2020 Big Game Status | 201 |
| 12. | Alexi Zawadzki Declaration | 69 |
| 13. | Jim French Declaration | 3 |
| 14. | Maria Anderson Declaration | 4 |
| 15. | Alanna Crutcher Declaration | 4 |

16944014_v3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094