Exhibit 1 -
Reno-Sparks Indian Colony and Atsa koodakuh wyh
Nuwu/People of Red Mountain's
Proposed Motion to Intervene

1 Julie Cavanaugh-Bill (State Bar No. 11533)
2 Cavanaugh-Bill Law Offices
3 Henderson Bank Building
4 401 Railroad Street, Suite 307
5 Elko, NV 89801
6 (775) 753-4357
7 julie@cblawoffices.org
8
9 William Falk (Utah Bar No. 16678) *Pro Hac Vice Application To Be Filed*
10 2980 Russet Sky Trail
11 Castle Rock, CO
12 (319) 830-6086
13 falkwilt@gmail.com
14
15 Terry J. Lodge (Ohio Bar No. 29271) *Pro Hac Vice Application To Be Filed*
16 316 N. Michigan St., Suite 520
17 Toledo, OH 43604-5627
18 (419) 205-7084
19 tjlodge50@yahoo.com
20
21 Attorneys for Reno-Sparks Indian Colony and Atsa koodakuh wyh Nuwu
22
23 **UNITED STATES DISTRICT COURT**
24 **DISTRICT OF NEVADA**
25

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, *et al.,* | ) Case No. 3:21-cv-103-MMD-CLB ) |
| Plaintiffs, | ) **INTERVENING PLAINTIFFS'** |
| | ) **MOTION FOR PRELIMINARY** |
| and | ) **INJUNCTION** |
| | ) |
| RENO-SPARKS INDIAN COLONY and ATSA KOODAKUH WYH NUWU/ PEOPLE OF RED MOUNTAIN | ) ) ) |
| | ) **ORAL ARGUMENT** |
| Plaintiff-Intervenor, | ) **REQUESTED** |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.,* | ) ) |
| | ) |
| Defendants | ) |
| | ) |

and                                            )
                                               )
LITHIUM NEVADA CORP.                           )
                                               )
        Defendant-Intervenor                   )
_____)


        Now come Intervening Plaintiffs Reno-Sparks Indian Colony (RSIC) and Atsa

koodakuh wyh Nuwu/People of Red Mountain (together "Intervening Plaintiffs"), by and

through local counsel, Julie Cavanaugh-Bill and out-of-state counsel William Falk and

Terry Lodge ((who are submitting *pro hac vice* applications and will comply with LR IA

11-2 within 14 days), hereby move for a Temporary Restraining Order and Preliminary

injunction in this matter to enjoin physical disturbance of Thacker Pass pursuant to the

Thacker Pass Lithium Mine Project ("the Project) Record of Decision (ROD), Plan of

Operations (PoO), or Historic Properties Treatment Plan (HPTP). The original name for

Thacker Pass in the local Numic dialect spoken by members of Atsa koodakuh wyh

Nuwu/People of Red Mountain is "Peehee mu'huh," and will be used instead of Thacker

Pass.


Dated this 20th day of July, 2021

                                    By: /s/Julie Cavanaugh-Bill
                                    Julie Cavanaugh-Bill (State Bar No. 11533)
                                    Cavanaugh-Bill Law Offices
                                    Henderson Bank Building
                                    401 Railroad Street, Suite 307
                                    Elko, NV 89801
                                    (775) 753-4357
                                    julie@cblawoffices.org


                                    /s/ William Falk

William Falk, Esq (Utah Bar No. 16678)
(319) 830-6086
falkwilt@gmaail.com

/s/  Terry J. Lodge
Terry J. Lodge, Esq. (Ohio Bar No. 29271)
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 205-7084
tjlodge50@yahoo.com
Co-Counsel for Intervenors

## MEMORANDUM OF POINTS AND AUTHORITIES

The RSIC received a letter from Defendant Bureau of Land Management ("BLM) on July 12, 2021 denying its request for government-to-government consultation under the National Historic Preservation Act (NHPA), section 106. On June 8, in exchange for a two-week extension to file response briefs to the Plaintiffs' Motion for Preliminary Injunction, the BLM and Defendant-Intervenor Lithium Nevada Corp. ("Lithium Nevada") stipulated that no Project area ground disturbance activities would occur before July 29, 2021. Absent an order enjoining the BLM and Lithium Nevada from physically disturbing a massacre site, possible burial sites, and historic properties eligible for inclusion on the National Register of Historic Properties (NRHP), BLM will permit ground disturbance of historic properties that Native American tribes attach cultural and religious significance to before those Native American tribes or the public have been adequately consulted under the NHPA. First, however, Intervening Plaintiffs establish standing.

