1

2

3                           UNITED STATES DISTRICT COURT

4                                DISTRICT OF NEVADA

5                                        * * *

6    WESTERN WATERSHEDS PROJECT, *et*        Case No. 3:21-cv-00103-MMD-CLB
     *al.*,
7                                            ORDER
                                 Plaintiffs,
8            v.

9    BUREAU OF LAND MANAGEMENT OF
     THE U.S. DEPARTMENT OF THE
10   INTERIOR, *et al.*,

11                               Defendants.

12

13   **I.      SUMMARY**

14           Plaintiffs[1] sued Defendants[2] over their approval of the Thacker Pass Lithium Mine

15   Project, seeking to halt construction of the mine. (ECF No. 1.) The Court is not ruling on

16   the merits of Plaintiffs' claims. This Order only addresses Plaintiffs' motion for preliminary

17   injunction (ECF No. 23 ("Motion")), which requests the extraordinary remedy of preliminary

18   injunctive relief primarily to enjoin Intervenor-Defendant Lithium Nevada Corporation

19   ("Lithium Nevada") and the Federal Defendants from proceeding with a historical/cultural

20   resources survey that involves some ground disturbances pending the Court's decision

21   on the merits. Because Plaintiffs have failed to meet their burden to demonstrate a

22   likelihood of irreparable harm in the absence of their requested preliminary injunction

23   pending a merits determination in this case, and as further explained below, the Court will

24   deny Plaintiffs' Motion.

25

26           [1]Plaintiffs are Western Watersheds Project, Great Basin Resource Watch, Basin
     and Range Watch, and Wildlands Defense. (ECF No. 1 at 1.)

27           [2]Defendants are Bureau of Land Management of the U.S. Department of the Interior
     ("BLM"), the Department of the Interior, and Ester M. McCullough (collectively, "Federal
28   Defendants"). (ECF No. 1 at 1.)

## II.    BACKGROUND

### A. Project Approval Process

Lithium Nevada submitted a proposed plan of operations to BLM for a lithium mine in the Thacker Pass area of Humboldt County, Nevada—and to explore for additional lithium resources in the vicinity of the proposed mine—in July 2019 (the "Project"). (ECF No. 30 at 10.) BLM issued a notice of intent to prepare an environmental impact statement on January 21, 2020. (*Id.*) BLM then held public meetings and received letters about the Project. (*Id.*) On July 29, 2020, BLM made a draft environmental impact statement ("DEIS") available for public comment discussing the environmental impacts of approving the Project. *See Notice of Availability of the Draft Environmental Impact Statement*, 85 FR 45651-01, 2020 WL 4340040 (July 29, 2020). BLM then held two more public meetings and received letters on the DEIS. (ECF No. 30 at 10.) BLM issued the final environmental impact statement ("FEIS") on December 4, 2020. *See* BLM, *Thacker Pass Lithium Mine Project Final Environmental Impact Statement DOI-BLM-NV-W010-2020-0012-EIS*, 85 FR              78324              (Dec.              4,              2020), https://eplanning.blm.gov/public_projects/1503166/200352542/20030633/250036832/Thacker%20Pass_FEIS_Chapters1-6_508.pdf. BLM then considered more comments for another 30-day period before approving the Project in a record of decision dated January 15, 2021. (ECF No. 30 at 10.) *See also* BLM, *Thacker Pass Lithium Mine Project Record of Decision and Plan of Operations Approval DOI-BLM-NV-W010-2020-012-EIS* (Jan. 2021), https://eplanning.blm.gov/public_projects/1503166/200352542/20033308/250039507/Thacker_Pass_Project_ROD_signed_2021-01-15.pdf.[3]

///

///

---

[3]Lithium Nevada pointed out (ECF No. 31 at 9 n.2) that these documents are available online. *See* BLM, *BLM National NEPA Register*, DOI-BLM-NV-W010-2020-0012-EIS (Last Accessed Jul. 22, 2021), https://eplanning.blm.gov/eplanning-ui/project/1503166/570.

**B. Plaintiffs' Claims**

Plaintiffs filed this case the following month. (ECF No. 1.) Plaintiffs allege that BLM's decision to approve the Project violated the Federal Land Policy Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701, *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et. seq.*, and unspecified other federal laws and their implementing regulations. (ECF No. 1 at 2.) Plaintiffs seek review of BLM's decision to approve the Project under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. (ECF No. 1 at 2.) "Plaintiffs ask [the Court] to set aside/vacate and remand the decisions to the BLM, and enjoin any construction, operation, or development of the Project until the violations have been corrected." (*Id.* at 3.)