### I.   The Intervening Plaintiffs Have Standing To Proceed

The Intervening Plaintiffs allege a procedural injury based on the NHPA, relying on the APA. To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact,

1  (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is

2  likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.

3  Ct. 1540, 1547 (2016), as revised (May 24, 2016) (*quoting Lujan v. Defs. of Wildlife*, 504

4  U.S. 555, 560 (1992)). At this stage, standing may be judged based on the allegations

5  in the Intervening Plaintiffs proffered Complaint. *See Susan B. Anthony List v. Driehaus*,

6  134 S. Ct. 2334, 2342 (2014).

7      A plaintiff shows a procedural injury-in-fact "when a procedural requirement has not

8  been met, so long as the plaintiff also asserts a 'concrete interest' that is threatened by

9  the failure to comply with that requirement." *City of Sausalito v. O'Neill*, 386 F.3d 1186,

10  1197 (9th Cir. 2004) (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341

11  F.3d 961, 969–70 (9th Cir. 2003)). A "concrete interest" implicated by a procedural

12  requirement may reflect "aesthetic, conservational, and recreational" values and does

13  not need to be an economic harm. *Sierra Club v. Morton,* 405 U.S. 727, 738 (1972). "To

14  allege a cognizable procedural harm, plaintiffs must identify an injury that follows the

15  violation of a procedural right, which was afforded to them by statute and designed to

16  protect  their threatened concrete interests." *St. Croix Chippewa Indians of Wis. v.*

17  *Salazar*,  384 Fed.Appx. 7, 8 (D.C. Cir. 2010) (unreported).

18      The Supreme Court has stated that, while suing under the APA, the interest a

19  Plaintiff asserts "must be arguably within the zone of interests to be protected or

20  regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band*

21  *v. Patchak*,132 S. Ct. 2199, 2210 183 L. Ed. 2d 211 (2012) (internal citation omitted).

22  This test "is not meant to be especially demanding." *Id.* And, the Supreme Court has

1  "always conspicuously included the word 'arguably' in the test to indicate that the benefit

2  of any doubt goes to the plaintiff." *Id.*

3      NHPA's regulations require federal agencies to provide interested members of the

4  public reasonable opportunity to participate in the Section 106 process. "Thus, any

5  member of the public who can demonstrate sufficient interest in the preservation of the

6  historical lands at issue falls within the zone of interests protected by the NHPA."

7  *Montana Wilderness Ass'n v. Fry*, F.Supp 2d 1127, 1150-51 (D. Montana 2004) The

8  Intervening Plaintiffs have a strong interest in preserving Peehee mu'huh and the

9  historic properties found there.

10      Here, the Intervening Plaintiffs allege concrete aesthetic interests in the enjoyment

11  of Peehee mu'huh as a site for hunting and gathering in support of their traditional and

12  tribal cultures. They also suggest considerable history of their ancestors' use, habitation

13  and consequential tribal events having taken place in and around this mountain pass as

14  a significant portal through the mountain chain for animals and people. The Intervening

15  Plaintiffs further point to requirements related to and/or contained with the statute and

16  regulations of the NHPA, and allege that the BLM has not satisfied these requirements.

17  The threat to the Intervening Plaintiffs' interests by the Government's failure to satisfy

18  the procedural requirement is clear because the requirement directly relates to "the

19  effect of the undertaking on the property" within the meaning of NHPA § 402. 54 U.S.C.

20  § 307101(e).  The Intervening Plaintiffs satisfy the first element of Article III standing.

21  *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 779 (9th Cir. 2006) (finding

22  injury-in-fact requirement met where plaintiffs pointed to use of affected area and

23  activity that will lessen enjoyment of use).

The next requirement of standing is whether the injury in question is "fairly traceable" to the conduct of the Government. Here, the Government's conduct is failure to take into account the effects of the mine project on Peehee mu'huh's cultural and historic resources, and also, to have failed to consult with affected indigenous peoples. A claim of procedural injury affects the standing analysis, and can relax some requirements. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18 (2007). Where, as here, claims rest on a procedural injury, "the causation and redressability requirements are relaxed." *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior,* 767 F.3d 781, 790 (9th Cir. 2014) (quoting *Cantrell v. City of Long Beach,* 241 F.3d 674, 682 (9th Cir. 2001)).

The NHPA violations arise from BLM's failure to consult and to take into account information relevant for making a determination as to whether the mine will adversely affect the cultural and historic resources and sites at Peehee mu'huh. And, if so, how those effects may be avoided or mitigated. The challenged activity is not the undertaking itself, but the process by which the effects of the undertaking are considered and assessed.