Plaintiffs specifically bring nine claims. (*Id.* at 63-69.) They are:

1. Violation of the wildlife portions of the controlling resource management plans ("Resource Plans") constituting a violation of FLPMA (*id.* at 63);

2. Violation of the visual resource portions of the Resource Plans constituting another violation of FLPMA (*id.* at 64);

3. Violation of FLPMA and NEPA because BLM approved the Project in reliance on unsupported assumptions that Lithium Nevada had "valid and existing rights" under the Mining Law of 1872, 30 U.S.C. § 22 (ECF No. 1 at 64-65);

4. Violation of FLPMA and NEPA because BLM failed to adequately analyze potential mitigation measures and their effectiveness (*id.* at 65-66);

5. Violation of FLPMA and NEPA because BLM failed to adequately analyze direct, indirect, and cumulative impacts of the Project (*id.* at 66);

6. Violation of FLPMA and NEPA because BLM failed to adequately analyze the background/baseline conditions of the Project (*id.* at 66-67);

7. Violation of FLPMA and NEPA because BLM failed to ensure compliance with air and water quality standards and protect public resources (*id.* at 67);

8. Violation of FLPMA and NEPA because BLM failed to determine reclamation costs and obtain related financial assurances (*id.* at 67-68); and

1    9. Violation of FLPMA because BLM authorized unnecessary or undue degradation

2    of the land within the Project area (*id.* at 68).

3    **C. Procedural History**

4    The Court approved the parties' joint stipulation on the Motion, which set a briefing

5    schedule, allowed the parties to exceed the page limits provided for in the Local Rules,

6    and reflected Lithium Nevada's agreement not to "conduct any ground disturbance

7    activities in the Project area in connection with the Thacker Pass Project as challenged in

8    Plaintiffs' Complaint before July 29, 2021." (ECF No. 26 at 4; *see also generally id.*) The

9    Court then set a hearing on the Motion for July 21, 2021 (the "Hearing"). (ECF No. 27.)

10   The Court subsequently granted Defendants' motions to strike two exhibits that Plaintiffs

11   submitted with their reply brief in support of the Motion after permitting Defendants to file

12   surreplies as to one of the exhibits. (ECF Nos. 38, 42; *see also* ECF Nos. 39, 40

13   (surreplies).) The Court specifically struck the Declaration of Terry Crawforth (ECF No. 32-

14   1) and a letter from Michelle Griffin of the Nevada Department of Environmental Protection

15   dated May 3, 2021 (ECF No. 32-4). (ECF Nos. 38, 42.)

16   **III.    LEGAL STANDARD**

17   Federal Rule of Civil Procedure 65 governs preliminary injunctions. "'An injunction

18   is a matter of equitable discretion' and is 'an extraordinary remedy that may only be

19   awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst.*

20   *v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council,*

21   *Inc.*, 555 U.S. 7, 22, 32 (2008)). To qualify for a preliminary injunction, a plaintiff must

22   demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm;

23   (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the

24   public interest. *See Winter*, 555 U.S. at 20. A plaintiff may also satisfy the first and third

25   prongs under a "sliding scale" approach by showing serious questions going to the merits

26   of the case and that a balancing of hardships tips sharply in plaintiff's favor. *All. for the*

27   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (holding that the Ninth

28   Circuit's "sliding scale" approach remains valid following the *Winter* decision). The plaintiff,

4

1   however, must still show a likelihood of irreparable harm and that an injunction is in the

2   public interest. *See id.* at 1135; *see also id.* ("*Winter* . . . requires the plaintiff to make a

3   showing on all four prongs.").

4   **IV.    DISCUSSION**

5          The Court will deny the Motion because Plaintiffs have not presented any specific,

6   non-speculative evidence that they will be irreparably harmed in the absence of an

7   injunction pending a ruling on the merits. *See id.* ("*Winter* tells us that plaintiffs may not

8   obtain a preliminary injunction unless they can show that irreparable harm is likely to result

9   in the absence of the injunction.").[4] As further explained below, Plaintiffs have accordingly

10  not met their burden under *Winter* to show they are entitled to the extraordinary remedy of

11  a preliminary injunction, and the unique facts of this case otherwise render a preliminary

12  injunction inappropriate. The Court begins its analysis by noting several threshold

13  considerations and establishing the boundaries of the parties' dispute as to irreparable

14  harm as the Court understands it following the Hearing.