The final standing question is whether the Intervening Plaintiffs can establish redressability. The plaintiff must show it is likely that the injury "will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "Plaintiffs alleging procedural injury can often establish redress[a]bility with little difficulty, because they need to show only that the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision of whether to take or refrain from taking a certain action." *Salmon*

1  *Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008). That is

2  the circumstance here. Lithium Nevada's permit application was rushed through BLM

3  processing, resulting in permit issuance before the NHPA review was anywhere near

4  completion.

5      Intervening Plaintiffs' claims, then, are redressable, and courts should not "pre-judge

6  the outcome of any consultations" that may take place. *Tyler v. Cuomo,* 236 F.3d 1124,

7  1134 (9th Cir. 2000). "At this point . . . it is impossible for us to know with any degree of

8  certainty just what the end result of the NHPA process would be," and under those

9  circumstances we avoid "shortcutting the process which has been committed in the first

10 instance to the responsible federal agency." *Id.* (quoting *Vieux Carre Prop. Owners,*

11 *Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1446–47 (5th Cir. 1991)) (noting the

12 need to consider a range of outcomes and not merely a binary between no change or a

13 completely altered approach). "Whether a plaintiff has a legally protected interest (and

14 thus standing) does not depend on whether he can demonstrate that he will succeed on

15 the merits." *Louisiana Energy & Power Auth. v. Federal Energy Regulatory Comm'n*,

16 141 F.3d 364, 368 (D.C. Cir. 1998) (citation and internal quotation marks omitted).

17 **II.  Standards for Preliminary Relief**

18     To gain preliminary injunctive relief, a plaintiff must successfully "establish that he is

19 likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

20 of preliminary relief, that the balance of equities tips in his favor, and that an injunction is

21 in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20

22 (2008). 9th Circuit courts focus on the harms that will result during the full pendency of

23 the case while the injunction is in place when deciding whether to grant a preliminary

1    injunction. See *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765-66 (9th

2    Cir. 2014). The 9th Circuit has also clarified that "[s]erious questions need not promise a

3    certainty of success, nor even present a probability of success, but must involve a 'fair

4    chance of success on the merits." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362

5    (9th Cir. 1988) (citations omitted).

6        Intervening Plaintiffs successfully meet all four aspects of this test. In cases where

7    federal agencies were found to have failed to meet the NHPA Section 106 consultation

8    requirements for Indian tribes, those failing agencies engaged in more efforts at

9    consultation than the BLM, Winnemucca District Office here. So, the Intervening

10   Plaintiffs are likely to succeed on the merits.

11       In the absence of preliminary relief, an archaeological contractor will cause

12   irreparable harm by gouging seven, 40-meter-long, several-meter-deep trenches and

13   hand-dig as many as 525 holes into land hallowed by the massacre of the Intervening

14   Plaintiffs' ancestors, where artifacts created by the Intervening Plaintiffs' ancestors can

15   be found, and where some of the Intervening Plaintiffs' ancestors are buried. Digging

16   these trenches and holes is likely to destroy artifacts and human remains. This

17   desecration would cause the Intervening Plaintiffs extreme emotional and spiritual

18   distress. See Eben and Hinkey Declarations.

19       The balance of equities tips in the Intervening Plaintiffs' favor because the only

20   hardship BLM and Lithium Nevada face from the Intervening Plaintiffs' motion is a delay

21   in archaeological digs. If BLM is set on permitting, and Lithium Nevada is set on

22   constructing, a mine that will destroy a massacre site, a place where the Intervening

23   Plaintiffs' ancestors survived genocide, burial sites, and artifacts, the NHPA cannot stop

1    it. The NHPA only requires that BLM adequately consult with Indian tribes and the

2    general public before permitting this destruction. Lastly, the public has a strong interest

3    – especially as a wave of new lithium mines are proposed around the country – in

4    federal agencies fulfilling the consultation obligations with which Congress has

5    burdened them.

6    **A. The Intervening Plaintiffs Are Likely to Succeed on the Merits.**

7    The Intervening Plaintiffs challenge BLM's failure to complete the NHPA's Section

8    106 obligatory consultation process, as provided for at 36 Code of Federal Regulations

9    (CFR). Section 800, Protection of Historic Properties (2004) in issuing a Record of

10   Decision (ROD) for the Thacker Pass Lithium Mine Project (the Project) without making

11   a reasonable and good faith effort to identify Indian tribes that should have been

12   consulted with because they attach religious and cultural significance to Peehee

13   mu'huh, in contravention of 36 CFR § 800.2(c)(2)(ii)(A); without providing to Indian

14   tribes who attach religious and cultural significance to Peehee mu'huh a reasonable

15   opportunity to identify their concerns about historic properties, advise on the