15         To start, the Court agreed at the Hearing to reach the merits of this case on the

16  expedited timetable proposed by the parties. (ECF No. 47.) The Court specifically

17  committed to do its best to issue a merits decision by early 2022. The Court understands

18  from the Hearing that this is before any construction is likely to begin on the Project, as it

19  is very unlikely that any construction would begin until the snow melts in the spring of

20  2022. In addition, this case is unique in that Lithium Nevada committed to provide 60 days

21  advance notice before it commences any ground disturbance in a related case challenging

22  the Project, *Bartell Ranch LLC, et al. v. Ester M. McCullough, et al.*, Case No. 3:21-cv-

23  00080-MMD-CLB, ECF No. 39 (D. Nev. Jun 8, 2021). Plaintiffs in this case could sign up

24  for email alerts on the docket in that case (to the extent they are not already monitoring

25  the other case) and could file a renewed motion for preliminary injunction in this case if

26  they learn Lithium Nevada intends to engage in any additional ground disturbing activity

27  ———————————

28         [4]The Court accordingly does not address the parties' arguments on the other *Winter* factors.

before the Court reaches the merits here. These unique circumstances make preservation of the status quo via injunction less necessary than it may otherwise be.

Moreover, following the Hearing, the scope of Plaintiffs' irreparable harm argument is narrow. First, Plaintiffs stated they are not challenging Lithium Nevada's plan to place a trailer and temporary fencing within the Project area (described in ECF Nos. 31 at 46, 31-12 at 11-12). Second, Plaintiffs stated they do not oppose Lithium Nevada conducting any survey work in the Project area, such as biological surveys, that would not involve any ground disturbance. Third, and as noted, the Court struck Crawforth's declaration (ECF No. 32-1), which Plaintiffs improperly raised for the first time in their reply to establish irreparable harm. (ECF No. 38.) Fourth, the Court understands that much of Plaintiffs' irreparable harm argument from its Motion regarding Lithium Nevada imminently starting construction on the Project itself (ECF No. 23 at 45-46) is now moot considering the Federal Defendants' representations that Lithium Nevada may not start construction on the Project until it successfully completes its historic properties treatment plan ("HPTP"), and obtains several additional required permits, and Lithium Nevada's representation that it does not plan to start construction on the Project until 2022 assuming it can obtain all required permits.[5] In sum, Plaintiffs conceded at the Hearing that they seek to show irreparable harm solely based on the digging Lithium Nevada hopes to conduct this summer in accordance with the HPTP.

It is therefore worthwhile to specifically discuss what the HPTP entails. The HPTP is required by the National Historical Preservation Act ("NHPA") because BLM determined that the Project would have adverse effects on sites eligible for inclusion in the National Register of Historic Places. (ECF No. 30 at 15-16.) It is described in the declaration of Mark E. Hall, the BLM employee (an archeologist) in charge of the HPTP for the Project. (*Id.*; *see also* ECF No. 30-1 ("Hall Declaration").) Mr. Hall explains that the HPTP involves

---

[5]The Court does not fault Plaintiffs for filing their Motion based on the best information they had at the time of filing, as of course information about when Lithium Nevada is willing and able to start construction on the Project is uniquely within Lithium Nevada's control.

1   three stages of activity: (1) excavating and collecting data from 21 precontact historic

2   properties; (2) archival research and a pedestrian survey of a Civilian Conservation Corp

3   camp and corresponding dump located within the Project area; and (3) data collection and

4   potential excavation of any additional historic properties that Lithium Nevada may disturb

5   as part of its exploration activities. (ECF No. 30-1 at 4-6.) The HPTP as to the 21

6   precontact historic properties is most pertinent to the parties' argument here. This portion

7   of the HPTP involves a contractor digging between two and 25 holes by hand at each of

8   the 21 precontact historic sites and digging seven mechanical trenches (presumably by

9   backhoe) at some of the sites—of up to a few meters deep and 40 meters long. (*Id.* at 5.)