16   identification and evaluation of historic properties, articulate their views on the

17   undertaking's effects on such properties, and participate in the resolution of adverse

18   effects, also in contravention of 36 CFR § 800.2(c)(2)(ii)(A); without seeking and

19   considering the views of the public in a manner that reflects the nature and complexity

20   of the undertaking, in contravention of 36 CFR § 800.2(d)(1); and for issuing a ROD

21   before a draft Memorandum of Agreement with the Nevada State Historic Preservation

22   Officer (SHPO) was made available for public comment, in contravention of the 2014

1   BLM-SHPO State Protocol Agreement ("the Protocol"). Because of these failures, the

2   ROD and HPTP are invalid and will likely be set aside.

3

4       The Ninth Circuit has emphasized that federal agencies owe a fiduciary duty to all

5   Indian tribes, and that at a minimum this means agencies must comply with general

6   regulations and statutes. *Pit River Tribe v. U.S. Forest Serv.,* 469 F.3d 768, 788 (9th

7   Cir. 2006). Violation of this duty to comply with NHPA requirements during the process

8   of reviewing and approving projects vitiates the validity of that approval and may require

9   that it be set aside. *Id.*

10      The National Historic Preservation Act (NHPA) obligates the Bureau of Land

11  Management ("BLM"), in cooperation with Indian tribes, private organizations, and

12  individuals, "to administer federally owned, administered, or controlled historic property

13  in a spirit of stewardship for the inspiration and benefit of present and future

14  generations…" (54 U.S.C. § 300101(3)). When the NHPA was passed, Congress

15  explained that the purpose of the NHPA is to remedy the dilemma that "historic

16  properties significant to the Nation's heritage are being lost or substantially altered,

17  often inadvertently, with increasing frequency" (*Montana Wilderness Ass'n v. Fry*, 310

18  F.Supp. 2d 1127, 1151 (D. Montana, 2004) (quoting 16 U.S.C. § 470(b)(3).

19      36 Code of Federal Regulations § 800 *et seq* was enacted to govern implementation

20  of NHPA's Section 106 consultation process. 36 CFR § 800.1(a) states the purposes of

21  the section 106 process, in pertinent part:

22  "The section 106 process seeks to accommodate historic preservation concerns with
23  the needs of Federal undertakings through consultation among the agency official and
24  other parties with an interest in the effects of the undertaking on historic properties,
25  commencing at the early stages of project planning. **The goal of consultation is to**

1  **identify historic properties potentially affected by the undertaking, assess its**
2  **effects and seek ways to avoid, minimize or mitigate any adverse effects on**
3  **historic properties** (emphasis added)."
4

5      § 800.1(c) adds: "The agency official shall ensure that the section 106 process is

6  initiated early in the undertaking's planning, so that a broad range of alternatives may

7  be considered during the planning process for the undertaking."

8      § 800.2(d)(1) describes the important role the public plays in helping federal

9  agencies steward historic properties and states: "The views of the public are essential to

10  informed Federal decision-making in the section 106 process."

11      Also, § 800.2(d)(1) requires that "[t]he agency official shall seek and consider the

12  views of the public in a manner that reflects the nature and complexity of the

13  undertaking and its effects on historic properties [and] the likely interest of the public in

14  the effects on historic properties…"

15      36 CFR § 800.2(c)(2)(B)(ii) states that NHPA, Section 101(d)(6)(B) "requires the

16  agency official to consult with **any** Indian tribe or Native Hawaiian organization that

17  attaches religious and cultural significance to historic properties that may be affected by

18  an undertaking. The requirement applies regardless of the location of the historic

19  property." (emphasis added)

20      The NHPA's tribal "consultation requirement is not an empty formality; rather it

21  'must recognize the government-to-government relationship between the Federal

22  Government and Indian tribes'." *Quechan Tribe of Fort Yuma Indian Reservation v. US*

23  *Dept. of Interior*, 755 F.Supp.2d 1104, 1108-1109 (SD Calif. 2010) (quoting §

24  800.2(c)(2)(ii)(C)). "Furthermore, under § 800.2, consulting parties that are Indian tribes

11

1  are entitled to special consideration in the course of an agency's fulfillment of its

2  consultation obligations." *Id.* at 1109.

3    The Reno-Sparks Indian Colony, Fort McDermitt Paiute and Shoshone Tribe,

4  Summit Lake Paiute Tribe, Burns Paiute Tribe of Oregon, Duck Valley Shoshone-Paiute

5  Tribe, Lovelock Paiute Tribe, Battle Mountain Band Colony of the Te-Moak Tribe of

6  Western Shoshone, Winnemucca Indian Colony, Cedarville Rancheria, Ft. Bidwell

7  Indian Community, Fallon Paiute-Shoshone Tribe, and the Pyramid Lake Paiute Tribe

8  attach religious and cultural significance to Pehee mu'huh.