10   "All hand-excavated units and mechanically excavated trenches will be fenced for safety

11   (as needed during work) and backfilled to surface level/ original compaction upon

12   completion of data collection, with backfilling depending on what is found and how long

13   excavation takes." (*Id.*)

14          As an additional threshold consideration, the parties presented argument both in

15   their briefs and at the Hearing as to whether Plaintiffs may properly rely on digging incident

16   to the HPTP to show irreparable harm in this case, where Plaintiffs bring NEPA and

17   FLPMA claims—but not an NHPA claim. (*See, e.g.*, ECF Nos. 30 at 18-20, 32 at 9-10.)

18   However, the Court assumes without deciding that Plaintiffs may properly rely on digging

19   incident to the HPTP to show irreparable harm because the Court is not persuaded that

20   Plaintiffs have met their burden to show they are irreparably harmed by this digging in any

21   event.[6]

22          That brings the Court to Plaintiff's irreparable harm argument—that digging the

23   holes incident to the HPTP causes Plaintiff irreparable harm because digging the holes

24

25          [6]While unnecessary to resolve the Motion, the Court is generally persuaded by
    Plaintiffs' argument that they may challenge the digging incident to the HPTP because the
26   harm they are asserting it would cause—destruction of some sagebrush with follow-on
    negative impacts on sage-grouse—is one of the types of harm Plaintiffs argue BLM failed
27   to adequately consider in approving the Project. Moreover, the Court found Plaintiffs'
    argument generally persuasive that they had no other feasible option for challenging the
28   HPTP, despite Defendants' contrary arguments that Plaintiffs could have—but did not—
    participate in the consultative process required by the NHPA.

1   will inevitably involve removing some sagebrush, and that, in turn, will inevitably harm

2   some sage-grouse, especially considering how long it takes sagebrush to regrow once

3   disturbed. (ECF No. 32 at 7-9.) In terms of evidence to support this argument, Plaintiffs

4   point primarily to paragraph 30 of the declaration of Dr. Clait E. Braun—a biologist who

5   has specialized in the study of sage-grouse for more than 40 years—as fleshed out by

6   statements in paragraphs 14, 17, and 32 of that same declaration. (ECF No. 23-30 ("Braun

7   Declaration").) In paragraph 30, Dr. Braun states:

8

9          For instance, I understand the mining company and/or BLM is proposing to
           conduct historical/cultural surveys that involve excavations and/or soil or
10         vegetation removal, digging up sagebrush habitat to search for cultural
           artifacts. Such actions have the immediate potential to harm sage-grouse
11         and its habitat by impacting sagebrush or forbs used by sage-grouse. In
           addition, any kind of ground disturbance can act as a weed vector by
12         removing native vegetation and destroying biological soil crusts, thus
           reducing resistance to cheatgrass invasion.
13

14   (*Id.* at 11.) Paragraph 14 states in pertinent part that "Thacker Pass provides important

15   sage-grouse nesting, brood-rearing, and winter habitats and at least 30 sage-grouse are

16   known to have recently used the Project area." (*Id.* at 6.) Paragraph 17 generally explains

17   that sage-grouse depend on intact sagebrush. (*Id.* at 7.) And paragraph 32 states that the

18   mine will destroy winter sage-grouse habitat. (*Id.* at 11-12.)

19          The Braun Declaration describes harm that is more speculative than specific, and

20   not specifically tied to any of the actual sites that may be excavated incident to the HPTP.

21   "Speculative injury does not constitute irreparable injury sufficient to warrant granting a

22   preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th

23   Cir. 1988) (citation omitted). Even paragraph 30 of the Braun Declaration—the only

24   paragraph addressing the HPTP specifically—assumes that the digging incident to the

25   HPTP will involve digging up sagebrush. But that is not necessarily true. Indeed, given

26   that Dr. Braun does not claim to know where the holes will be dug, he cannot know that

27

28

1    digging the holes will involve digging up sagebrush.[7] And the other inferences contained

2    within paragraph 30 depend on that mistaken premise. Moreover, the paragraph is written

3    as a generalized hypothetical, and does not discuss any concrete impacts likely to occur

4    because of the HPTP. Outside of paragraph 30, paragraph 32 does not address the HPTP

5    at all. (*Id.* at 11-12.) And paragraphs 14 and 17 state general propositions that are likely

6    true, but likewise do not speak to the actual digging contemplated as part of the HPTP.

7    (*Id.* at 6-7.) Thus, the Braun Declaration as pertinent to the HPTP is too speculative and

8    insufficiently specific to the HPTP to demonstrate that Plaintiffs will be irreparably harmed

9    if Defendants are able to proceed with the HPTP before the Court rules on the merits.