9    Under § 800.2(c)(2)(B)(ii)(A),

10   "[t]he agency official shall ensure that consultation in the section 106 process
11 provides the Indian tribe...**a reasonable opportunity to identify its concerns about**
12 **historic properties, advise on the identification and evaluation of historic**
13 **properties, including those of traditional religious and cultural importance,**
14 **articulate its views on the undertaking's effects on such properties, and**
15 **participate in the resolution of adverse effects**. It is the responsibility of the agency
16 official **to make a reasonable and good faith effort** to identify Indian tribes...that shall
17 be consulted in the section 106 process."

18
19   § 800.2(c)(2)(B)(ii)(A) reminds agency officials, once again, that section 106

20 consultation should commence early in the planning process.

21   The Reno-Sparks Indian Colony and all the tribes who attach religious and

22 cultural significance to Peehee mu'huh have been denied a reasonable opportunity to

23 identify their concerns about historic properties, advise on the identification and

24 evaluation of historic properties, articulate their views on the undertaking's effects on

25 such properties, and participate in the resolution of adverse effects.

26   § 800.2(c)(2)(B)(ii)(C) advises that "[c]onsultation with Indian tribes should be

27 conducted in a manner sensitive to the concerns and needs of the Indian tribe…"

1   Consultation conducted in a manner sensitive to the concerns and needs of

2   Indian tribes would have accounted for the fact that the worst pandemic in at least 100

3   years was raging around the world, especially when those Indian tribes were

4   disproportionately affected by the COVID-19 pandemic. Many tribal offices, including

5   RSIC's and Fort McDermitt's, were closed for most of 2020.

6   Originally, all of 36 CFR § 800 governed implementation of NHPA's Section 106

7   consultation process, but the BLM Nevada State Office, under a National Programmatic

8   Agreement (NPA, 1997, as amended 2012) among BLM, the Advisory Council of

9   Historic Preservation (ACHP), and the National Conference of State Historic

10  Preservation Officers, replaced the procedures set forth in 36 CFR § 800.3 through §

11  800.7 with the 2014 BLM-State Historic Preservation Officer (SHPO) Protocol

12  Agreement ("the Protocol").

13  The Protocol's Preamble declares that the Protocol is "...designed to enhance the

14  participation of consulting parties, the general public and Native American tribes in the

15  section 106 process…" The Protocol includes this bright-line rule about public

16  participation, at Section V.F.4.a-b:

17  "4. BLM will negotiate a [Memorandum of Agreement] addressing adverse effects when

18  BLM and SHPO agree that the adverse effects are known prior to the approval of the

19  undertaking.

20

21  a.      The MOA establishes BLM-SHPO concurrence regarding the resolution of
22  project-related adverse effects according to a [Historic Properties Treatment Plan], as
23  well as other stipulations and measures that may be specified in the MOA. BLM must
24  initiate consultation with SHPO regarding eligibility, effects, and resolution of adverse
25  effects with sufficient lead time to allow for development of an MOA on a schedule
26  meeting the undertaking's anticipated DR or ROD. BLM will also consult with Indian

1   tribes and other consulting parties, as appropriate. The MOA must be signed by the
2   appropriate parties <u>prior</u> to BLM's issuance of a DR or ROD for the undertaking.
3
4   b.      Draft PAs and MOAs should be made available for public comment." (emphasis
5   with original.)
6

7          Despite BLM and SHPO agreeing that adverse effects to historic properties in

8   Peehee mu'huh were known prior to approval of the undertaking, the MOA was not

9   signed by the appropriate parties prior to BLM's issuance of the ROD. Nor were draft

10  Programmatic Agreements or Memorandums of Agreement made available for public

11  comment.

12         Inexplicably, the Notice of Availability of the Final Environmental Impact

13  Statement for the Proposed Thacker Pass Project, published December 4, 2020, stated

14  that "[t]he BLM and Nevada SHPO recently executed a Memorandum of Agreement to

15  resolve adverse effects to the 57 historic properties." But, then, the Record of Decision

16  contradicted the Notice of Availability and stated:

17         "In accordance with the requirements of Section 106 of the National Historic

18  Preservation Act, the BLM coordinated and consulted with the State Historic

19  Preservation Office (SHPO). The BLM received a letter dated Wednesday, October 7,

20  2020, providing the SHPO's concurrence on the cultural resource report and finding of

21  adverse effect. A Memorandum of Agreement and treatment plan are being prepared,

22  and the BLM will continue to consult with the SHPO on the Project and treatment plan in

23  accordance with programmatic protocols."