10        The Braun Declaration also does not contradict the statements in the Hall

11    Declaration that the work contemplated in the HPTP will occur close to a relatively noisy

12    road and at least one mile or more than any known lek, suggesting that any impact to local

13    sage-grouse would be minimal. (*Compare* ECF No. 23-30 *with* ECF No. 30-1 at 7.) And

14    while Plaintiffs argue that Hall is an archeologist—not a biologist and sage-grouse expert

15    like Dr. Braun—Hall's statements left uncontradicted by Dr. Braun regarding potential

16    disturbance to local sage-grouse rely on third party data sources that appear reputable

17    and are not the sort of statements that could only be credible if made by a sage-grouse

18    expert in any event. Hall's statements tend to show that any disturbance to sagebrush,

19    and, by extension, sage-grouse from the HPTP will be minimal.

20        Moreover, the Ninth Circuit Court of Appeals has declined to adopt a rule that

21    "*any* potential environmental injury *automatically* merits an injunction." *Earth Island*, 626

22    F.3d at 474 (citation omitted, emphasis in original). And here, at best, Plaintiffs have

23    presented a *de minimus* harm to approximately .25 acres of land that may contain

24    sagebrush within a Project area of some 18,000 acres. (ECF No. 30-1 at 6.) Defendants

25    also intend to remediate the holes they dig incident to the HPTP. (*Id.* at 6-7.) An injunction

26

27        [7]Even assuming Plaintiffs did not know the precise digging sites at the time they
     filed their Motion, they could have sought more information about the sites on June 24 at
28    the latest, when the Federal Defendants filed the Hall Declaration, and proffered a
     supplemental Braun declaration with their reply brief. But they did not.

1 is inappropriate where, as here, the impact to the land is *de minimus* and will be at least

2 partially remediated. *See, e.g.*, *S. Utah Wilderness All. v. Bernhardt*, Case No. CV 20-

3 3654 (RC), 2021 WL 106384, at \*5 (D.D.C. Jan. 12, 2021) (finding lack of irreparable harm

4 where approved road improvements would result in 9.9 acres of surface disturbance

5 adjacent to a 5.4 acre well pad subject to remediation measures). In other words, this case

6 does not currently merit a preliminary injunction—particularly given Plaintiffs' proffer of

7 minimal, speculative evidence as to irreparable harm discussed above.

8        The Court also finds the most pertinent cases Plaintiffs rely on in their reply

9 distinguishable. (ECF No. 32 at 7-8.) *Cottrell* involved a logging project covering 1,652

10 acres. *See* 632 F.3d at 1135. And even there, the Ninth Circuit noted that any potential

11 environmental injury does not warrant an injunction, drawing a distinction between a

12 hypothetical case where an injunction should not issue and the "actual and irreparable

13 injury" that Plaintiffs had articulated there. *See id.* Further, *W. Watersheds Project v.*

14 *Bernhardt*, 392 F. Supp. 3d 1225, 1255 (D. Or. 2019) involved livestock grazing, which

15 would logically have a much more widespread and indiscriminate impact on the

16 indisputably[8] fragile sagebrush ecosystem than the hole-digging subject to remediation

17 Plaintiffs proffer as their irreparable harm here.

18        In sum, a preliminary injunction is an extraordinary remedy never awarded as of

19 right. *See Winter*, 555 U.S. at 24. To show entitlement to a preliminary injunction, Plaintiffs

20 must show they would be irreparably harmed. *See Cottrell*, 632 F.3d at 1135. Under the

21 unique factual circumstances of this case, and given the limited, speculative evidence of

22 imminent harm Plaintiffs presented, they have failed to meet their burden to show they will

23 be irreparably harmed in the absence of a preliminary injunction as the parties await the

24 Court's merits decision.

25

26        [8]The Court accepts and otherwise understands that sagebrush is very fragile and takes years to regrow. *See, e.g.*, *W. Watersheds Project*, 392 F. Supp. 3d at 1254.

27 Moreover, "[t]he Court takes very seriously any permanent alterations to the natural environment." *S. Utah Wilderness All.*, 2021 WL 106384, at \*5. But the digging incident to the HPTP will impact only a very small area relative to the Project area and, as noted,

28 Plaintiffs' evidence of imminent harm is general and speculative.

1    **V.    CONCLUSION**

2          The Court notes that the parties made several arguments and cited to several cases

3    not discussed above. The Court has reviewed these arguments and cases and determines

4    that they do not warrant discussion as they do not affect the outcome of the Motion before

5    the Court.

6          It is therefore ordered that Plaintiffs' motion for preliminary injunction (ECF No. 23)

7    is denied.

8          DATED THIS 23rd Day of July 2021.

9

10   _____

11   MIRANDA M. DU
     CHIEF UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11