24         According to the ROD, the following is the extent of BLM's "Native American

25  Consultation" prior to issuing the ROD:

"The BLM has been in contact with tribal governments regarding this Project from its early stages (October 2018) and through the ensuing National Environmental Policy Act (NEPA) process.

In December 2019, BLM sent certified letters to Fort McDermitt, Pyramid Lake, Summit Lake, and Winnemucca Indian Colony 'initiating formal consultation.' These tribes are also on the Project EIS mailing list to receive updates, and the BLM notified the tribes of the availability of the draft EIS in July 2020. The tribes also received notification and copies of the final EIS by certified mail in December 2020. No comments or concerns have been raised during formal government to government consultation for the Project by the tribes."

This was contradicted in a letter received by the RSIC on July 12, 2021 from Kathleen Rehberg, Field Manager, BLM Winnemucca, Humboldt River Field Office who stated that only the Fort McDermitt Paiute-Shoshone tribe, the Summit Lake Paiute tribe, and the Winnemucca Indian Colony were invited to consult on the project and its impact.

In *Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir.1995), the 10th Circuit ruled that the US Forest Service did not make a reasonable and good faith effort to identify historic properties despite the Forest Service mailing letters to local Indian tribes, including the plaintiff Sandia Pueblo, and individual tribal members who were known to be familiar with traditional cultural properties. The letters requested detailed information describing the location of the sites, activities conducted there, and the frequency of the activities. The Forest Service also asked tribes to provide maps of the sites as well as provide documentation of the historic nature of the property. See *Pueblo of Sandia v. United States*, 50 F.3d 856, 860 (10th Cir.1995).

In addition to mailing form letters to the tribes and individuals, Forest Service officials also participated in meetings of the All Indian Pueblo Council and the San

1    Felipe Pueblo. None of the tribes or individuals provided the Forest Service with the

2    type of information requested in the letters and meetings. *Id.*

3          Despite the Forest Service's efforts, the 10th Circuit ruled these efforts were not

4    enough to meet the reasonable effort to identify historic properties in affected areas

5    required by the NHPA. Of particular note the 10th Circuit stated, "The record reveals

6    that the Forest Service did request information from the Sandia Pueblo and other local

7    Indian tribes, but a mere request for information is not necessarily sufficient to constitute

8    the 'reasonable effort' section 106 requires." *Pueblo of Sandia v. United States*, 50 F.3d

9    856, 860 (10th Cir.1995) Compared to the efforts of the Forest Service in *Pueblo of*

10   *Sandia*, the BLM, Winnemucca District Office has done even less to satisfy the

11   reasonable effort standard under the NHPA.

12         In *Quechan Tribe of Fort Yuma Indian Reservation v. US Dept. of Interior*, 755

13   F.Supp.2d 1104 (SD Calif. 2010), the BLM offered documentation of consultations with

14   tribes different from the plaintiffs, with other agencies, and with the public. However, the

15   federal district court noted:

16   "While this other consultation appears to be required and serves other important
17   purposes, it doesn't substitute for mandatory consultation with the Quechan Tribe. In
18   other words, that BLM did a lot of consulting in general doesn't show that its
19   consultation with the Tribe was adequate under the regulations. Indeed, [the BLM]
20   grouping tribes together (referring to consultation with 'tribes') is unhelpful: Indian tribes
21   aren't interchangeable, and consultation with one tribe doesn't relieve the BLM of its
22   obligation to consult with any other tribe that may be a consulting party under NHPA."
23   *Quechan Tribe of Fort Yuma Indian Reservation v. US Dept. of Interior*, 755 F.Supp.2d
24   1104, 1118 (SD Calif. 2010)
25

26         *The Quechan Tribe* court also stated: "...the BLM's communications are replete

27   with recitals of law (including Section 106), professions of good intent, and solicitation to

16

1    consult with the Tribe. But mere pro forma recitals do not, by themselves, show BLM

2    actually complied with the law. *Id.*

3          Furthermore, federal courts have ruled "[c]ontact, of course, is not consultation,

4    and 'consultation with one tribe doesn't relieve the [agency] of its obligation to consult

5    with any other tribe." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205

6    F.Supp.3d 4, 32 (D. DC 2016) (citing *Quechan Tribe of Fort Yuma Indian Reservation v.*

7    *U.S. Dep't of Interior*, 755 F.Supp.2d 1104, 1112, 1118 (S.D.Cal. 2010))

8          The only so-called consultations the BLM can demonstrate for the Thacker Pass

9    project are mere *pro forma* recitals, requests for information, and feeble attempts at

10   contacting a fraction of the number of tribes who attach religious and cultural

11   significance to Peehee mu'huh. Because of this, the Intervening Plaintiffs are likely to

12   succeed on the merits.

13         **B. The BLM's Failure to Follow NHPA Regulations Is Irreparable Harm**

14         In the absence of preliminary relief, the Intervening Plaintiffs are likely to suffer

15   irreparable harm.  As previously discussed in the standing section of this Memorandum,

16   the harm is in the form of procedural injury -- but it is procedural injury infused with

17   damage to culture, religious practices, personal and collective history and tradition.

18         The Thacker Pass Project Area encompasses a massacre site. This massacre is

19   how Peehee mu'huh got its name. Peehee mu'huh means "rotten moon" in English. The

20   Intervening Plaintiffs' oral histories describe an event where Paiute hunters went away

21   from Peehee mu'huh to hunt and, when the hunters returned, they found their loved

22   ones massacred with their intestines strewn and rotting across the sage brush in a part

23   of the Pass shaped like a crescent moon. Because they were massacred there, the

1   flesh, blood, and bones of the Intervening Plaintiffs' ancestors are physically part of

2   Peehee mu'huh. This massacre and the physical presence of the Intervening Plaintiffs'

3   slain ancestors has hallowed Peehee mu'huh. The Intervening Plaintiffs frequently visit

4   Peehee mu'huh to honor their massacred ancestors.

5          The Project Area also includes hills where the Intervening Plaintiffs ancestors hid

6   from American soldiers when those soldiers came to violently force the Intervening

7   Plaintiffs' ancestors onto reservations. There are many caves and rocks in Peehee

8   mu'huh where the Intervening Plaintiffs' ancestors could watch the surrounding land for

9   approaching soldiers for many miles. The Fort McDermitt tribe descends from

10  essentially two families who, hiding in Peehee mu'huh, managed to avoid being sent to

11  reservations farther away from their ancestral lands. It could be said that the Fort

12  McDermitt tribe might not exist if it wasn't for the shelter provided by Peehee mu'huh.

13         If the BLM had consulted with the Intervening Plaintiffs, it would have heard

14  these stories and would have been urged by the Intervening Plaintiffs to do more to

15  avoid, minimize, and mitigate the effects the Project would have on Peehee mu'huh.

16  Presently, however, the BLM plans to allow seven 20-40 meter-long trenches at least

17  several meters deep to be dug in Peehee mu'huh. The BLM also plans to dig as many

18  as 525 "hand excavation units" at "21 precontact historic properties," with each unit

19  being potentially a meter and a half deep.

20         Scraping away the Intervening Plaintiffs' ancestors in Peehee mu'huh to dig

21  seven ditches 40-meters-long and several-meters-deep with excavators that have the

22  power to destroy artifacts, snap human bones, and break decaying bodies before

23  operators are even aware of what their machines have found while at the same time

1    hand-digging constellations of hundreds of holes across a land serving as the final

2    resting place of the Intervening Plaintiffs' murdered ancestors is a desecration of the

3    highest order and would irreparably harm them.

4           Intervening Plaintiffs, other Indian tribes who attach religious and cultural

5    significance to Peehee mu'huh, and the general public all had a right to meaningful

6    consultation *before* the ROD was issued by the BLM, under the NHPA Section 106

7    process. Allowing the BLM and Lithium Nevada to proceed under this invalid ROD

8    without the BLM's fulfillment of Section 106 obligations is irreparable harm.

9           BLM and its permittees often claim that they will backfill test-pits and other holes

10   upon completion of data collection. But even if BLM plans on backfilling the trenches

11   and holes, there could be human remains and artifacts below the ground surface.

12   The excavators and shovels could harm the very human remains and artifacts the

13   archaeologists would be looking for.

14           **C. The Intervening Plaintiffs' Interest In Participating in NHPA Consultation**
15           **Outweighs BLM's and Lithium Nevada's Interest Proceeding with the**
16           **Project**
17

18           The balance of equities favors the Intervening Plaintiffs. For the BLM and Lithium

19   Nevada, the most serious possible injury that could be caused by a preliminary

20   injunction order is a temporary delay in the Project's operations. The BLM and Lithium

21   Nevada may argue that the public has an economic interest in mine, but the Intervening

22   Plaintiffs echo the Plaintiffs' invocation of *S.E. Alaska Conservation Council v. U.S.*

23   *Army Corps of Engineers*, 472 F.3d 1097, 1011 (9th Cir.) where the Ninth Circuit

24   minimized the hardship caused by temporary delays in construction activities:

1  "Although the public has an economic interest in the mine, there is no reason to believe

2  that the delay in construction activities caused by the court's injunction will reduce

3  significantly any future economic benefit that may result from the mine's operation."

4       In fact, pausing right now so that BLM can adequately consult with Indian tribes

5  before the Project would destroy land sacred to the tribes, might actually *improve*

6  economic benefits in the future as socially-conscious investors shy away from projects

7  accused of violating Native American rights.

8       For the Intervening Plaintiffs, however, the desecration performed by heavy

9  machinery digging seven trenches and hand shovels digging as many as 525 holes

10 cannot be undone once it begins. The destruction caused by trenching and digging are

11 likely to restrict the Intervening Plaintiffs' ability to suggest alternatives to avoid,

12 minimize, or mitigate the Project's adverse effects on historic properties. It's possible,

13 too, that inadvertent destruction of cultural resource sites, burial sites, human remains,

14 and artifacts is used as an excuse to justify mitigation measures that are less sensitive

15 to the concerns of Native people.

16  **D. The Public Has A Strong Interest In Meaningful Consultation To Preserve**
17  **Historic Properties**
18
19      Granting preliminary relief to the Intervening Plaintiffs so that the BLM can

20 adequately consult with RSIC, Atsa koodakuh wyh Nuwu/People of Red Mountain, other

21 Indian tribes, and the general public benefits the public more than allowing the BLM to

22 get away with shirking its responsibilities under the NHPA. The public has a strong

23 interest in federal agencies following the consultation regulations Congress has

24 burdened them with. Even after centuries of genocide and racism, the NHPA does not

25 give Indian tribes the power of consent to stop federal agencies and archaeological

firms working for mining corporations from looting their traditional lands. At the very

least, the federal agencies must be required to follow regulations that only burden them

with hearing Indian tribes' concerns before they begin the looting. It's not completely just

that federal agencies are only required to listen to their Native victims before they

destroy their land. But, it is the law.

**III. No Bond Is Necessary in the Case**

In order to obtain a preliminary injunction, a plaintiff may be required to post a

bond as the court deems proper. Fed. R. Civ. P. 65(c). "The court has discretion to

dispense with the security requirement, or to request a mere nominal security, where

requiring security would effectively deny access to judicial review." *Cal. ex rel. Van De*

*Kamp v. Tahoe Reg'l Plan Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985). In *Cal. ex*

*rel. Van De Kamp v. Tahoe Reg'l Plan Agency*, the court did not require a bond where

the plaintiffs were public interest organizations seeking to protect the environment.

Atsa koodakuh wyh Nuwu/People of Red Mountain is composed of members

belonging to one of the poorest tribes in the nation. They seek to protect their ancestral

lands and ensure that the BLM follows the NHPA regulations. They have a very limited

capacity to post a bond. RSIC also seeks to protect lands religiously and culturally

important to it. It is also trying to help BLM follow the NHPA regulations, in part so that

BLM does not establish a pattern of ignoring consultation requirements across Indian

Country.

Anything more than a nominal bond would be very difficult for the Intervening

Plaintiffs to post and would effectively deny their access to judicial review.

By: /s/Julie Cavanaugh-Bill
Julie Cavanaugh-Bill (State Bar No. 11533)

| | |
|---|---|
| 1 | Cavanaugh-Bill Law Offices |
| 2 | Henderson Bank Building |
| 3 | 401 Railroad Street, Suite 307 |
| 4 | Elko, NV 89801 |
| 5 | (775) 753-4357 |
| 6 | julie@cblawoffices.org |
| 7 | |
| 8 | William Falk, Esq (Utah Bar No. 16678) |
| 9 | 2980 Russet Sky Trail |
| 10 | Castle Rock, CO 80108 |
| 11 | (319) 830-6086 |
| 12 | falkwilt@gmail.com |
| 13 | |
| 14 | Terry J. Lodge, Esq. (Ohio Bar No. 29271) |
| 15 | 316 N. Michigan St., Suite 520 |
| 16 | Toledo, OH 43604-5627 |
| 17 | (419) 205-7084 |
| 18 | tjlodge50@yahoo.com |
| 19 | |
| 20 | |
| 21 | |
| 22 | **<u>CERTIFICATE OF SERVICE</u>** |
| 23 | |
| 24 | I hereby certify that on July 20, 2021, I filed the foregoing using the United States |
| 25 | District Court CM/ECF, which caused all counsel of record to be served electronically. |
| 26 | |
| 27 | /s/Julie Cavanaugh-Bill |
| 28 | Julie Cavanaugh-Bill (State Bar No. 11533) |
| 29 | |
| 30 | |